The Honorable Ricardo S. Martinez

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>MARK F. SPANGLER,<br><br>　　　　　　Defendant. | CASE NO. CR12-133RSM<br><br>GOVERNMENT'S TRIAL BRIEF |

The United States of America, by Jenny A. Durkan, United States Attorney for the Western District of Washington, and Michael Lang, Francis Franze-Nakamura and Carl Blackstone, Assistant United States Attorneys for said District, submits this brief for the criminal trial of Defendant Mark Spangler.

## I.  STATUS OF THE CASE

Defendant Spangler is charged in a 33-count Indictment.  Counts 1 through 25 charge the defendant with wire fraud, in violation of Title 18, United States Code, Section 1343.  Counts 26 through 32 charge the defendant with money laundering in violation of Title 18, United States Code, Section 1957.  Count 33 charges the defendant

1  with Investment Adviser Fraud in violation of Title 15, United States Code, Section 80b-

2  6.

3       Trial is set to begin on October 15, 2013.  The government estimates it will call

4  approximately fifty witnesses, and its case in chief should take approximately three

5  weeks.  Defendant Spangler is represented by Jon Zulauf and John Carpenter.  The

6  defense has indicated that it intends to call four expert witnesses and eighteen to twenty

7  lay witnesses.

## II.  STATEMENT OF FACTS

9       The defendant, Mark Spangler, was an investment advisor who abused his position

10  of trust by diverting his clients' money to two high-risk startup companies in which he

11  had a financial interest, without their knowledge or consent.  Many of Spangler's victims

12  had been his clients for over a decade.  Some were his boyhood friends.  Every one of

13  these clients had instructed Spangler to put their money in safe investments, in public

14  companies and income–producing investments.  Through false statements – written and

15  verbal – Spangler created the illusion that he was doing just that.  Over the course of

16  time, Spangler invested more than $50 million into two high risk startup companies,

17  leading his investors to lose more than half their investment portfolios.  By the end of his

18  fraudulent scheme, when Spangler knew he could not sustain the illusion of profit, he

19  sought new investors.  These efforts failed, and what had become a Ponzi scheme

20  collapsed.  His company was turned over to a court-appointed receiver, who disposed of

21  any remaining assets and distributed them back to the investor clients.

### Mark Spangler and The Spangler Group

23       Mark Spangler was a financial advisor and certified financial planner who ran a

24  solo practice called "The Spangler Group" ("TSG") on Seattle's Capitol Hill

25  neighborhood from 1982 to mid-2011.  At one point, Spangler reported to the United

26  States Securities and Exchange Commission that he managed over $100 million in assets.

27  From June 2003 to June 2011, Mr. Spangler received over four million dollars in

28  investment advisory fees from his clients.

GOVERNMENT'S TRIAL BRIEF – 2
*U.S. v. Mark Spangler*, CR12-133RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Spangler registered as a financial advisor with the SEC and made regular filings with the SEC to maintain his registration. As required by the SEC, the Spangler Group drafted and maintained a Code of Ethics and Policies and Procedures Manual. These documents outline the fiduciary duties which Mr. Spangler acknowledged owing to his clients.

Spangler also was a member of the National Association of Personal Financial Advisors ("NAPFA"). He served as the president of NAPFA from 1996 to 1998. As a member of NAPFA, Mr. Spangler was required to sign, on an annual basis, the organization's "Fiduciary Oath." This Oath stated that Spangler would exercise his best efforts to act in good faith and in the best interests of his clients.

### The Spangler Group's Funds

Spangler invested his clients' funds in a variety of investment vehicles, including limited liability corporations that served as private investment vehicles for Spangler to pool his clients' assets. These vehicles were created through confidential private placement memoranda ("PPMs"). Five of these investment vehicles are relevant to this trial: Equity/Growth +, Income +, SV7, SV9 and SV11.

- **Equity/Growth +:** Spangler created Equity Investors Group, LLC on August 27, 1988 to invest in publicly traded equities. In June 2008, Spangler changed the name of this fund to SG Growth+ Investors Group, LLC ("Growth+"), through an amended PPM.

- **Income +:** Second, Spangler created Income+ Investors Group, LLC on July 2, 1998. In May 2008, Spangler changed the name of the fund to SG Income+ Investors Group, LLC ("Income+") through an amended PPM.

- **SV7:** On July 5, 2000, Spangler created Spangler Ventures Seven, LLC ("SV7") to invest in a startup company called TeraHop Networks, Inc. ("TeraHop").\

- **SV9:** On June 20, 2001, Spangler created Spangler Ventures Nine, LLC ("SV9") to invest in a startup company called Tamarac.

GOVERNMENT'S TRIAL BRIEF – 2
*U.S. v. Mark Spangler*, CR12-133RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   • **SV11:** On May 28, 2004, Spangler created Spangler Ventures Eleven, LP ("SV

2      11") also to invest in TeraHop.

3      Under the terms of the "SV" documents, Spangler Ventures (essentially, Mark

4   Spangler), as manager of the SV funds, was entitled to twenty percent (20%) of the

5   proceeds after the sale, liquidation, or disposal of either company. Thus, in the event that

6   either TeraHop or Tamarac was sold, Spangler stood to gain millions. In fact, after the

7   receiver sold Tamarac, Spangler Ventures/Mark Spangler was due to receive

8   approximately $2 million, as its share of the profits from this sale. As of today, Spangler

9   has not relinquished claim to some of this money, and apparently hopes to receive

10  approximately $400,000 following completion of legal proceedings against him.

