```
 1                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
 2                            AT SEATTLE
   _____
 3
   UNITED STATES OF AMERICA,        )
 4                                  )   NO. CR12-133RSM
           Plaintiff,               )
 5                                  )   SEATTLE, WASHINGTON
   v.                               )   10/07/2013
 6                                  )
   MARK F. SPANGLER,                )   FINAL PRETRIAL
 7                                  )   CONFERENCE AND HEARING
           Defendant.               )   ON MOTIONS IN LIMINE
 8                                  )

 9 _____

10
                    VERBATIM REPORT OF PROCEEDINGS
11           BEFORE THE HONORABLE RICARDO S. MARTINEZ
                    UNITED STATES DISTRICT JUDGE
12
   _____
13 APPEARANCES:

14   For Plaintiff:          CARL H. BLACKSTONE
                             FRANCIS FRANZE-NAKAMURA
15                           MICHAEL J. LANG
                             United States Attorney's Office
16

17   For Defendant:         JON R. ZULAUF
                            Zulauf & Chambliss
18
                            JOHN R. CARPENTER
19                          Federal Public Defender's Office

20                          ALAN ZARKY

21

22

23

24
   Proceedings recorded by mechanical stenography, transcript
25 produced by Reporter on computer.
```

```
 1                         PROCEEDINGS
 2  ─────────────────────────────────────────────────────
 3         THE COURT:  Counsel, good afternoon.  You may all be
 4  seated.  Thank you.
 5         THE CLERK:  This is the matter of United States
 6  versus Mark Spangler, Case No. CR12-133, assigned to this
 7  court.
 8      Will counsel please make your appearances for the record.
 9         MR. LANG:  Good afternoon, Your Honor.  Mike Lang,
10  Carl Blackstone, and Francis Franze-Nakamura on behalf of the
11  United States.
12         THE COURT:  The usual suspects.
13         MR. CARPENTER:  Good afternoon, Your Honor.  John
14  Carpenter and Mr. Zulauf for Mr. Spangler, who is also
15  present in court, with two additional suspects, Mr. Zarky,
16  whose name you may have seen on some briefings, and also
17  paralegal Julie Valencia, who will be running the technology,
18  we anticipate, during the trial.
19         THE COURT:  All right.  Let me ask about that.  First
20  of all, good afternoon.  Thank you.  You may be seated.  But
21  let me ask a little bit about that.  Where do you intend to
22  be seated when you are doing all of this?
23         MS. VALENCIA:  I think I will be down there, so I can
24  be hooked into this final computer link down there.
25         THE COURT:  Okay.  So you won't need an extra little
```

1    table or anything else like that?

2         MS. VALENCIA:  I think we will fit.  We actually were

3    trying it, so as long as I can hook up to that one down

4    there.

5         THE COURT:  Okay.  That makes a lot of sense.  And

6    that would be fine, for you to be at counsel table and to do

7    that.

8      All right.  Counsel, this is our last meeting before our

9    trial date, scheduled for a week from tomorrow, October 15th,

10   at 9 o'clock in the morning.  The court has had a chance to

11   receive and review the motions in limine from both sides.

12   There was a late filing.  Actually, there was a request for

13   the court to grant an order allowing the defense to file a

14   motion late.

15     Mr. Lang, I didn't see anything in terms of a response.

16   And I know it was filed very late.  So I'm not sure that the

17   government has even had an opportunity to respond to that.

18        MR. LANG:  We did not respond in writing, Your Honor.

19   We are prepared to respond verbally today.  We don't have an

20   objection to the late filing, and we're prepared to respond

21   verbally today.

22        THE COURT:  Then, Madam Clerk, the court will grant

23   the defense motion to allow the late filing.

24     And, Mr. Lang, let's take that matter up right now.  What

25   is the government's response to the motion?  The motion by

1  the defense is basically to exclude any testimony regarding

2  impact of loss.

3          MR. BLACKSTONE:  Mr. Lang has delegated that task to

4  me, so I will respond.

5          THE COURT:  Mr. Blackstone.

6          MR. BLACKSTONE:  Your Honor, in this case, we intend

7  to introduce evidence as to the total scope of the loss.  And

8  what the jury will hear is that Mr. Spangler stole and lost

9  over $50 million of the victims' money.

10      There will be a chart that will be displayed to the jury

11  that will show the jury how much money each one of these

12  victims lost.  They lost close to 75 percent of the stated

13  value of their accounts and more than 60 percent of the

14  actual net money they put in.  I think the defense has no

15  objection to that chart coming into evidence.

16      We do not intend to ask each victim, "How did that loss

17  affect you?  What is your reaction to it?"  We won't get into

18  that.  We won't ask them, "Have you suffered financially?

19  Have you suffered emotionally?"  Although all of them have

20  suffered incredible emotional loss over this, in addition to

21  significant financial losses.  And we can save that for when

22  and if there is a sentencing in this case, Your Honor.

23      What we do intend to go into -- and this was not part of

24  the defense motion, but I want to make sure everything is

25  clear about this.  We are going to ask these victims what

1    they intended to do with the money they entrusted to

2    Mr. Spangler.

3        The court will learn during trial that all of these

4    people, through hard work and luck, made an awful lot of

5    money.  Most of them worked at Microsoft in the early days.

6    And they made millions of dollars, some of them.  They

7    entrusted this nest egg -- this was their nest egg.  Many of

8    them stopped working, and they looked at this money to

9    support them in their old age, pay for their children's

10   college education, and to give them a sufficient income

11   stream so they wouldn't have to work.