11                   **The Diversion to TeraHop and Tamarac**

12     From 1998 to 2003, Spangler invested the Income+ and Equity Investors/Growth

13  money as advertised – in public markets (Equity) and relatively safe, income generating

14  investments (Income+). In 2003, he changed direction, without advising his clients that

15  he was doing so, and in direct contravention of the 1998 PPMs. From 2003 until 2011,

16  Spangler liquidated virtually all of the legitimate holdings of Income+ and Growth+, and

17  invested the remaining funds into two startup companies – TeraHop and Tamarac.

18     TeraHop Networks, Inc. ("TeraHop") was a privately held company co-founded

19  by Mr. Spangler. The company sought to develop systems that would allow companies

20  to monitor the location of activity of people and equipment using wireless networks. *Id.*

21  TeraHop was initially incorporated on November 13, 2002, as Seekernet, Inc., and was

22  renamed TeraHop on June 7, 2006. Spangler was the CEO of TeraHop from January

23  2010 to June 2011, and a member of the company's board of directors from December

24  2001 to April 2011.

25     From 2002 to its closure in 2011, TeraHop failed to generate any meaningful

26  revenue. During this time period, TeraHop made a total of approximately $70,000 in

27  sales. During this same period, The Spangler Group's clients were the primary investors

28  in the company, without their knowledge.

GOVERNMENT'S TRIAL BRIEF – 3
*U.S. v. Mark Spangler*, CR12-133RSM

1    The second startup company, Tamarac, Inc. ("Tamarac"), was a privately held
2    company co-founded by Mr. Spangler.  Tamarac designed and sold investment portfolio
3    management software for financial advisors.  Spangler was chairman of Tamarac's board
4    of directors from late 2009 to early 2011.  Unlike TeraHop, Tamarac was successful in
5    developing a viable product and producing significant revenue.  In 2011, the court-
6    appointed receiver sold Tamarac for approximately $55 million.

7    At the same time that Spangler was collecting millions of dollars in investment
8    advisory fees from his clients, Spangler was also generating income as the director, CEO,
9    and Chairman of the Board of both TeraHop and Tamarac.  Between 2003 and 2011,
10   Spangler and The Spangler Group received over one million dollars from TeraHop and
11   Tamarac.

12   Spangler used Income+ and Growth+ to divert his clients' funds to TeraHop and
13   Tamarac.  He invested the vast majority of these funds – approximately $40 million --
14   into TeraHop, which burned through the money at an extraordinary clip (at one point,
15   TeraHop's "burn rate" was approximately $600,000 a month).  Spangler concealed the
16   diversion by providing investors with quarterly statements, PowerPoint presentations, and
17   other documents that deliberately concealed the extent to which Income+ and Growth+
18   were invested in TeraHop and Tamarac.  In these documents, he also failed to disclose
19   the tremendous losses that TeraHop was incurring, and falsely indicated that the Income+
20   and Growth+ funds were steadily increasing in value.

21                          **The Spangler Ponzi Scheme**

22   By 2009, Spangler could not sustain his losing investment in TeraHop.  He needed
23   new investor money to pay his clients what they expected was due.  Thus began his Ponzi
24   scheme.  During trial, the government will illustrate two central aspects of this Ponzi
25   scheme.  First, Spangler used his clients' pooled funds to pay phantom interest payments
26   and dividends back to themselves and to other clients.  For example, Income+ made
27   regular interest payments to investors.  Spangler's clients believed that these payments
28   were generated from actual income, generated by real companies creating real revenue.

GOVERNMENT'S TRIAL BRIEF – 4
*U.S. v. Mark Spangler*, CR12-133RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

In reality, the "income" these clients received was largely their own money, diverted from Income+ and Growth+ to TeraHop, then circulated back to them.

The second aspect of Spangler's Ponzi scheme came into play after Income+ and Growth+ became increasingly concentrated in TeraHop, and therefore increasingly illiquid. The severe illiquidity of these two funds posed an incredible dilemma. If a client wished to liquidate their interest in Income+ and Growth+, Spangler would either (1) have to tell the client that he or she could not liquidate, or (2) raise additional money to cover the liquidation. Spangler generally chose the latter option. For example, between November 2009 and February 2011, Spangler obtained $3.5 million from three new investors based on false representations that their funds would be invested in a diversified portfolio, including private equities. These funds were used to pay out earlier investors and to continue to keep TeraHop afloat.

In 2011, Spangler's situation worsened. TeraHop continued to struggle, and several of his clients asked to liquidate their holdings in Income+ and Growth+. Spangler was desperate to find new investors to pay off the old. He created a PowerPoint presentation to show to potential investors, claiming extraordinary growth in The Spangler Group. Spangler falsely represented to prospective investors that Income+ and Growth+ were highly successful and would generate a positive rate of return. For example, in 2011, Spangler touted to prospective investors that Income+ was ". . . doing extremely well . . . $10k invested in the fund in 200 was worth more than $21K at the end of 2010 (including annual interest payments of 7+%)." When Spangler was unable to raise sufficient funds to pay out his disgruntled investors and keep TeraHop afloat, his Ponzi scheme collapsed. He was forced to abruptly shut down TeraHop in April 2011. In June 2011, he entered receivership.

As his scheme collapsed around him, and knowing that the SEC was closing in, Spangler and his wife decided to sell their house and yacht and move to Ecuador. In September 2011, just days before their planned departure, the FBI conducted a search of his home, foiling their escape.

GOVERNMENT'S TRIAL BRIEF – 5
*U.S. v. Mark Spangler*, CR12-133RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# III. APPLICABLE LAW

## A. Wire Fraud

Counts 1 through 25 allege that the Defendant committed Wire Fraud, in violation of Title 18, United States Code, Section 1343. Section 1343 makes it a crime if any person:

> having devised . . . any scheme or artifice to defraud, or for obtaining money or property by means of false and fraudulent pretenses, representations, or promises transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme and artifice.[.]