12       They entrusted this money to Mr. Spangler, believing that

13   he was going to put it into safe and sound investments that

14   paid a modest return and preserved their capital.  Each one

15   -- many of them told him:  This money is to pay for my kids'

16   education.  This money is to pay for Mom and Dad when they

17   have to go to a nursing home.  This money is to pay for taxes

18   that I see coming down the road.

19       And we intend to ask the victims about them, why they were

20   giving their money to Mr. Spangler, and what the purpose of

21   that money was.  And he led them to believe that only a small

22   amount of their money would be put into this startup company.

23   Unbeknownst to them, he took $50 million of their money and

24   put it into his company, a company that he controlled, a

25   company he had a significant financial stake in, and he lost

1    it all.

2        We think the reason why the victims gave the money to

3    Mr. Spangler is highly relevant for two reasons. First,

4    Mr. Spangler is going to blame the victims. We think that's

5    going to be the cornerstone of his defense here. He's going

6    to say: I told all these people that I was going to take

7    virtually all their money and put it into two risky startup

8    companies. The victims will deny that. They will say: We

9    never heard of that, he never told us that until the wheels

10   came off at the end.

11       The fact that these victims told him that the money was

12   going to go to pay for education, to pay for nursing homes,

13   to pay for their retirement indicates that they intended that

14   money to be available. They wouldn't have put that amount of

15   money at risk in a startup company, where it's highly

16   illiquid. You can't get your money out. If you want your

17   money out, you can only get it out if that company hits it

18   big. And nine out of ten times these startup companies fail.

19       So the fact that the victims wanted the money short term,

20   wanted to use it for things, indicates that they intended it

21   to go into safe investments and contradicts Mr. Spangler's

22   claim that they knew the money was going to TeraHop.

23       It also is critical evidence of his intent to defraud. He

24   knew that these people were looking to this money as their

25   nest egg. And the only way he could take it from them and to

1   put it into a risky investment was through a scheme to

2   defraud, which was orchestrated for over eight years.

3       So we think the reason why they gave money to Mr. Spangler

4   is very relevant.  It doesn't relate to how the loss affected

5   them.  But we intend to get into that with many of the

6   victims, Your Honor.

7           THE COURT:  All right.  Thank you, Mr. Blackstone.

8       Counsel, maybe I should have asked.  I had a chance to

9   read all of the material that was submitted regarding the

10  motions in limine that we're handling today.  I don't

11  necessarily believe the court needs any further argument.

12      But I'm not sure if the government feels, given the back

13  and forth of some of the stuff and when it came in and the

14  timing of when it came in, if you would like to address any

15  other issues in oral argument here today before we go ahead

16  and before the court can make its ruling?

17          MR. LANG:  Thank you, Your Honor.  On behalf of the

18  government, I would like to address our motion to exclude the

19  defense experts.  That's the only issue that I would like to

20  clarify and expand upon, if the court would permit me to do

21  so.

22          THE COURT:  Let me just ask you a question about

23  that, just to make certain I understand.  There are four

24  defense experts that have been identified.  The government, I

25  believe, has no objection to Mr. Neil Beaton, B-E-A-T-O-N?

1          MR. LANG:  Correct, Your Honor.

2          THE COURT:  All right.

3          MR. LANG:  So our motion relates to three defense

4   experts, Ms. Johnston, who's a law professor in Oregon, Peter

5   Brous, who is apparently some economist, and then John

6   Keller, a retired IRS agent.  I want to give some global

7   observations about what I understand the defense to be and

8   how I believe the defense-proffered experts do not fit in and

9   are not relevant to that defense.

10         THE COURT:  All right.  Let me ask you a question for

11  our record.  You did receive the email or letter dated the

12  26th, 29th, whenever it was, sent by the defense?

13         MR. LANG:  Your Honor, I was not -- and I apologize

14  to the court and to counsel.  I did not see that until they

15  filed their response.  Mr. Blackstone received it.

16         THE COURT:  All right.

17         MR. LANG:  And, obviously, the government not

18  speaking to other branches of the government is a big

19  problem, and this trial team is an example of that.  So I

20  apologize to the court and to counsel for that.

21      So our issue is not one of notice.  Our issue is one of

22  relevance and one of -- frankly, relevance.  The defense --

23  and this is what they have informed us of previously in an

24  email related to the advice of defense counsel.  And I

25  understand it may have changed, but I'm not certain.

1    We expect -- and I'm going to read from this email in part

2  because it will inform our discussion here.  "We expect our

3  basic defense to be general denial; that is, Mark Spangler

4  did not intend to defraud his investors.  We also expect to

5  assert a good faith defense, in part based on reliance of

6  counsel.  Mark Spangler hired many lawyers to assist him.  We

7  expect to call each of those lawyers at trial and understand

8  that by doing so we will waive the attorney-client

9  privilege."

10    So this relates to the attorney-client issue.  So the

11 defense is apparently one of, "I did not intend to defraud,

12 and not only that, I relied on what my lawyers were telling

13 me in good faith, so that, therefore, what I did convey to my

14 clients and what I did not convey, I believed in good faith I

15 did not have to convey, or I was not obliged to."

16    An advice of counsel defense, to succeed, the defendant

17 must demonstrate that he fully disclosed to his attorney all

18 material facts and relied in good faith on the attorney's

19 recommended course of conduct.  That's *United States versus*

20 *Munoz*, a Ninth Circuit case.  He fully disclosed to his

21 attorney, and he relied in good faith on that attorney's

22 recommendations.  That is an advice of counsel defense.