18 U.S.C. § 1343.

To obtain a conviction for wire fraud, the government must prove the following elements:

(1) The defendant knowingly participated in or devised a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises;

(2) the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

(3) the defendant acted with the intent to defraud; that is, the intent to deceive or cheat; and

(4) the defendant transmitted, or caused to be transmitted, by wire communication in interstate commerce writings, signs, or signals to carry out or attempt to carry out an essential part of the scheme.

See Ninth Circuit Model Jury Instructions, 8.121 and 8.124 (2010 Edition).

## 1. Scheme to Defraud

To establish wire fraud, the government must prove that the defendant schemed to obtain money or property by false representations, deceitful statements, half-truths,

GOVERNMENT'S TRIAL BRIEF – 6
*U.S. v. Mark Spangler*, CR12-133RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  or the concealment of material facts.  *See United States v. Beecroft*, 608 F.2d 753, 757

2  (9th Cir. 1979) (mail fraud statute); *United States v. Allen*, 554 F.2d 398, 410

3  (10th Cir. 1977).  The Supreme Court, in explaining the similar mail fraud statute,

4  clarified the meaning of the term "defraud:"

5      the words "to defraud" in the mail fraud statute have the "common
       understanding" of "wronging one in his property rights by dishonest
6      methods or schemes and 'usually signify the deprivation of something of
       value by trick, deceit, chicane or overreaching.'"
7

8  *Carpenter v. United States*, 484 U.S. 19, 27 (1987) (citations omitted).  The government

9  need not prove every allegation of fraudulent activity appearing in the Indictment.

10 *Beecroft*, 608 F.2d at 757.  The government must, however, prove sufficient facts to

11 support an inference of a fraudulent scheme.  *See United States v. Toney*, 598 F.2d 1349,

12 1355- 56 (5th Cir. 1979); *United States v. Joyce*, 499 F.2d 9, 22 (7th Cir. 1974),

13 *cert. denied*, 419 U.S. 1031 (1974).

14      It is well settled that a scheme to defraud need not be an active misrepresentation.

15 "A nondisclosure or concealment may serve as a basis for the fraudulent scheme . . .

16 when there exists an independent duty that has been breached by the person so charged.

17 This independent duty may exist in the form of a fiduciary duty to third parties."  *United*

18 *States v. Dowling*, 739 F.2d 1445, 1448-49 (9th Cir. 1984).

19      **2.    Materiality**

20      The government must also prove that the defendant's misrepresentations were

21 material, or that he omitted material facts.  A statement is material if it "has a natural

22 tendency to influence, or is capable of influencing, a person to part with money or

23 property."  *See* Ninth Circuit Model Jury Instructions 8.121 and 8.124.  The government

24 does not need to prove that any of the investors actually relied on the defendant's

25 misrepresentations, only that the statements were capable of influencing a person to part

26 with money or property.  *See United States v. Blixt*, 548 F.3d 882, 889 (9th Cir. 2008)

27 (noting that the criminal mail fraud statute does not require the government to prove

28

GOVERNMENT'S TRIAL BRIEF – 7
*U.S. v. Mark Spangler*, CR12-133RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

actual reliance).  Furthermore, "'capable of influencing' is an objective test, which looks at 'the intrinsic capabilities of the false statement itself, rather than the possibility of the actual attainment of its end.'"  *Peterson*, 538 F.3d at 1072 (quoting *United States v. Facchini*, 832 F.2d 1159, 1162 (9th Cir. 1987)); *see also Carpenter*, 95 F.3d at 776 (9th Cir. 1996) (affirming materiality jury instruction which referred to "reasonable and prudent"person).  That the materiality standard does not reference a particular industry standard, but considers the "intrinsic capabilities" of the alleged misrepresentation itself, is key.  *See Peterson*, 538 F.3d at 1072.

### 3.    Intent to Defraud

The government must prove that the defendant acted with the specific intent to defraud.  An intent to defraud may be shown by evidence that the defendant performed an act with the intent to deceive or mislead, often for the purpose of causing an economic loss to another or economic gain to the defendant.  *Benny*, 786 F.2d at 1418.  Intent to defraud may be proved solely by circumstantial evidence, *United States v. Kessi*, 868 F.2d 1097, 1104 (9th Cir. 1989), and may be inferred from a defendant's statements and conduct.  *United States v. Peters*, 962 F.2d 1410, 1414 (9th Cir. 1992) (intent to defraud inferred from defendant's knowledge of numerous customer complaints); *United States v. Dial*, 757 F.2d 163, 170 (7th Cir. 1985) (intent to defraud inferred from evidence that defendant took steps to conceal illegal activities).

### 4.    Use of Wires

The government must prove that the defendant caused an interstate or foreign wire communication to be used in furtherance of his scheme.  The law does not require that the defendant personally caused the wire transmission.  *See United States v. Jones*, 712 F.2d 1316, 1320 (9th Cir. 1983).  Rather, it is enough that the defendant knows that the wires will be used in the ordinary course of business or reasonably can foresee such use.  *Jones*, 712 F.2d at 1320; *United States v. Bohonus*, 628 F.2d 1167, 1173 (9th Cir. 1980); *United States v. Lothian*, 976 F.2d 1257, 1262 63 (9th Cir. 1992).  Each separate wire communication in furtherance of the scheme to defraud constitutes a separate violation of

GOVERNMENT'S TRIAL BRIEF – 8
*U.S. v. Mark Spangler*, CR12-133RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  the wire fraud statute.  *See  United States v. Vaughn*, 797 F.2d 1485, 1493 (9th Cir.