23    The defense has endorsed the lawyers who wrote these legal

24 documents upon which Mr. Spangler is premising his defense,

25 these PPMs, the claim that, "I relied on what my lawyer told

1  me, and I relied on the document that this lawyer created for

2  me."

3      They are going to call, as I understand it, Keith Baldwin,

4  the man who wrote that document.  Keith Baldwin, Your Honor,

5  is the best person to testify about what that document means

6  and what he conveyed to Mark Spangler, what advice of counsel

7  he gave to Mark Spangler.  Mark Spangler, in addition, would

8  be in the best position to testify as to what good faith he

9  put into his lawyer's recommendation.

10     Hiring a law professor from Oregon five years after the

11 fact, Jennifer Johnston, to testify about what she thinks

12 that document means is not pertinent to a good faith defense,

13 a lack of intent defense, nor an advice of counsel defense.

14 It is not relevant.  It is an effort to put in an objective

15 standard into the defendant's subjective belief.

16     If the defense wants to convey a subjective belief, "I,

17 Mark Spangler, believed in good faith that I could act in

18 this way," it has to come from him.  And if he wants to talk

19 about what his lawyer communicated to him, it has to come

20 from that lawyer.  Some third-party law professor hired five

21 years after the fact is simply not relevant, Your Honor.

22     The same overarching observation I would make also for the

23 additional experts, Mr. Brous and Mr. Keller.  Mr. Brous, as

24 I understand it, would testify to the state of the economy in

25 2008 -- 2007 to 2009, I think, is what the defense has

1   suggested.  And, again, I think, if I'm guessing correctly,

2   the defense will attempt to use that information to say:

3   Look what Mr. Brous told you, ladies and gentlemen of the

4   jury.  The economy was tanking.  Therefore, Mr. Spangler

5   acted in a reasonable way, in a manner in which he was trying

6   to protect his clients' assets.

7        Again, this is five years after the fact.  This is trying

8   to impose an objective standard, Mr. Brous' view of the

9   economy, onto the defendant's subjective good faith belief

10  that he was acting properly at that time.

11       And I know this court handled a lot of self-defense cases

12  back at the county, as did I.  We have a subjective standard

13  and an objective standard in those cases.  Put yourself in

14  the mind of the defendant.  Did he act as a reasonable person

15  would act?

16       And the only person that can testify in a self-defense

17  case is the defendant.  What was your state of mind at the

18  time?  That's the same standard here, Your Honor, in terms of

19  how the defendant's state of mind was at the time he was

20  disclosing or not disclosing material facts to his clients.

21  These experts do not help inform that decision.

22       Finally, Your Honor, Mr. Keller is equally irrelevant and

23  not reliable.  Frankly, on this, I simply don't understand

24  what documents Mr. Keller has relied upon to say -- and I

25  think the defense's position is that Mr. Keller will say that

1    he found nothing in his analysis that led him to believe

2    there was any attempt to make false representations to the

3    clients.

4         Now, that seems to, first of all, go to an ultimate

5    conclusion, the defendant's state of mind.  And I recognize

6    that experts can testify on occasion to ultimate conclusions.

7    But these seem too far gone to be permissible.

8         And I also don't understand what documents Mr. Keller has

9    relied upon to permit him to make those sorts of opinions.

10   And I want to help inform the court here as to the nature of

11   the evidence that we expect to come out.  I don't know if the

12   court's screen is on, but I want to show a few documents that

13   relate to what Mr. Spangler was communicating to his clients

14   to show that Mr. Keller's observations about these documents

15   can simply not make sense.

16        What I have on the screen here is a portfolio position

17   analysis, a PPA.  This is the sort of document that

18   Mr. Spangler would provide to his clients on a quarterly

19   basis.  This one is dated March of 2010, and it shows that

20   Ms. Ingram had 25.8 percent of her money in SG Income+, about

21   $831,000.  The remaining 2 million was in something called SG

22   Growth+.  That's the document she got.  That told her,

23   Ms. Ingram, here's where your money is.  So, apparently,

24   Mr. Keller is going to look at this document and say it made

25   full disclosure.  The next one is dated September of 2010,

1   same thing, Income and Growth.

2      Now, we have attempted for purposes of the trial to convey

3   that quantitative information in a visual format for the

4   jury's understanding.  This is what Ms. Ingram, were she to

5   see that in a pie chart, 71 percent of your money is in

6   Growth, 28 percent is in Income, those two funds.  Where

7   Ms. Ingram's actual money was, was 70 percent of her money is

8   in a company called TeraHop, 18 percent is in a company

9   called Tamarac.  88 percent of her money is in two companies.

10      So, apparently, Mr. Keller is going to look at this

11   document dated 12/31/10 that says 70 percent of your money is

12   in Growth, 28 percent is in Income, and that, according to

13   Mr. Keller, will tell the jury nothing -- there was no

14   attempt to make false representations to the client about

15   their account balance or account activity.

16      I fail to see the connection between these sorts of

17   documents and that ultimate conclusion.  I don't believe that

18   it is a reliable conclusion.  I don't believe the defense can

19   show that it is a reliable conclusion.

20      So at bottom, Your Honor, all of the experts, in the

21   government's view, are not relevant to Mr. Spangler's state

22   of mind as it existed during the course of this crime.  And

23   as to Mr. Keller, there is additional lack of clarity as to

24   the information and reliability of his opinions.