2  1986); *United States v. Calvert*, 523 F.2d 895, 914 (8th Cir. 1976).

3      **5.      Good Faith**

4      An honest, good faith belief in the truth of representations made in the course of

5  an alleged scheme is a defense.  However, an honest belief in the ultimate success of the

6  venture, or that no harm to the victim will result, does not excuse false representations or

7  material omissions.  *United States v. Painter*, 314 F.2d 939 (4th Cir. 1963); *Beecroft*, 608

8  F.2d 753.  As the Ninth Circuit has held, ". . . a good faith belief that the victim will be

9  repaid and will sustain no loss is no defense.  *United States v. Molinaro*, 11 F.3d 853, 863

10 (9th Cir. 1993) (quoting *Benny*, 786 F.2d at 1417).  Furthermore, it is not necessary for

11 the Government to prove that someone suffered a loss or that a defendant benefitted

12 financially.  *See Reina v. United States*, 446 F.2d 16 (9th Cir. 1971).  In this case,

13 however, the Government will prove a significant loss to a number of victims, and a

14 substantial benefit, and prospective benefit, to the defendant.

15      Although good faith is a defense to a fraud charge, the defendant is not entitled to

16 a separate good- faith jury instruction "where the court has already instructed the jury as

17 to specific intent."  *United States v. Dees*, 34 F.3d 838, 842 (9th Cir. 1994).  The United

18 States intends to submit a specific-intent instruction, thereby obviating the need for a

19 separate good-faith instruction.

20 **B.      Money Laundering**

21      The defendant is charged in Counts 26 through 32 with Money Laundering, in

22 violation of Title 18, United States Code, Section 1957.  Section 1957 makes it a crime

23 to: "[K]nowingly engage or attempt to engage in a monetary transaction in criminally

24 derived property of a value greater than $10,000 and is derived from specified unlawful

25 activity."  18 U.S.C. § 1957.

26      To convict a defendant of Money Laundering, the government must prove that:

27 (1) the defendant knowingly engaged or attempted to engage in a monetary transaction;

28 (2) the defendant knew the transaction involved criminally derived property; (3) the

GOVERNMENT'S TRIAL BRIEF – 9
*U.S. v. Mark Spangler*, CR12-133RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 property had a value greater than $10,000; (4) the property was, in fact, derived from

2 Wire Fraud (Counts One through Twenty Five); and (5) the transaction occurred in the

3 United States. *See* Ninth Circuit Model Jury Instruction, 8.150 (2010 Edition).

4     The term "monetary transaction" means the deposit, withdrawal, transfer, or

5 exchange, in or affecting interstate commerce, of funds or a monetary instrument by,

6 through, or to a financial institution.

7     The term "criminally derived property" means any property constituting, or

8 derived from, the proceeds of a criminal offense.  The government must prove that the

9 defendant knew that the property involved in the monetary transaction constituted, or was

10 derived from, proceeds obtained by some criminal offense.  The government does not

11 have to prove that the defendant knew the precise nature of that criminal offense, or knew

12 the property involved in the transaction represented the proceeds of Wire Fraud (Counts

13 One through Twenty Five).

14     Although the government must prove that of the property at issue more than

15 $10,000 was criminally derived, the government does not have to prove that all of the

16 property at issue was criminally derived.

17 **C.    Investment Adviser Fraud**

18     Finally, Defendant is charged in Count 33 with Investment Adviser Fraud, in

19 violation of Title 15, United States Code, Section 80b-6.   That statute states:

20     It shall be unlawful for ***any investment adviser***, by use of the mails or any

21     means or instrumentality of interstate commerce, directly or indirectly–

22     (1) to employ any device, scheme, or artifice to defraud any client or

23     prospective client;

24     (2) to engage in any transaction, practice, or course of business which

25     operates as a fraud or deceit upon any client or prospective client;

26     . . .

27

28

GOVERNMENT'S TRIAL BRIEF – 10
*U.S. v. Mark Spangler*, CR12-133RSM

4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative. The Commission shall, for the purposes of this paragraph (4) by rules and regulations define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative.  15 U.S.C. § 80b-6 (Emphasis added.)

To obtain a conviction for Investment Adviser fraud the Government must prove that:  (1) the defendant  was an investment adviser; (2) who employed a device, scheme, or artifice to defraud, which includes any transaction, practice, or course of business intended to defraud a client; (3) the defendant acted knowingly and willfully, and with the intent to defraud; and (4) the defendant employed such device, scheme or artifice to defraud by use of the mails or any means or instrumentalities of interstate commerce.  (Based upon the instruction used by the Hon. Leonard B. Sand, United States District Court Judge for the Southern District of New York, in *United States v. Alan Bond*, 01 CR 1140; *see also* 15 U.S.C. § 80b-6.)

1. **Investment Adviser**

The Investment Advisers Act of 1940 prohibits frauds by "investment advisers." 15 U.S.C. § 80b-6.  The Act defines an "[i]nvestment adviser" as "any person who, for compensation, engages in the business of advising others ... as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities."  15 U.S.C. § 80b-2(a)(11).