25      Thank you.

1          THE COURT:  Thank you, Mr. Lang.

2     Mr. Carpenter, I'm assuming, since your name is

3  prominently featured at the bottom of most of these things,

4  that you are the one that will be responding to --

5          MR. CARPENTER:  Yes, Your Honor.

6          THE COURT:  -- what Mr. Lang just indicated.

7          MR. CARPENTER:  Your Honor, first, a couple of global

8  observations.  I was listening to my good friend, Mr. Lang

9  here, make his presentation, and I thought, wow, it sounds

10 like the government's closing argument.  And I think that

11 goes to the crux of the matter.

12     The government does not agree with our experts.  The

13 government doesn't have to agree.  But certainly the law does

14 not suggest that the only person that can testify to state of

15 mind in a criminal case is Mr. Spangler and he should be

16 compelled to take the stand, to put on that evidence, that's

17 the only way we can do it.

18     With regard to the material that Mr. Keller provided, I

19 believe this is the first I've heard that the government is

20 confused about that.  And I believe an assistant to

21 Mr. Zulauf sent that information over.  And I recall seeing

22 an email to that effect, at least to Mr. Blackstone.  So

23 perhaps Mr. Lang hasn't seen that.  But I believe the

24 documents he has are the documents that Mr. Keller has

25 considered.

1    And a lot of the information that Mr. Keller would testify

2   to is set forth in our argument -- or our briefing, that, you

3   know, he reviewed the data, basically that the monies that

4   were reported to him, to Mr. Spangler, from the companies,

5   were those which appeared on their books; there is no shell

6   account; and there doesn't seem to be any evidence of

7   misleading the values that he was provided from Tamarac and

8   TeraHop, for example.

9    Also, Mr. Keller has done a comparison in regard to what

10  would have happened had Mr. Spangler during this period of

11  time continued to invest the money in other accounts, such as

12  a Southeastern Asset Management account that you'll be

13  hearing about over the course of the trial as well, and the

14  losses that that account suffered.

15    So I suggest to you, as we put in our briefing, that

16  Mr. Keller's testimony is relevant.  It does relate to

17  Mr. Spangler's state of mind, because the lack of falsity

18  would negate any intent to deceive.

19    And the rate of returns are relevant, too, to explain, you

20  know, why Mr. Spangler invested the way that he did, and that

21  he was doing so wisely, given the economic environment that

22  he was working with.

23    And turning now to Professor Peter Brous, that's what he

24  would testify to, to remind people about what was going on

25  then, and that the economy was in a basic state of free-fall.

1    And the government says, well, this is, you know, common

2    knowledge.  You know, we can assume, I think fairly, that

3    every juror is going to understand, hopefully, that in 2008

4    we had an economic free-fall.  But, really, the extent of

5    what that free-fall was, you know, maybe not.

6        I mean, we set forth specific examples in our briefing and

7    in the offer of proof to the government about 70 percent

8    losses in local companies and such.  And I don't think that

9    that sort of loss is really in the forefront of most jurors'

10   minds.

11       With regard to Professor Brous in particular, I think

12   probably the amount of time that the government and I have

13   spent briefing this issue and now arguing this issue is

14   probably longer than the testimony ultimately would be.

15       I was talking with Mr. Zarky about, you know, what I could

16   commit to you in how brief I think his testimony would be.

17   And Mr. Zarky was like, 15 minutes.  And I didn't want to

18   time myself to 15 minutes.  It's very rare we have a witness

19   on and off the stand in 15 minutes.  But I suggest less than

20   30 would be relevant.

21       Finally, with regard to Professor Johnston, the couple of

22   points made in the government's brief that, well, we could

23   rely on the attorneys to describe what is meant by these

24   contracts, which will be a crucial part of, I think, both

25   parties' cases, there's a problem with that, because some of

1   these attorneys certainly are guarded in their discussions.

2   And I think the government has seen that, and we certainly

3   have.

4       The suggestion, again, that Mr. Spangler needs to take the

5   stand to talk about what these contracts mean, I don't think

6   can compel him to take the stand.  He may very well end up

7   testifying.  But it's ironic to me that the government is

8   suggesting that only Mr. Spangler can testify about this, we

9   can't call an expert, this wouldn't be helpful to the trier

10  of fact, but they themselves call their own agent to the

11  stand to testify about what they felt the contracts meant in

12  order to obtain an indictment against Mr. Spangler.

13      So all of our witnesses, Your Honor, we believe to be

14  relevant in this case.  They specifically address the issues

15  that are going to be at the forefront, which is basically, at

16  the end of the day, Mr. Spangler's intent, what it was.  And

17  we're convinced, at the end of the case, these experts would

18  help us show that Mr. Spangler did not have an intent to

19  deceive.

20          THE COURT:  Thank you very much, Mr. Carpenter.

21  Before you step down, as I told you earlier, the court had an

22  opportunity to thoroughly review all of the material, and is

23  ready to make rulings.  But is there any other area you would

24  like to present oral argument on regarding the government's

25  motion?

```
 1           MR. CARPENTER:  Your Honor, I think most of it has
 2    been set forth in our briefing.  I think it's been pretty
 3    clear.  With regard to the fiduciary duty issue, in
 4    particular in regard to the Rutherfords, Mr. Budge, and
 5    Ms. Smith, it seems to me the big danger -- and I think this
 6    is set forth in our brief -- is under Wolf, that there's a
 7    relevance problem, and there's a problem of wrongful
 8    conviction based on some extra-legislative duty that's
 9    imported into this case.
10        And I wanted to highlight that problem with what exists
11    here, in terms of the SEC obligations that the government is
12    now talking about, and in the NAPFA as well.  And it seems to
13    me -- I was thinking about this over the weekend, and it
14    seems to me that the danger is clearly outlined in Wolf.  But
15    if you think about it, the reason why we can't import these
16    things, and the idea that somehow the Investment Advisor Act
17    isn't where you find the fiduciary duty, I suggest that's
18    where it is found.
19        I mean, if you're going to convict Mr. Spangler, it has to
20    be under the fiduciary duty that the federal law outlines
21    under the Act.  If the government thinks it needs to bring
22    another duty in to let the jury know what the Act means or
23    what mail fraud means, then we have a constitutional notice
24    problem and a vague statute.
25        And I think that really undermines the Wolf opinion.  We
```