Under the Investment Adviser Act of 1940, investment advisers have a fiduciary duty to their clients. *SEC v. Capital Gains Research Bureau, Inc*., 375 U.S. 180, 194 (1963); *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 17 (1979).  In *TransAmerica*, the Court explained that 15 U.S.C. § 80b-6, the provision of the Act that Spangler is charged with violating, establishes "'federal fiduciary standards' to govern

GOVERNMENT'S TRIAL BRIEF – 11
*U.S. v. Mark Spangler*, CR12-133RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

the conduct of investment advisors." *Transamerica*, 444 U.S. at 17.  In *Capital Gains*, the Court described the fiduciary duty imposed by the Act as "an affirmative duty of 'utmost good faith, and full and fair disclosure of all material facts, 'as well as an affirmative obligation 'to employ reasonable care to avoid misleading' his clients."  375 U.S. at 194; *see also Santa Fe Industries Inc. v. Green*, 430 U.S. 472, 475, n. 11 (explaining that the *Capital Gains* Court recognized "that Congress intended the Investment Advisors Act to establish federal fiduciary standards for investment advisors").

### 2. Scheme to Defraud

See the discussion of Scheme to Defraud in relation to Wire Fraud at pages 2-3, *supra*.

### 3. Intent to Defraud

See the discussion of Intent to Defraud in relation to Wire Fraud at pages 3-4, *supra*.

### 4. Use of Instrumentalities of Interstate Commerce

The Government will establish that the defendant engaged in various interstate wire transmissions to further his scheme.  These transmissions will consist of e-mails and the interstate wire transfer of funds.

## IV.  EVIDENTIARY ISSUES

### A.    Business and Public Records

The government will offer into evidence various business records from The Spangler Group.  The defense has stipulated to the foundational requirements for most of these records.  The admissibility of such items is governed by Rule 803(6), Federal Rules of Evidence.  The rule permits such evidence as admissible hearsay under the following conditions:

GOVERNMENT'S TRIAL BRIEF – 12
*U.S. v. Mark Spangler*, CR12-133RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5

> A... record...made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness . . . unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

6 Fed. R. Evid. 803(6).

7    Any person familiar with the record-keeping practices of the business capable of

8 identifying the record at issue as having been made in the ordinary course of business is a

9 sufficient foundation witness.  Personal knowledge of the document is not required and

10 does not affect its admissibility.  *United States v. Pitman*, 475 F.2d 1335, 1337 (9th Cir.

11 1973).  Similarly, a record generated by a third party and received and relied upon, such

12 as an invoice, becomes a business record of the company relying upon it.  *United States*

13 *v. Childs*, 5 F.3d 1328, 1333-34 (9th Cir. 1993); *United States v. Doe*, 960 F.2d 221, 223

14 (1st Cir. 1992); *Sakes Intern, Inc. v. M/V Export Champion*, 817 F.2d 1011, 1013 (2d Cir.

15 1987).  The government need not show the records are accurate; it needs only to show the

16 records are kept in a regular manner and are relied upon for the management and

17 operation of the business.  *Johnson v. United States*, 325 F.2d 709, 711 (1st Cir. 1963).

18 Incompleteness, ambiguities and inaccuracies in records go to weight, not admissibility.

19 *United States v. Catabran*, 836 F.2d 453, 458 (9th Cir. 1988); *United States v. Hudson*,

20 479 F.2d 251, 254 (9th Cir. 1972).

21    Rule 803(8) provides an exception to the hearsay rule for public records from a

22 public agency or office, relating to an activity of the office.  "Records kept . . .[b]y public

23 agencies may be admissible under the business records exception, Fed. R. Evid. 803(6),

24 as well as under the public records exception, Fed. R. Evid. 803(8)."  *United States v.*

25 *Bohrer*, 807 F.2d 159, 162 (10th Cir. 1986) (internal citations omitted).

26    In this case, the government will offer various records kept by the IRS and the

27 SEC.  These documents are prepared by a public agency dealing with official activities of

28

GOVERNMENT'S TRIAL BRIEF – 13
*U.S. v. Mark Spangler*, CR12-133RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    the agency necessary for the performance of its duties.  They are admissible pursuant to

2    Fed. R. Evid. 803(8) and 803(6).  *Hughes v. United States*, 953 F.2d 531 (9th Cir. 1992)

3    (IRS Certificate of Assessments and Payments, even when computer generated, are

4    admissible public records of proof that assessment had been made).  The government will

5    also offer a broad range of business records pursuant to Rule 803(6).

6        Rule 902 permits admission of business records and public records into evidence

7    without testimony of a custodian witness.  For this "self-authentication" rule to apply to a

8    business record, it must be accompanied by a written declaration of a custodian or other

9    qualified person indicating the record was made at or near the time of occurrence, by a

10   person with knowledge, kept in the course of regularly conducted activity, and made as a

11   regular practice.  Rule 902(11), Federal Rules of Evidence.  Public documents are also

12   self-authenticating if under seal of the United States, a state, or any agency thereof, and

13   accompanied by signature and attestation.  Rule 902 (1), Federal Rules of Evidence.

14   Public documents which are not under seal but are accompanied by a declaration

15   containing the same elements as a self-authenticating business record are also admissible

16   without the necessity of testimony from a custodian witness.  Fed. R. Evid. 902(1);

17   *United States v. Neff*, 615 F.2d 1235, 1241 (9th Cir. 1980) (IRS Certificate of

18   Assessments and payment showing no tax return filed properly admitted).

19   **B.    IRS Records**

20       The United States anticipates offering into evidence certified copies of certain

21   Internal Revenue Service records; primarily, these are tax returns from The Spangler

22   Group, Mark Spangler, and TeraHop.  The defense has stipulated to these records.

23   Barring that stipulation, the government will offer certified copies of these records, which

24   are self-authenticating and admissible pursuant to Federal Rules of Evidence 902(4),

25   803(8) and 1005.