1    can't take that risk.  If these things are brought in, we

2    risk having to do this trial all over again.

3         Thank you.

4              THE COURT:  Thank you.

5         All right.  Gentlemen, let's take up the defendant's

6    motions in limine, first of all.  There was a motion to

7    strike the surplusage in the indictment.  And as both parties

8    know, the court does not read the indictment to the juries,

9    especially in this case, with the number of counts that have

10   been brought.  So it's technically moot.

11        However, it's not moot as to whether or not the

12   government, or either party, can get into the type of

13   testimony regarding the two issues that you outlined, whether

14   or not they can mention the term "Ponzi scheme" and whether

15   or not they can go into showing that there was a fiduciary

16   duty on behalf of Mr. Spangler here.

17        The fiduciary duty issue is a very interesting one in

18   terms of what some of the case law seems to say in this

19   particular area.  And, of course, now I'm only talking about

20   the admissibility of this evidence at trial and jury

21   instructions that will be presented to the jury at this point

22   in time.

23        Let me indicate this:  I think the defendant's objection

24   to the fiduciary duty one is a little misplaced in that your

25   argument basically is the jury may be able to convict him for

1    a violation of that duty alone, or get confused.  And I think

2    that's where the court's jury instructions will take care of

3    that.

4        And I am going to be extremely careful in that particular

5    area, making sure the jury understands fully well what the

6    elements of each of the crimes charged against Mr. Spangler

7    are, and what specific burden the government bears in proving

8    each of those particular elements.

9        So, for now, the court is going to deny the defendant's

10   motion that the government cannot label it a Ponzi scheme or

11   that they cannot go into the fiduciary duty in proving that,

12   as they set out in their material.

13       Regarding the defendant's motion to exclude impact of

14   loss, I agree fully that impact of loss is relevant for

15   sentencing, if we get there.  It is not relevant to the trial

16   itself.

17       Mr. Blackstone argues that the reasons these individual

18   investors gave the money to the defendant may be relevant.

19   The court agrees with that as well.  The reasons why they

20   gave the money may certainly be relevant.  Any conversations

21   they had with him about why they were giving that, I think

22   certainly come in.

23       So the court is going to grant the defense motion to

24   exclude any testimony regarding the impact of loss, and

25   expects the defense to make any appropriate objection if you

1  believe the questioning that is being done by the government

2  of these particular witnesses strays from reasons why they

3  gave the money to the impact of losing the money.

4      All right.  There was a motion to exclude the testimony of

5  the government witnesses, Budge, two Rutherfords, and Roberta

6  Smith.  The court is going to deny that motion.  The court

7  feels that the majority of their testimony is actually fact

8  testimony.  It's not really expert testimony.

9      There was some indication about that either one or all of

10  them would be talking about the value of diversifying

11  investments.  I'm not sure that that is relevant or something

12  that I think most laypeople would certainly understand.

13  Again, as indicated, the court is denying the defense motion,

14  however, will be carefully watching to make sure you don't

15  get into cumulative testimony or that strays too far outside

16  the areas as mentioned by the government's moving documents

17  as well.

18      All right.  Let's take up the government's motions in

19  limine to exclude expert testimony or asking for a Daubert

20  hearing.  The request for a Daubert hearing is, I think, not

21  necessary.  The court is granting the motion to exclude the

22  testimony of John Keller.  In looking at the materials that

23  were presented to the court, the court sees no value in

24  Mr. Keller's testimony.  It is not relevant in any way,

25  shape, or form.  Therefore, that will be granted.

1      The defense (sic) is also objecting to Mr. Brous and

2   Ms. Johnston.  As indicated previously, the government has no

3   objection to the testimony of Neil Beaton.  So we're only

4   discussing Mr. Brous and Ms. Johnston.

5      While it's close, and I think relevancy is certainly an

6   issue, I think the defendant certainly has and deserves the

7   full ability to put on the best defense possible.  I'm

8   convinced that there may be some relevancy, some value in the

9   testimony of both those witnesses.

10     The court will allow the testimony of Mr. Brous and

11   Ms. Johnston.  I will hold the defense to their promise that

12   it will be brief.  I think they indicated that one of them

13   would only be about a half hour in length, in terms of the

14   direct.  So, again, if we start straying too far afield, the

15   court will expect the appropriate objection from the opposing

16   party.

17     All right.  There's also a motion to prevent witnesses

18   from offering any direct opinions about the guilt or

19   innocence of the defendant.  Obviously, that motion is

20   granted.  That is fully only the province of the jurors to

21   determine whether or not the government has proven its case

22   to their satisfaction and the standard that the court will

23   instruct them on, and no one else is to testify in any way,

24   shape, or form, or give any kind of opinion testimony about

25   his guilt or innocence.