26       Rule 803(8) provides an exception to the hearsay rule for public records from a

27   public agency or office, relating to an activity of the office.  "Records kept in the regular

28   course of business of public agencies may be admissible under the business records

GOVERNMENT'S TRIAL BRIEF – 14
*U.S. v. Mark Spangler*, CR12-133RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   exception, Fed. R. Evid. 803(6), as well as under the public records exception, Fed. R.

2   Evid. 803(8)." *United States v. Bohrer*, 807 F.2d 159 (10th Cir. 1986).

3          In the present case, the government will offer various records maintained by the

4   IRS.  These documents are records prepared by a public agency dealing with official

5   activities necessary for the performance of its duties.  They are thus admissible pursuant

6   to Fed. R. Evid. 803(8) and 803(6).  *Hughes v. United States*, 953 F.2d 531, 539-40 (9th

7   Cir. 1992) (IRS Certificate of Assessments and Payments, even when generated by

8   computer, are admissible public records of proof that assessment had been made).  The

9   government will also offer a broad range of business records pursuant to Rule 803(6).

10  **C.    Expert Testimony**

11         The government has retained Mark Mitchell, a chartered financial analyst, as an

12  expert.  The government has provided the defense with all of the information required

13  under Rule 16 as it relates to Mr. Mitchell.  At this juncture, the government does not

14  anticipate calling Mr. Mitchell during its case-in-chief.  The government reserves the

15  right to call him as a rebuttal witness.

16  **D.    Summary Witness, Charts and Summary Schedules**

17         Three types of summaries and charts are typically used in criminal cases:

18  (1) summaries of voluminous records which may be admissible pursuant to Fed. R. Evid.

19  1006; (2) summaries of a summary expert which may be admitted pursuant to Fed. R.

20  Evid. 611(a); and (3) demonstrative or pedagogical charts that are used as testimonial

21  aids, but which are not themselves introduced into evidence.

22         The government intends to use and offer several summary charts as evidence at

23  trial.  These charts will be offered through three federal law enforcement witnesses:  FBI

24  Forensic Accountant (FA) Jared Young, IRS Special Agent Ben George, and FBI Special

25  Agent Spencer Walker.  The charts summarize or highlight other exhibits and are

26  intended to assist the jury in understanding voluminous evidence and materials.  Each of

27  these witnesses will testify to receiving and reviewing underlying bank records and will

28  use summary charts of certain transactions culled from thousands of records.

GOVERNMENT'S TRIAL BRIEF – 15
*U.S. v. Mark Spangler*, CR12-133RSM

1    Rule 611, addressing the Mode and Order of the Interrogation of Witnesses, gives

2    the Court great discretion in what a witness may use during testimony.  Use of charts by a

3    summary witness using other admissible evidence is allowed if it assists the jury and

4    renders the presentation of information clearer.  *United States v. Olana*, 62 F.3d 1180,

5    1204 (9th Cir. 1995).  The substantive content must be authenticated, but that may be

6    done by the summary witness, if the witness has reviewed the underlying evidence.  Fed.

7    R. Evid. 901; *United States v. Soulard*, 730 F. 2d 1291, 1299 (9th Cir. 1984).  Moreover,

8    as explained below, Rule 1006 allows for the summaries of voluminous materials to be

9    admissible and used as substantive evidence, rather than solely as demonstrative

10    evidence.  *See United States v. Meyers*, 847 F.2d 1408, 1411-12 (9th Cir. 1988)

11    (admitting summary of otherwise admissible evidence as substantive evidence where the

12    summary contributed to the clarity of the presentation).

13    **1.    Fed. R. Evid. 1006 Summary Schedules**

14    Summaries and charts of voluminous records are used to present evidence of

15    records so voluminous as to be impractical or impossible to actually bring into court and

16    use during trial.  *See* Fed. R. Evid. 1006; *United States v. Johnson*, 594 F.2d 1253, 1255

17    (9th Cir. 1979) ("The purpose of Rule 1006 is to allow the use of summaries when the

18    volume of documents is so large as to make their use impractical or impossible."), *cert.*

19    *denied*, *Ritchey v. United States*, 444 U.S. 964 (1979).  The underlying records used to

20    prepare Rule 1006 summaries are not usually admitted into evidence although they can

21    be.  Proponents must lay a proper foundation for admissibility of underlying records.  *See*

22    *United States v. Shirley*, 884 F.2d 1130, 1133 (9th Cir. 1989); *United States v. Meyers*,

23    847 F.2d 1408, 1411 (9th Cir. 1988); *United States v. Johnson*, 594 F.2d 1253, 1254 57

24    (9th Cir. 1979); *United States v. Scales*, 594 F.2d 558, 562 (6th Cir. 1979).  Moreover,

25    the records must be made available to defense in advance of trial.  *Paddack v. Dave*

26    *Christensen, Inc.*, 745 F.2d 1254, 1261 (9th Cir. 1984).

27    Summaries of voluminous records introduced pursuant to Fed. R. Evid.1006 are

28    themselves the evidence and are therefore admissible at trial.  *See  United States v. Baker*,

GOVERNMENT'S TRIAL BRIEF – 16
*U.S. v. Mark Spangler*, CR12-133RSM

1   10 F.3d 1374, 1411 (9th Cir. 1993) ("[T]his Circuit has often allowed the use of summary

2   charts and summary witness testimony based on testimonial evidence (most commonly in

3   tax cases)"); *United States v. Nordby*, 225 F.3d 1053 (9th Cir 2000); *United States v.*

4   *Wood*, 943 F.2d 1049, 1053 (9th Cir. 1991).