1     There was also a motion to exclude any defense comment or

2   questioning about whether the case should be merely a civil

3   matter.  The defense mostly agrees with that, and so does the

4   court.  It will be granted as well.

5     The defense goes on in their moving documents to indicate

6   that that certainly would not preclude the defense from

7   arguing that maybe the standard for a civil case may have

8   been met, but that the standard of beyond a reasonable doubt

9   in a criminal case, being different, has not been met.  And I

10  agree wholeheartedly.  That is fair game.  This ruling by the

11  court does not in any way, shape, or form prevent the defense

12  from making that particular argument at any point in time,

13  especially at closing.

14     All right.  Did I miss any motions that the government can

15  think of?

16          MR. BLACKSTONE:  No, Your Honor.

17          THE COURT:  Any motions from the defense that I may

18  have missed?

19          MR. CARPENTER:  No, Your Honor.

20          THE COURT:  All right.  Let's take a minute and talk

21  about logistics.  Given the potential length of the case

22  itself -- first of all, let me ask the government:  Are you

23  going to have an IT person?  Is one of your agents going to

24  be handling all of the IT things?

25          MR. BLACKSTONE:  We are.  We're planning to have a

1    desk.  We're going to come up on Friday.  There will either

2    be a desk here or back there where the agent will be to

3    operate the machine.

4          THE COURT:  Yes.  When we've done it in the past,

5    Mr. Blackstone, with similar type cases, where there was a

6    lot of evidence being presented, I think it works better if

7    it's in the actual well of the courtroom.

8          MR. BLACKSTONE:  Okay.

9          THE COURT:  Once we get the jury selected and stuff,

10   we're not going to have anyone coming in from that side.  So

11   they'll exit and enter only on this side.

12         MR. BLACKSTONE:  Okay.

13         THE COURT:  All right.  And from the defense

14   perspective, as we've discussed earlier, you're going to be

15   setting up on this end over here?

16         MS. VALENCIA:  Yes.

17         THE COURT:  Okay.  Perfect.  That will work.

18      Counsel, I looked back at the notes taken from our

19   previous meeting last month, on the 4th, and I think -- Madam

20   Clerk, did we hear from our jury person how many total jurors

21   he is looking at bringing in?

22         THE CLERK:  He anticipates between 50 and 55.

23         THE COURT:  All right.  Counsel, our jury coordinator

24   indicates that between 50 and 55 jurors will be brought in.

25   Now, one of the things that I need to let you know is that

1   they've already been cleared for the anticipated length of

2   the trial.  So that really is not an issue.  It's just the

3   other things we kind of need to get into.

4       That's still a large group of people.  That means very

5   little seating will be left in the courtroom for anyone that

6   may want to come in.  And as all of you understand, it's an

7   open courtroom, and anyone can.  My intent is to get the

8   jurors as squished together as they possibly can to leave

9   space for any spectators in the back rows, especially on my

10  right-hand side of the courtroom.

11      If I remember correctly, from looking at my notes and

12  stuff, I think we indicated that voir dire would be

13  60 minutes per side, no more than that.  And the government,

14  or both sides wanted -- well, let me just double check.

15      You wanted to split it, 30 and 30?

16          MR. BLACKSTONE:  Yes.  I think, depending on what

17  Mr. Lang does, we'll see if we want to split it or not.  But

18  right now we will.

19          THE COURT:  And, Mr. Carpenter, the same thing?

20          MR. CARPENTER:  Yes, Your Honor.

21          THE COURT:  All right.

22          MR. CARPENTER:  Not depending on Mr. Lang, but we'll

23  both do it.

24          THE COURT:  All right.  And because of the length,

25  and because of the fact that I got my flu shot last week and

1  was thinking, oh, no, this is flu season coming up, I'm going

2  to go with 16 potential jurors, which means four alternates

3  will be seated.

4      We have room for 14 in the box, as you can tell.  If we go

5  with one extra, we can probably squeeze them into the box.

6  But I've tried that before.  It leaves very little space for

7  those individuals.  Two of those chairs are actually not

8  fixed, so they're moveable.  But they tend to kind of bump

9  into each other.

10     So you can see the setup that we've done now.  We've put

11  another monitor on the end, in the back row, and intend to

12  seat two other people, two other jurors, in those chairs, as

13  you can tell over there.  It makes it a little difficult for

14  the back row whenever they enter and exit during our breaks,

15  but I think we can handle that.

16     We're trying to keep it as open as possible down here.

17  There's no way we can put another chair down on the front row

18  because, with our court reporter and then that chair, that

19  prevents the witnesses from being able to enter and exit and

20  to be able to sit up in the witness chair.  So I think that's

21  the best way.

22     So we'll go with four additional, which means that each

23  side will get two additional preemptories then, so a total of

24  12 and 8.

25          MR. BLACKSTONE:  Your Honor, I forgot.  Are you going

1    to let the people know they are alternates at the time or

2    wait until the end?

3          THE COURT:  No, we are not going to let them know

4    that they are alternates at the time.  In fact, my practice,

5    unless I hear an objection from either side, a strenuous

6    objection, my practice is, that's when we actually use our

7    little jury box.

8       At the very end of the trial, assuming all of them are

9    still here, we put everybody's names in there and spin it

10   around, and the jurors get to see that it's a totally random

11   draw.  So nobody knows who the alternates are until the very

12   end.  And, obviously, if we lose someone along the way, that

13   name will be eliminated.

14      And let me ask.  Let me just double check.  That is my

15   standard practice.  Any objection from the defense in doing

16   it that way?