5        The government will offer into evidence summaries of voluminous bank records

6   credit card records, and financial records obtained from The Spangler Group.  These

7   schedules summarize, among other things, the allocation of funds by the defendant over

8   time; the valuation of Growth+ and Income + and the expenditure of funds. The records

9   supporting these summaries are routinely kept by financial institutions in the normal

10   course of business and fall within the hearsay exception of Rule 803(6).  The underlying

11   financial records have been provided to the defense and the defense has stipulated to the

12   admissibility of these records.

13       **2.**      **Fed. R. Evid. 611(a) Summary Testimony & Schedules**

14        Rule 611(a) of the Federal Rules of Evidence authorizes the court to "exercise

15   reasonable control over the mode...of...presenting evidence so as to (1) make the...

16   presentation effective for the ascertainment of the truth, [and] (2) avoid needless

17   consumption of time."  Fed. R. Evid. 611; *see United States v. Gardner*, 611 F.2d 770,

18   776 (9th Cir. 1980) (summary chart admissible in tax evasion case under Rule 611(a));

19   *United States v. Paulino*, 935 F.2d 739, 752 54 (6th Cir. 1991) (testimony of nonexpert

20   summary witness regarding cash generated from cocaine sales in drug conspiracy case

21   admissible under Rule 611(a) where trial court gave limiting instruction and defense had

22   full opportunity to cross examine); *United States v. Scales*, 594 F.2d 558, 563 64 (6th Cir.

23   1979) (summaries of testimonial evidence designed "to aid the jury in its examination of

24   the evidence already admitted" do not come within Rule 1006, but are authorized by Rule

25   611(a)), 5 Jack B. Weinstein and Margaret A. Berger, Weinstein's Evidence, at &

26   1006[03] (summary "prepared by a witness from his own knowledge to assist the jury in

27   understanding or remembering a mass of details is admissible, not under Rule 1006, but

28   under such general principles of good sense as are embodied in Rule 611(a)").

GOVERNMENT'S TRIAL BRIEF – 17
*U.S. v. Mark Spangler*, CR12-133RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

The government intends to offer a number of summary charts during its case-in-chief.  These summaries will be based on evidence admitted during the trial.  Such summaries themselves can also be properly admitted into evidence.  *See, e.g., United States v. Shirley*, 884 F.2d 1130, 1133 34 (9th Cir. 1989).  In *Shirley*, the summary expert witness compiled a summary of telephone records based on information already introduced into evidence.  "Summary evidence..., 'can help the jury organize and evaluate evidence which is factually complex and fragmentally revealed in the testimony of the multitude of witnesses.'"  *Shirley*, 884 F.2d at 1133 34, citing *United States v. Lemire*, 720 F.2d 1327, 1348 (D.C. Cir. 1983); see also *United States v. Meyers*, 847 F.2d 1408, 1412 (9th Cir. 1988) (properly admitting chart detailing long distance calls made by various coconspirators); *United States v. Marchini*, 479 U.S. 1085 (1987) (admitting summary calculations of IRS agent where he was cross-examined on his testimony).

The use of summary expert witnesses has long been approved by the courts.  *United States v. Johnson*, 319 U.S. 503, 519 20 (1943) (reversing Court of Appeals and concluding that summary witness's testimony was admissible in a tax evasion prosecution).  The introduction of an expert summary witness and summary schedules has been approved by the Ninth Circuit in tax cases.  *See United States v. Marchini*,  479 U.S. 1085 (1987);*Goldberg v. United States*, 789 F.2d 1341, 1343 (9th Cir. 1986).  *See also United States v. Voorhies*, 658 F.2d 710, 715 (9th Cir. 1981) ("[T]he fact of a tax due and owing may be established by documentary evidence of tax liability, accompanied by a summary by an expert").  "The nature of a summary witness testimony requires that he draw conclusions from the evidence presented at trial."  *United States v. Esser*, 520 F.2d 213, 218 (7th Cir. 1975).  *United States v. Baker*, 10 F.3d 1374, 1411 (9th Cir. 1993) ("[T]his Circuit has often allowed the use of summary charts and summary witness testimony based on testimonial evidence (most commonly in tax cases)"), *cert. denied*, 513 U.S. 934 (1994), *overruled on other grounds*, *United States v. Nordby*, 225 F.3d 1053 (9th Cir 2000).

GOVERNMENT'S TRIAL BRIEF – 18
*U.S. v. Mark Spangler*, CR12-133RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### 3.     Demonstrative Charts

The government also intends to use various demonstrative charts during its opening statement, examination of witnesses, and in closing argument. Such charts include, for example, a diagram of Defendant Spangler's nominee entities, and a chart of his income. The government does not intend to offer these charts into evidence. Courts have repeatedly allowed use of charts similar to those the United States intends to use in this case. *See, e.g., United States v. Scales*, 594 F.2d 558, 561 562 (6th Cir. 1979) (summary of indictment); *United States v. Jennings*, 724 F.2d 436, 441 443 (5th Cir. 1984) (compilation of 200 pages of material involving substantial amount of mathematical calculations), *cert. denied*, 467 U.S. 1227 (1984); *United States v. Stephens*, 779 F.2d 232, 238 (5th Cir. 1985) (simple flow charts tracing the Defendant's use of loan proceeds).