17          MR. CARPENTER:  No, Your Honor.

18          THE COURT:  All right.  So assuming both sides use

19   all their perempts and there's no cross-over -- remember, we

20   do simultaneous strikes.  Assuming everybody uses all their

21   peremptories and we end up with 16 jurors, 20 peremptory

22   challenges, that gets us to 36 immediately.

23      As you can tell, that leaves us about 15 to 20 people or

24   so in terms of that gray area for challenges for cause or

25   other potential reasons of why they may not be able to sit as

 1    jurors on this particular case.

 2        All right.  I think we've got everything sorted out, in

 3    terms of exhibits as well.  I think the numbering system

 4    works that's been presented.

 5        Mr. Carpenter, is there something else?

 6            MR. CARPENTER:  There is, Your Honor.  Mr. Zulauf and

 7    I would like to split openings in this case, with the court's

 8    permission.  I think both the government and the defense are

 9    looking at openings believed to range from perhaps 60 minutes

10    to 75 minutes.

11        The reason for this split is, this is certainly one of the

12    more complicated cases I've been involved in.  I've come in

13    late, later than Mr. Zulauf, certainly.  And he has certainly

14    done the lion's share of the work, particularly in regard to

15    the attorneys and the contracts and the impacts of those.

16        And what we would like to do is to allow Mr. Zulauf to

17    talk about that aspect of the case, and I would talk about

18    the remainder of the case.  I think the way that we have

19    structured it at this point, I would be going first, probably

20    for about 20, 25 minutes, and then Mr. Zulauf would take

21    over.

22        I've asked the government whether they would agree.  And I

23    think that they're going to defer to the court, knowing that

24    it's highly irregular.  And I guess that's who we are as

25    defense counsel.

1          THE COURT:  Mr. Lang.

2          MR. LANG:  Thank you, Your Honor.  Mr. Carpenter is

3     correct, not that they are irregular, but we find the process

4     of splitting opening highly irregular.  The three lawyers on

5     our side talked about this, and we found it very unusual.  I

6     looked up, tried to find any case law.  I don't see anything

7     out there that gives us a legal basis to object.  I just

8     think it may perhaps give the defense an unfair advantage.

9     But that's the nature of, you know, being a defendant.  So in

10    that, you want to give them every benefit.

11         On the other hand, I don't think -- you know, it's not

12    like a two- or a three-hour opening statement.  I believe

13    that we have two highly capable lawyers representing

14    Mr. Spangler, and splitting opening, on top of the fact that

15    it's just highly unusual, it's not something that we would

16    prefer.  But that being said, we defer to the court's good

17    judgment.  And Mr. Carpenter is correct on that position.

18         Thank you.

19         THE COURT:  Counsel, I have never done that before.

20    In almost 25 years of being on the bench, in April of next

21    year, I've never, ever done that before.  And we've handled

22    some rather lengthy trials, including one where the opening

23    statement was well over two hours long, which I won't do

24    again either.

25         But let me do this:  Let me think about it.  Let me take a

1    look.  As Mr. Lang said, let me see if I can find any help

2    from looking at some of the case law, or looking at what some

3    of my brethren judges have done around the country.  And I

4    promise that by the end of business tomorrow, Tuesday, we'll

5    send out a little message indicating which way the court is

6    going to go on that, all right?  I know you need to prepare.

7    If the court denies it, you need to prepare.

8        Mr. Zulauf.

9        MR. ZULAUF:  Could I comment just for a moment?  I

10   think the government has already asked, and the court has

11   approved their splitting closing argument.  If I'm correct, I

12   think the position was that they wanted two people to do

13   closing.

14       Part of the problem with this case is that there is an

15   enormous amount of material.  John Carpenter has focused on

16   one portion of the material.  I have focused on a different

17   portion.  It would be very helpful for us to be able to

18   continue that split and present it to the jury.

19       THE COURT:  I understand.  I understand the reasons

20   why you are asking.  And the court will take a very serious

21   look at it.  The splitting of closings is much more common,

22   in terms of allowing that to happen.  And we're talking about

23   rebuttal.  We're not talking about allowing two attorneys,

24   even government counsel, to do splitting of opening in any

25   other way, other than rebuttal and opening closings.

1        All right.  Anything else then we need to do in terms of

2   logistics at this point in time that might be helpful to both

3   sides as they get ready?

4        MR. LANG:  I had two requests for clarification, Your

5   Honor, if the court would permit.  Frankly, one, and a

6   request for clarification.  On the splitting of the jury

7   selection process, both sides have 60 minutes.  Is the court

8   contemplating that the government goes 30, then the defense,

9   then the government, then the defense?

10       THE COURT:  Exactly.

11       MR. LANG:  Okay.  Thank you.  Secondly, as to opening

12  statements, in the last couple trials I've done, our jury

13  selection process has wrapped up roughly around 3 o'clock in

14  the afternoon of that first day.  In those cases the court

15  has typically allowed opening to go the next day so that the

16  government and defense does not -- the government doesn't

17  open and then there's a large gap in time and the defense

18  opens the next day.

19       If the court would permit it, it would be our

20  preference -- and I haven't talked to the defense about this,

21  but if we start to get around the 3 o'clock hour, if the

22  court would permit us to do openings on the next court day, I

23  believe that would be efficient and would help the jury's

24  attention span as well.