The Ninth Circuit has determined that courts should take three precautionary measures when demonstrative charts are used: (1) carefully examine the charts out of the presence of the jury to determine if information contained in them is supported by proof. *United States v. Soulard*, 730 F.2d at 1292; *United States v. Abbas*, 504 F.2d 123, 125 (9th Cir. 1974); (2) allow charts to be used as testimonial aids for witnesses and visual aids for counsel in argument, but not admit the charts in evidence or allow their use during jury deliberation, *Abbas*; and (3) instruct the jury that the charts are an explanation of other evidence and not proof per se. The jury should be told the charts are presented as a matter of convenience and if found to be inaccurate they should be disregarded entirely. *Id.*

### E.     The Defendant May Not Introduce His Own Out-of-Court Statements.

The Defendant may try to offer a number of his own statements through witnesses, without taking the stand. Defendant may argue that if any of his statements are admitted, then the government should be required to admit any potentially exculpatory portion of his out-of-court statement under the rule of completeness. This argument fails for at least two reasons. First, the Ninth Circuit has made clear that Federal Rule of Evidence 106

GOVERNMENT'S TRIAL BRIEF – 19
*U.S. v. Mark Spangler*, CR12-133RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  does not provide an independent basis for the admissibility by the defendant of any

2  portion of his prior statements, not otherwise introduced by the government.  Such

3  statements constitute self-serving hearsay and Federal Rule of Evidence 801(d)(2)

4  provides an exception to the hearsay rule only where a statement is offered against the

5  party that made the statement, not when it is offered on the declarant's behalf.  *See*

6  *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000); *United States v. Fernandez*,

7  839 F.2d 639, 640 (9th Cir. 1988).  The hearsay rule precludes a party from placing his

8  exculpatory statements — or any others — before the jury without subjecting himself to

9  cross examination.  *Ortega*, 203 F.3d at 682.  Second, the Ninth Circuit has determined

10  that the rule of completeness, under Fed. R. Evid. 106, applies only to written or recorded

11  statements.  *United States v. Collicott*, 92 F.3d 973, 983 (9th Cir. 1996).

12  **F.     Advice of Counsel Defense**

13        The defendant has indicated that he may rely on an advice of counsel defense.

14  The defendant is entitled to this instruction only if he or she has laid a sufficient

15  foundation for the defense.  *United States v. Ibarra-Alcarez*, 830 F.2d 968, 973 (9th Cir.

16  1987).  At bottom, this defense requires that the defendant "must demonstrate that he

17  fully disclosed to his attorney all material facts and relied in good faith on the attorney's

18  recommended course of conduct."  *United States v. Munoz*, 233 F.2d 1117, 1132 (9th Cir.

19  2000).

20        The government has interviewed the lawyers who provided advice to the

21  defendant.   It is clear that the defendant did not disclose to these lawyers that he intended

22  to invest virtually all of his clients' funds into two risky startup companies.

23  Consequently, the government does not believe that the defendant will be able to lay a

24  sufficient foundation to warrant an "advice of counsel" jury instruction.

25  **G.     Victim Presence in the Courtroom.**

26        Some of the defendant's victims may wish to be present in the courtroom after

27  they testify.  They have a statutory right to do so under the Crime Victim's Rights Act,

28  unless the court, by clear and convincing evidence, finds that their testimony may be

GOVERNMENT'S TRIAL BRIEF – 20
*U.S. v. Mark Spangler*, CR12-133RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   materially altered if they hear from other witnesses.  18 U.S.C. § 3771(a)(3).  Before

2   making this determination, the court ". . . shall make every effort to permit the fullest

3   attendance possible by the victim and shall consider reasonable alternatives to the

4   exclusion of the victim from the criminal proceeding."  18 U.S.C. § 3771(b)(1).  This

5   right is an exception to the traditional rule that witnesses be excluded from the

6   courtroom.  Fed. R. Evid. 615(d).

7                                        **V.  CONCLUSION**

8            This memorandum has been prepared to acquaint the Court with the factual and

9   legal issues that may arise at trial.  If other issues arise, the government will address them

10  by way of supplemental briefing.

11           DATED this 10th day of October, 2013.

12

13                                                Respectfully submitted,

14                                                JENNY A. DURKAN
15                                                United States Attorney

16

17                                                s/ *Carl Blackstone*
                                                  CARL BLACKSTONE
18                                                Assistant United States Attorney
19                                                United States Attorney's Office
                                                  700 Stewart Street, Ste. 5520
20                                                Seattle, Washington 98101
21                                                Phone: 206-553-2905
                                                  Facsimile: 206-553-2502
22                                                E-mail: carl.blackstone@usdoj.gov

23

24

25

26

27

28

GOVERNMENT'S TRIAL BRIEF − 21
*U.S. v. Mark Spangler*, CR12-133RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

s/ *Michael J. Lang*
MICHAEL J. LANG
Assistant United States Attorney
United States Attorney's Office
700 Stewart Street, Ste. 5520
Seattle, Washington 98101
Phone: 206-553-1779
Facsimile: 206-553-2502
E-mail: mike.lang@usdoj.gov


s/ *Francis Franz-Nakamura*
FRANCIS FRANZ-NAKAMURA
Assistant United States Attorney
United States Attorney's Office
700 Stewart Street, Ste. 5520
Seattle, Washington 98101
Phone: 206-553-4402
Facsimile: 206-553-2422
E-mail: francis.franze-nakamura@usdoj.gov

GOVERNMENT'S TRIAL BRIEF – 22
*U.S. v. Mark Spangler*, CR12-133RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the attorneys of record for the defendant.

s/ *Bonnie R. Wolfgram*
BONNIE R. WOLFGRAM
Paralegal
United States Attorney's Office
700 Stewart Street, Ste. 5220
Seattle, WA 98101
Phone:  206-553-2520
Facsimile:  206-553-2502
E-mail: bonnie.wolfgram@usdoj.gov

GOVERNMENT'S TRIAL BRIEF – 1
*U.S. v. Mark Spangler*, CR12-133RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970