25       THE COURT:  I don't believe I have ever split up

 1  openings on two different days.  And I won't do it here

 2  either.  So we'll do it one way or the other.  If we finish

 3  in time, early enough to get both in, even if that means

 4  going a little bit late, we'll do that, try to maximize our

 5  jury time as much as possible.  But if we don't, if we're

 6  getting towards the end of the day where we can't get them

 7  both in, then the court is going to do exactly as you

 8  requested and set them both over for the following day.

 9          MR. LANG:  Thank you, Your Honor.

10          THE COURT:  There's a substantial amount of info that

11  I end up having to give the jurors, too.  So I'm thinking

12  that, given the number of jurors, given the alternates, given

13  how long I'm allowing for voir dire, it might very well -- I

14  can't really see us getting openings done on Tuesday.

15          MR. LANG:  Thank you.  The last issue I had related

16  to the statement of the case, which the government viewed as

17  a summary.

18          THE COURT:  Yes.

19          MR. LANG:  I provided the defense a copy.  It didn't

20  go out until this morning.  For some reason, my email had a

21  firewall up.  So I don't think the defense has had a chance

22  to review it.  I did bring a copy today, if the court would

23  at least like to begin the process of considering it.  But I

24  don't know if counsel has concerns about that.  But I'm happy

25  to give the court a copy of what I've provided to defense

1   thus far.

2          THE COURT:  Yes.  Thank you.  And please make sure

3   the defense has it as well.  And I'll just wait to hear from

4   the defense in terms of what -- let me ask you to do this:

5   Once you've had a chance to review it, then get together with

6   the other side and see if you can come up with any tweaks or

7   adjustments.  If both sides can't do it, tell me what the

8   problem is, and we don't need to get back together again, but

9   then the court will come up with a final draft, all right?

10         MR. LANG:  Thank you, Your Honor.  Would the court

11  like a copy now, or just wait?

12         THE COURT:  No.  Now.

13         MR. LANG:  Okay.  May I approach?

14         THE COURT:  Yes.

15         MR. LANG:  No other issues on our side, Your Honor.

16  Thank you.

17         THE COURT:  Anything further from the defense side?

18         MR. CARPENTER:  No, Your Honor.

19         THE COURT:  Counsel, thank you all very much.  As all

20  of you know, there is a lot of work that goes into prepping

21  and starting a trial.  We are bringing in a substantial

22  number of jurors on this case.  One of my biggest concerns,

23  especially with going with a jury as big as this, is that

24  room back there, the jury room.  It's not really built to

25  hold that many people comfortably.  In fact, they are not

1    going to be very comfortable.  The bathrooms alone, there are

2    two bathrooms back there and 16 people.

3        I intend to keep our breaks, literally, as tight as

4    possible.  We may have to expand them a little bit, in other

5    words, in terms of how long it takes the jurors to do what

6    they need to do back there and be ready to come on out.

7        But the flip side of that is, I don't want to keep them

8    back in that jury room longer than necessary, all right?  So

9    if there is anything that we need to do out here outside

10   their presence, let's do our best to do it before trial,

11   before court hours, after court hours, during lunch break, or

12   some other time, to maximize their time out here, to minimize

13   their time back in that little room back there.

14       Mr. Zulauf.

15           MR. ZULAUF:  Your Honor, I have one other issue that

16   we all are familiar with by reading the papers, and that is

17   the possibility that the federal government will shut down

18   next week.  And I don't know if the court has given any

19   thought to whether that affects the trial here.  It certainly

20   appears that the federal government may not be paying CJA

21   counsel, I notice.  But has the court given any thought to

22   whether we just plow ahead or not?

23           THE COURT:  We've been thinking about this for about

24   the last six months, Mr. Zulauf.  One of the conclusions that

25   -- there are so many things that poor Chief Judge Pechman has

1   been inundated with that's, I can't imagine, taking her away

2   from all the other duties that she really has.

3       But one of the core, most essential things that courts do

4   is handle criminal trials.  And one of the questions I had,

5   and this was weeks and weeks ago, knowing what was going to

6   happen by this point in time, or what might happen, is

7   whether or not custodial status made any difference.  And the

8   answer was flat out, no, it does not.

9       So we will suspend many other things from occurring, but

10  we will not suspend any scheduled criminal matters.  That

11  includes Mr. Spangler.  However, just for you guys to know,

12  one of the things that we do have to do is, that means there

13  are specific orders that have to go out.

14      Thankfully, he's not in custody, so there are no marshals

15  we have to deal with.  But CSOs, jury coordinators, other

16  staff people that handle all of those things have to be here.

17  And, apparently, from what I read in the papers, eventually

18  they may get paid, but they won't be getting paid during the

19  time that they are here until that entire mess is settled.

20  Hopefully, cooler heads will prevail back in the other

21  Washington.

22      All right.  So it's a go.  The only thing that might not

23  make it a go is if the parties reach any agreement,

24  obviously.  And I have nothing to do with that.  All I want

25  to say is, if anything were to happen, just notify us as

1   quickly as possible, because from this moment on, there is an

2   immense amount of work that goes into prepping for this, from

3   your side and my side as well.  And so if anything were to

4   happen, please let us know as quickly as you possibly can.

5       Other than that, have a great afternoon, and we'll be at

6   recess.

7       (Proceedings adjourned.)

8

9

10

11

12

13                   * * * * * * * * *

14

15                 C E R T I F I C A T E

16

17     I certify that the foregoing is a correct transcript

18   from the record of proceedings in the above-entitled matter.

19

20     Dated this April 23, 2014.

21

22                    /S/  KARI McGRATH

23                    Kari McGrath, CCR, CRR, RMR

24                    Official Court Reporter

25