UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

---

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | NO. CR12-133RSM |
| Plaintiff, | ) | |
| | ) | SEATTLE, WASHINGTON |
| v. | ) | 10/24/2013 |
| | ) | |
| MARK F. SPANGLER, | ) | |
| | ) | TRIAL - DAY 8 |
| Defendant. | ) | |
| | ) | |

---

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

---

APPEARANCES:

| | |
|---|---|
| For Plaintiff: | CARL H. BLACKSTONE<br>FRANCIS FRANZE-NAKAMURA<br>MICHAEL J. LANG<br>United States Attorney's Office |
| For Defendant: | JON R. ZULAUF<br>Zulauf & Chambliss<br><br>JOHN R. CARPENTER<br>Federal Public Defender's Office<br><br>ALAN ZARKY |

Proceedings recorded by mechanical stenography, transcript produced by Reporter on computer.

## EXAMINATION INDEX


| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| RICK RUPP | CROSS-EXAMINATION BY MR. ZULAUF | 1227 |
| | REDIRECT EXAMINATION BY MR. LANG | 1266 |
| | RECROSS-EXAMINATION BY MR. ZULAUF | 1272 |
| RICHARD FOXLEE | DIRECT EXAMINATION BY MR. LANG | 1277 |
| | CROSS-EXAMINATION BY MR. ZULAUF | 1296 |
| | REDIRECT EXAMINATION BY MR. LANG | 1300 |
| DIANE RYESKY | DIRECT EXAMINATION BY MR. BLACKSTONE | 1301 |
| | CROSS-EXAMINATION BY MR. ZULAUF | 1349 |
| | REDIRECT EXAMINATION BY MR. BLACKSTONE | 1364 |
| DR. ROBERT OLSON | DIRECT EXAMINATION BY MR. FRANZE-NAKAMURA | 1366 |
| | CROSS-EXAMINATION BY MR. CARPENTER | 1388 |
| | REDIRECT EXAMINATION BY MR. FRANZE-NAKAMURA | 1397 |
| ESSEX PORTER | DIRECT EXAMINATION BY MR. BLACKSTONE | 1401 |
| | CROSS-EXAMINATION BY MR. CARPENTER | 1424 |


## EXHIBIT INDEX


| EXHIBITS ADMITTED | PAGE |
|---|---|
| 105.5 to 105.19 and 105.58 | 1281 |
| 14.1 to 14.13; 103.5 to 103.23; 103.40 to 103.44; 103.46 to 103.48; 380.8, pages 1 through 5 | 1310 |
| A185.04 | 1396 |
| 115.5 to 115.23; 115.40 to 115.43; 115.47; 115.51; 401.2, page 13; 401.23, pages 62 to 66; 406.21, page 44 | 1406 |
| 115.45.001 | 1429 |

PROCEEDINGS

THE COURT: Good morning, counsel. Are we ready for our jury.

MR. LANG: Yes, Your Honor.

THE COURT: And, Mr. Lang, you had just finished direct, is that correct?

MR. LANG: Yes, Your Honor.

THE COURT: All right. Mr. Rupp, if I could have you take the stand. Good morning, sir.

THE WITNESS: Good morning, sir.

(Jury enters courtroom.)

THE COURT: Good morning. Welcome back. If you remember, when we left off yesterday, Mr. Lang had just finished his direct examination of Mr. Rupp. So now we are moving to cross-examination. And, by the way, today is your Friday. So happy Friday to all of you.

Counsel.

MR. ZULAUF: Thank you.

RICK RUPP,

being previously duly sworn, the witness was recalled and further testified as follows:

CROSS-EXAMINATION

BY MR. ZULAUF:

Q Good morning, Mr. Rupp.

A Good morning.
Q I'm Jon Zulauf, and together with John Carpenter, we represent Mark Spangler. Thank you for coming to testify.
As I understand it, you have been a long-time businessman. You have owned, I think you said, machine shops or manufacturing shops?
A Correct.
Q And as such, you are aware that the economy started to have trouble in 2007, right?
A Yes.
Q In fact, that's when the housing crises started, was in 2007, wasn't it?
A I guess it was. I'm not an economist.
Q You are aware that there was a housing crisis, right?
A Yes.
Q Okay. And there was sort of a great recession, I think, is the way they termed it, in that 2008-2009 time period, right?
A Hard times, yes.
Q Okay. And I think they have called it a financial crisis during that period of time, 2008 and 2009. That affected your business, I assume?
A I was not an owner of a business at that point in time. I was retired.
Q Okay. You were aware that the stock market during that

2008-2009 time period plummeted in value, right?
A Correct.
Q Some of the stocks lost as much as 50 percent of their value during that time, didn't they?
A I suspect so.
Q That was a rough time, wasn't it?
A Yes.
Q I want to just talk with you for a few minutes about your relationship with Mark Spangler. I think you started investing with Mark in 1991?
A Correct.
Q Okay. And so that covered a span from 1991 to 2011, I think. That's about 20 years, correct?
A Right.
Q And you viewed him, I think, as a personal friend, didn't you?
A Correct.
Q Okay. And you viewed him as a talented investment advisor, didn't you?
A Yes.
Q Let's talk about 1991 to 2010. During that period of time, you believed he was a man of honesty, didn't you?
A 2010, sometime in that time frame, I was starting to question things, but, basically, yes.
Q Let's talk about 1991 to 2009.

A Fine. Okay.
Q During that 18-year time period, you viewed him as a man of honesty and integrity, didn't you?
A He was a counselor to me.
Q Okay. And a good friend, right?
A A confidant.
Q Okay. And during that period of time, as far as you knew, his reputation was impeccable, wasn't it?
A I had no reason to doubt it.
Q Okay. One of the things that you were aware of from your friendship and your relationship with him is that he was a man interested in technology companies, correct?
A True.
Q Okay. And he studied them, didn't he?
A I would expect so.
Q And he was on the board of many of those companies, wasn't he?
A I don't -- I'm not familiar with all that.
Q Okay. Are you familiar with being on the board of companies?
A Yes.
Q Okay. And have you been on the board of companies?
A Yes.
Q Okay. And when you are on the board of a company, you really have inside information, don't you? You know things

that the general public doesn't know, correct?
A Correct.
Q Okay. And when you are on the board, you learn more about the operations of the company than the general public knows, correct?
A Yes.
Q And you learn quite a bit about the management team when you are on the board of a company, correct?
A I would hope so.
Q Okay. And you often learn more about the technology of the company than the general public might know, isn't that right?
A More than the general public, yes.
Q Okay. And you know a thing or two about startup businesses, didn't you?
A That wasn't my forte.
Q But you know about them, right?
A I know what startup companies are.
Q And you know that startup companies have failures and successes, right?
A As do all of them.
Q I think maybe two in ten might be successful, wouldn't you say?
A Startup companies?
MR. LANG: Your Honor, I'll object on relevance

grounds.

THE COURT: The objection will be sustained.

BY MR. ZULAUF:

Q Okay. Well, Mark talked with you about several startup companies, didn't he?

A Yes.

Q Okay. And you are aware that he was involved with many startup companies, aren't you?

A Involved, such as?

Q Interested in, focused on, talked about.

A He evaluated them for his clients.

Q Okay. All right. And two of those companies that he focused on were Tamarac and TeraHop, right?

A True.

Q Okay. And he talked with you about those companies?

A Yes.

Q Okay. And, in fact, he was quite high on the chances of success for Tamarac, wasn't he?

A Yes.

Q He believed that an investment in Tamarac could pay off, right?

A Yes.

Q Okay. And you probably are aware from his conversations that the first year for Tamarac was a little rocky, wasn't it?

A I suspect it was.
Q And so there are failures, even in the best of startup companies, aren't there?
A Yeah, as we've already -- yeah.
Q Okay. So there can be problems even with startup companies that later become really successful?
MR. LANG: Objection. He is not an expert. Relevance.
THE COURT: The objection will be sustained.
BY MR. ZULAUF:
Q Okay. Well, let me talk with you about Tamarac for a minute. Did Mark indicate to you when he talked with you about Tamarac that the problems could be fixed and this could be a very successful company?
A What time frame are we talking about?
Q Let's talk about that early time frame, that 2004-2005 time period.
A When he was putting information out to us, my wife and to me, about Tamarac, he was going through a full explanation of it. I don't recall anything about the status of what it was, currently.
Q Okay.
A And I just don't know that.
Q All right. By the time he started talking to you in detail about Tamarac, he believed it was going to take off as

a company, didn't he?
A I would hope so. He was asking for money for it.
Q Right. So he believed in it, right?
A Yes.
Q Did he talk to you about the technology of the company?
A We discussed what it was all about, the company.
Q Did he show you projections for the company?
A At some point in time, I'm sure he did.
Q Okay. And he expected it to become a $100 million company, didn't he?
A I can't verify that.
Q Okay. But when Tamarac was put into a receivership, it didn't reach its highest potential then, did it, for investors?
MR. LANG: Your Honor, I'll object. He is asking him to speculate. He has no idea.
THE COURT: Mr. Zulauf, how is this individual supposed to know any of that? The objection will be sustained.
BY MR. ZULAUF:
Q Did he ever project for you, that you remember -- and if you don't remember, that's fine. But do you remember him projecting that Tamarac would continue to have great revenues and continue to become more and more valuable?
A What kind of time frames? I don't know how to answer that

question.
Q Okay. Fair enough. Let me talk with you about TeraHop from a moment. Similarly, he was very high on the technology of TeraHop, wasn't he?
A Again, TeraHop was a string of companies that started in the early 2000s, SeekerNet and InTransit and a whole bunch of them. So I can't quite tie into your time frames of what you are talking about, so...
Q All right. That's fair. So let's talk about that 2007 time frame. I'm not sure if it helps to point to a year, but I'm going to try to do that. Do you remember talking to Mark Spangler about the technology of TeraHop?
A Was the corporate name TeraHop at the time?
Q I think it was.
A There were many technology changes with these companies as they evolved and finalized into TeraHop. And the technologies were somewhat different all the time, so...
Q Okay. Do you know that because you talked with Mark Spangler about it?
A That was the only way I would have known.
Q Okay. All right. So he did talk with you about the technology, and he was quite high on the technology, wasn't he?
A Probably all of them.
Q Okay. And did he tell you what he believed the value of

TeraHop would be in the future?
A We had -- as I think we covered yesterday, we had annual meetings. And in those annual meetings, for all the private equities, he would project basically three points. One was when it was going to generate revenue, when it was going to generate returns, and basically cash flow was the third one. But there were three basic points that he made on all the private equities every year that we got together.
Q Okay. And did he make a projection into the future for TeraHop?
A Yes. He did it with all of them.
Q And, again, he expressed to you his belief that TeraHop was going to take off, didn't he?
A Correct.
Q Mr. Rupp, my voice is a little scratchy today, so if you need me to repeat a question, let me know.
A Certainly.
Q You knew that Mark Spangler was involved in TeraHop and Tamarac at the board level, didn't you?
A With Tamarac, I was clear on that. The TeraHop thing was in and out. I wasn't sure at different times if he was still involved or not.
Q Okay. You knew at some point in time --
A I knew he was, earlier on. And in the in-between years of all those companies, I don't know that he was or he wasn't.

And I know he was at the end of it.
Q Okay. Overall, from 1991 to 2009, you had quite good success with his investment advice, right?
A Not on these startup companies.
Q Okay. He had some startup companies that weren't successful, right?
A I would say most of them.
Q Okay. Did you invest in Who's Calling?
A Yes.
Q Okay. And that was a tremendous success, wasn't it?
A I don't know that I would label it as tremendous. It was successful. I was happy.
Q It went from zero, as a startup company, to selling for more than $50 million, right?
A I don't know what that meant to me, though. I don't have that figure in front of me.
Q Okay.
A I know it was a positive, successful company.
Q He recommended to you Five States, I think, didn't he?
A Five States, yes.
Q And that was a success, right?
A Yes.
Q Okay. He recommended Tamarac to you, didn't he?
A Yes.
Q And that went from being a startup company to selling for

more than $50 million, right?
A If you say so.
Q Okay. All right. One of the things that is important here is, I don't intend to put words in your mouth. This is something that I thought you understood, was that it sold for $54 million. Did you understand that?
A I'm sure that there was a figure given to me for the sale price. But whether it was 54- or 58-, 60-, I don't know that.
Q But that was a tremendous success, wasn't it?
A It depends how you look at it. It's in a receivership, so therefore I lost --
Q Well, the fact that it was in a receiver --
MR. LANG: Your Honor, he is trying to answer the question.
MR. ZULAUF: I'm sorry.
A I was just saying, because it was in receivership, I lost the true value of my investment.
BY MR. ZULAUF:
Q Right. That's the problem with the receivership.
MR. LANG: I'll object to counsel testifying.
THE COURT: The objection to the form of the question is sustained.
BY MR. ZULAUF:
Q Let me talk with you for a minute. I think yesterday you

mentioned that you were upset about the fee that he charged when you withdrew money, I think, is that right?
A Correct.
Q Okay. And he charged you a fee for withdrawing from Equity or Growth, correct?
A It was out of Growth, yes.
Q Okay. And from a client relations point of view, that might not have been a good idea, because you became annoyed with him, didn't you?
A I had already paid him the fee for his services.
Q Okay. But as a fundamental matter, you believe in contracts, don't you?
A Yes.
Q Okay. And you believe that you are bound by the terms of a contract, don't you?
A Yes.
Q Okay. And were you aware that both Equity and Growth provided for a fee if you withdrew or partially withdrew from the fund?
A I can't answer that. I don't know.
Q Okay. Ms. Valencia, could we pull up 401.6, please? And could you go to page 14? And could you focus on the next-to-the-last paragraph, and that bottom sentence?
Mr. Rupp, do you see that last sentence there?
A Yes, I do.

Q Okay. Were you aware that the contract provided that there may be a withdrawal fee not to exceed 2 percent?
A I see that in front of me. I certainly wasn't made aware of it at the time. And is this document with the Growth?
Q This one is Equity. But I would represent to you that Growth is the same. Were you aware of the 2-percent fee?
A Was it in the Growth also?
Q I believe it was.
A Well, if it was, I don't know of it.
Q Okay. So it permitted a withdrawal fee, as far as when you look at this here? That was one of the terms of the contract, wasn't it?
A It appears to be so.
Q Okay. Let me talk with you for a few minutes about the terms of the contracts that you signed. And I want to focus for a few minutes just on Equity Investors Group, if I could. If a contract provides that the manager can make a change in investments -- let me start over.
If the Equity contract provided that the manager could make all the investment decisions, then that is a term of the contract, and you are bound by that, aren't you?
MR. LANG: Objection. He is not a lawyer.
THE COURT: The objection will be sustained.
BY MR. ZULAUF:
Q You were aware that Mark Spangler was going to be the

manager of Equity Investors Group?
A Yes.
Q Okay. And you were aware that, under the contract, he was allowed to change investments as time went on?
MR. LANG: I will object to that as mischaracterizing the document, Your Honor.
THE COURT: The objection will be sustained.
BY MR. ZULAUF:
Q All right. Ms. Valencia, could you take me to 401.1, please?
Mr. Rupp, you were aware that you signed the contract, right?
A This is Equity Investors?
Q It is.
A I suspect I did.
Q Okay. And do you see the language at the top, "In consideration of the agreements and obligations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the members agree as follows"?
A I see that.
Q Okay. And is that the sort of language you are familiar with from signing contracts? Is that contract language?
MR. LANG: Objection. Relevance.
THE COURT: The objection is sustained.

BY MR. ZULAUF:

Q Do you believe that you are bound by the terms of a contract that is signed?

MR. LANG: Objection. Asked and answered.

THE COURT: Mr. Zulauf, could we move off the subject?

MR. ZULAUF: Well, Your Honor, I want --

THE COURT: You can ask him any factual questions that you want. But asking him hypotheticals and asking him to speculate is not going to get you anything but objections from Mr. Lang.

MR. ZULAUF: Okay. Ms. Valencia, could you turn to page 4, please, and to Section 3.1, the section that talks about representations and warranties?

Do you see where it indicates that "each member hereby represents and warrants to the company and to other members as follows"?

A Yes.

Q And there are subsections under that, right?

A Yes.

Q Okay. And can you take me to page 5, Section (b), please?

And do you see that one of the representations made here is, "that such member has duly executed and delivered this agreement, which constitutes a legal, valid, and binding obligation of such member, enforceable against it, him, or

her in accordance with its terms"?

MR. LANG: Your Honor, I'll object. Simply reading a document to this witness is cumulative to things we have seen numerous times already. Asking questions based upon this is a different story. I object on cumulative grounds.

THE COURT: I am assuming you will be asking him a question about this?

MR. ZULAUF: I will.

THE COURT: I will overrule the objection. The question is?

BY MR. ZULAUF:

Q What does that language mean to you?

MR. LANG: I object on the grounds of what it means to him now, versus what it meant when he signed it.

THE COURT: The objection will be sustained.

BY MR. ZULAUF:

Q When you signed it back in, I think, 1998, you were aware that you would be bound by the terms of the agreement that you signed, right?

A This is a little bit more legal than I am capable of understanding. But I would say that Mark was a trusted advisor. We had seen many of these agreements over the previous seven or eight years, many kinds of languages. And like other clients, we signed them.

And because of the past philosophy, and I wouldn't say

contracts, but agreements, that I had with Mark an understanding, there was no reason for me to have doubt about any of this, or to question any of this.

Q Did you understand from your conversations with Mark that investments in Southeast Asset Management would be the initial investment for Equity Investors Group?

A I can't answer that.

Q Do you remember from conversations with Mark that the manager, in its sole discretion, from time to time, can invest the company's assets in one or more other investment vehicles?

A You know, the only comment I can make is, I know that day I read a newspaper, and I don't remember anything in the newspaper.

Q Okay. But you had conversations with Mark, right?

A Undoubtedly.

Q Okay. And Mark made it clear to you that initially they were going to invest in Southeast Asset Management, right?

A I can recall over time Southeast Asset Management, Longleaf, and O.M. Hawkins were all solid investments and people that Mark was very fond of their philosophy.

Q And Southeast Asset Management was expected to invest in equities, right?

A I think you've got that in reverse.

Q Southeast Asset Management was expected to invest in

equities, correct?
A I think equities were invested in Southeastern Asset Management -- or Southeast, I should say.
Q I understand the confusion now. Equity Investors Group was going to put its money into Southeast Asset Management, right?
A (Indicating.)
Q And you expected Southeast Asset Management would put its money into equities, right?
A The proceeds?
Q Right, what was invested in it.
A Yes.
Q Okay. And equities could be -- well, let me back up.
You are aware there are public companies and there are private companies, right?
A Yes.
Q And when there is stock issued, that is referred to as an equity, right, an ownership interest?
A Yes.
Q Okay. So when I say the word "equity," that can mean public equity or it could mean private equity, right?
A Yes.
Q Okay. And did you remember Mark telling you that he was going to initially put money into Southeast Asset Management?
A I'm sure we did. We did. We put money into Southeast

Asset Management. From which vehicle to which vehicle, I don't know.

Q All right. And he kept nearly all of the money in Southeast Asset Management for ten years, didn't he?

A I don't know the length of time. It's just too broad.

Q Okay. There's going to be some things that you just don't know. And it's fine to say, "I don't know," all right?

A Uh-huh.

Q Were you aware that Mark did, in fact, take the money that you had invested in Equity, and he did then put it into Southeast Asset Management? Were you aware of that?

A I don't know how I would have known that.

Q Okay. Did Mark tell you that he had done that?

A At that point in time, we might have had funds in Longleaf and Southeast Asset Management. So I just don't know the vehicle.

Q All right. Did Mark tell you how long he kept money in Southeast or in Longleaf?

A I suspect he was in and out of it all the time.

Q Okay. He had the right under -- or did he explain to you that he had the right to move money into other investments?

MR. LANG: I'll object to the form of the question, Your Honor.

THE COURT: The objection will be sustained.

BY MR. ZULAUF:

Q Did you talk with Mark about whether he could move money into other investments?
A We had a vehicle signed for investing that we used.
Q Okay. And that vehicle that you're talking about are the operating agreements and the private placement memorandum, right?
A Correct.
Q Okay. And those vehicles provided that Mark could change investments over time, right?
A Within the parameters of the investor.
Q Okay. And the investment objective was to invest in equities for growth over a period of time?
MR. LANG: I'll object. He has no personal knowledge of this, Your Honor.
THE COURT: The objection will be sustained.
BY MR. ZULAUF:
Q Mr. Rupp, do you remember if Mark Spangler indicated to you that Equity Investors Group had an investment objective to realize capital appreciation through investment in equity securities at a discount to their corporate worth?
A I would believe so.
Q Okay. All right. And that doesn't say public equities or private equities. It just says equities, right?
A Yes.
Q Okay. And do you remember Mark Spangler indicating to you

that the manager will select all of the company's investments, including investment advisors?
A Could you put that on me again, please?
Q Sure. Do you remember Mark Spangler talking with you about the manager of the company?
A No.
Q Were you aware that he was going to be the manager of Equity Investors Group?
A It was in the document.
Q Okay. And do you know that it was in the document because you went through the document?
A I read the document. I looked at the document.
Q Okay. And do you remember Mark telling you that the manager will select all of the company's investments?
A He did not tell me that.
Q Okay. Did you see it in the document?
A I believe I read it.
Q Okay. And did you see that the manager would select all of the investments without consulting with any of the other members of the Equity Investors Group?
A If that's in the document.
Q Okay. Do you remember him talking with you about that?
A No.
Q Do you remember seeing it in the document?
A Not really.

Q Okay. Do you remember talking with -- do you remember whether Mark Spangler ever talked with you about the fact that the manager does not intend or expect to diversify the company's portfolio?
A No.
Q Okay. Let me ask you this: Do you remember talking with Mark about the fact that the investment in the company would involve substantial restrictions on liquidity?
A I'll answer that we did not talk about these specific documents and each line item. They were presented to us, we asked questions, and we signed documents.
Q Okay. Do you remember ever talking to Mark about the fact that, because of the illiquidity, if an investor demanded payment and he didn't have the cash to pay, he might have to pay them with stock?
MR. LANG: Objection, Your Honor. He said he has never talked to Mark Spangler about these documents. This line of questioning is cumulative and unnecessary.
THE COURT: The objection will be sustained.
BY MR. ZULAUF:
Q Do you remember talking with him about a provision -- do you remember talking to him about his right to pay investors in kind if the company was illiquid?
A No.
Q If there are provisions of the contract -- if there's a

provision in this contract which allows for the manager not to diversify a portfolio, would you agree that the manager is allowed not to diversify the portfolio?

MR. LANG: Objection. Speculative.

THE COURT: It will be sustained, counsel.

BY MR. ZULAUF:

Q Mr. Rupp, one thing that you felt that the manager needed to do was to notify you if there were going to be changes in the investments, right?

A Mark knew how we worked and knew what we were looking for with our investments.

Q Okay. And you expected him to notify you as there were changes, right?

A Yes.

Q Okay. Ms. Valencia, could we turn to A121.06, please?

Did Mark sit down with you and give you PowerPoint presentations over the course of years?

A Yes, he did.

Q And I'm going to show you A121.06. I don't think that has been offered and admitted yet. But do you recognize that as the front page of a PowerPoint presentation that he gave you?

MR. LANG: Your Honor, the same process as yesterday. I don't have any objection to using these, for efficiency's sake. We've offered all of these. So no objection to publishing these to the jury.

THE COURT: Thank you, counsel.

BY MR. ZULAUF:

Q And you see that there was a PowerPoint presentation given on July 31, 2004. Is that your recollection, that you had a presentation in 2004?

A I would say the date probably does not reflect accurately when we met and went over it, but it was in that 2004 time frame.

Q Okay. And can we go to page 10, please? And does that presentation seem to indicate that the asset allocation for you at that point in time was about 9.7 percent in private equities?

A Yes, that's what it says there, yes, correct.

Q Okay. And can we see page 11, please? And do you see the section at the bottom that talks about private equity?

A Yes.

Q Okay. And do you see that his group target was to raise the percentage, almost double the percentage in private equity?

A Yes.

Q Okay. And if you look over at marketable equity, do you see that his intention was to lower the amount in marketable equities?

A That was not his choice to make.

Q Okay.

A This screen right here is something that we talked about. Mark presented what he wanted to see his clients at. But all the clients were obviously in different balances for different reasons. But it was not something where he had authority to go and say, well, we're going to move this to here and move that to there. He wasn't looking at that. He was not asking for that. It was just a discussion point.
Q A discussion point where you could see that his target was to increase private equity and decrease public equity?
A His target didn't reflect my target or my interests.
Q Okay. All right. Ms. Valencia, could we go to A121.07?
And, again, this is another PowerPoint presentation that he made in 2005, correct? Do you remember that?
A I'm sure we had a meeting in 2005 and went through this PowerPoint.
MR. ZULAUF: Again, I would move for the admission of A121.07.
MR. LANG: Your Honor, I object to the admission. I don't have a problem publishing it for cross-examination. This is already in through our series.
THE COURT: And that is the way we will handle it, Mr. Zulauf. We don't want double exhibits. But it is already in, and you may use it.
BY MR. ZULAUF:
Q So page 16, please. This is a year later. Do you see

where it talks about private equities at 12 percent?
A Correct.
Q Okay. And then could we have page 17, please? Okay. Again, this was Mark showing you what, in his mind, were the targets, correct?
A Yes.
Q And for private equities, his target was 20 percent, right?
A Correct.
Q And his target for marketable equities was 25 percent, right?
A Correct.
Q Okay. So he was explaining to you where his targets were at least, right?
A This was where he wanted his clients. And then, as I understood it, all of his clients fit into that light green spot, and the blue was where his clients were at the time.
Q Fair enough. Ms. Valencia, could we go to A121.08, please? And if we could go to page 6, please?
Do you remember Mark talking about private equity?
A Yes.
Q Okay. And do you remember him talking about alternative is the core?
A I read that, yes.
Q And that the major alternative strategy is private equity?

A I read that, yes.
Q Okay. And could we have page 10, please?
And do you see this slide for Equity Investors Group?
A I do.
Q Okay. And that slide indicates that, at that point in time, 25 percent of Equity Investors Group was invested in private equity, doesn't it?
A Yes, it does.
Q Okay. And then could we go to A121.09, please? And do you recognize that in 2007 you had another meeting with Mark?
A Yes.
Q And I think you've indicated that your meetings often were lengthy meetings, right?
A They typically took the better part of a day.
Q And could we go to page 5, please? Again, do you see where it indicates that the core investment strategy was in alternative investments?
A Yes, I do see that.
Q Okay. And could we go to page 6, please? And do you see that it says that alternative is core, and that the major alternative strategy is private equity?
A Yes.
Q Did Mark read this slide to you?
A I would not know that.
Q Okay. We're talking about a number of years ago, I

recognize. But when he made the presentations to you, he would walk through each slide, wouldn't he?
A Yes, he would.
Q Okay. All right. So could we then go to page 11, please? And do you see that page 11 has to do with Equity Investors Group and the percentage of investment in private equity?
A Yes.
Q Okay. And that's 31 percent at that point in time, right?
A (Indicating.)
Q Okay. Mark showed you this slide, right?
A If it was part of the package, I saw it, yes.
Q Okay. And you can see that he was reducing the amount in public equity to 49 percent, right?
A Yes.
Q Okay. And could we go to page No. 12, please? Now, this has to do with Long/Short Equity Investors Group. Were you invested in Long/Short?
A I suspect I was.
Q Do you see that 66 percent of the investments were in hedge funds?
A What year was this?
Q This was 2007.
A Okay.
Q Okay. And can you tell me, when we use the term "hedge fund," do you think in terms of -- well, tell me what you

believe that to mean. Are those more risky investments?
A Hedge funds? Mark employed hedge funds as a balancing tool.
Q Okay. Can we go to page 17, please? Again, Mark is talking about the alternative strategies. And do you see where it talks about private equity here?
A Uh-huh.
Q Okay. And right under that second bullet point, it talks about buying control, "We don't just buy an equity position." Can you tell me what that meant to you?
A Well, the philosophy, and what Mark was wanting to do, was to have control so that he understood the internal workings of the companies, and feeling that that was going to generate the long -- the better returns for his clients.
Q Because he could be on the board or he could be active in management?
A Uh-huh.
Q Okay. So when he talked about buying control, you understood that he was going to become active in the companies that he was purchasing?
A Well, not necessarily. That's --
Q All right.
MR. LANG: Well, excuse me. I don't know if he has answered completely.
THE COURT: Were you finished?

A Well, what I was saying was that buying control doesn't employ any particular kind of strategy. I mean, it doesn't say this is going to happen, control by just having the majority of the shares. I don't know what he's going to do.
BY MR. ZULAUF:
Q Right. But by buying control of a stock or a company, you have greater control over the course of the company, don't you?
A It's implied, yes.
Q Okay. And if you have stock control of a company, then you can, if you choose to, be on the board of the company, right?
A You are talking some corporate law there that I'm not totally familiar with.
Q All right.
A I would -- I think I know the answer to that, but there's too much about corporate structures that I would say --
Q Fair enough.
A -- not.
Q Have you been on the board of private companies?
A Yes.
Q Okay. And the way that you get on the board is that people with stock vote for who gets to be on the board, right?
A Unless the stock is controlled by a bank or controlled by

other entities.

Q But usually control of the stock means that you can decide who is going to be on the board, right?

A If you have authority of that stock, yes.

Q Okay. All right. When Mark showed you -- could we go back to Slide 11, please? When Mark showed you that 31 percent of Equity Investors Group was invested in private equity, did you talk with him about what private companies that he was interested in?

A No.

Q Can we go to Slide No. 35, please? Do you remember Mark showing you a portfolio of companies that he was interested in?

A These would have been companies that we were invested in already, not thinking about -- not saying we're going to look at these in the future. These were actual deals, done.

Q Were you invested in GoTV?

A I believe so.

Q And Action Engine?

A I wish not.

Q And ePartners?

A Right.

Q Okay. And Five States Energy?

A Yes.

Q Okay. And then could you show Slide 36, please?

And do you see Tamarac and TeraHop and Who's Calling and ZPower there?

A Yes, I do.

Q Okay. So you were aware that Mark Spangler was interested in those private companies, right?

A These were companies that private equities had bought positions in. So I'm just saying I don't know this interest thought that you have. He was interested. I mean, it's already a done deal.

Q Okay. He indicated to you that 31 percent of Equity was going to be -- was invested in private companies, right?

A Uh-huh.

Q And then he showed you a list of portfolio companies, right?

A I'm having a little problem with your language. But what he was showing was these were companies that we had invested in.

Q Did he talk about any other private companies to you, other than the ones that are on this screen, at that time?

A I don't know.

Q Okay. Could we go to, Ms. Valencia, to A121.10, please?

Did you have a meeting with him in March 2009?

A I believe it was a Skype session.

Q Okay. And he sent you the PowerPoint presentation, correct?

A Yes.
Q Okay. And then the PowerPoint presentation, after the meeting, was posted on the website, right?
A I don't think so.
Q Okay. Were you aware that they posted all of the PowerPoint presentations on the website?
A I don't think so.
Q Okay.
A You are saying my individual financial information was posted on the website?
Q Not your financial information. You had a section on the website just for you, right?
A Probably.
Q And you were the only one who could have access to that section, correct?
A I would hope so.
Q Okay. And, in fact, you were given a password to get into that section, right?
A Yeah. But when you said "website," you weren't talking specifically my section of the website.
Q I meant to be. But let me talk to you. You were aware that --
A Yes.
Q -- all the PowerPoint presentations for you, with all your information, were posted on your section of the website,

right?
A I believe so.
Q Okay. All right. So could we go to page 4, please? Again, I think, for perhaps the third time, Mark is talking with you about the core being alternative, right?
A That's what he said there, yes.
Q Okay. And could we have page 5, please? Do you see where it says the major alternative strategy is private equity?
A Yes.
Q Okay. And he went through, again, each page of this presentation with you, didn't he?
A Correct.
Q Okay. And could we go to page 13, please? On page 13, he indicated to you that SG Growth was -- first of all, this is 2009, right?
A Yes.
Q Okay. And he indicated to you that 70.65 percent of SG Growth was invested in private equity, right?
A Yes.
Q And could we have page 17, please? And, again, he is talking about private equity as being the major alternative strategy, right?
A Along with some other points there.
Q Right. Okay. The second bullet point, his strategy is to become involved in equity deals that aren't available for

public participation. That meant, didn't it, that he is investing in private companies?

MR. LANG: I'll object to what it meant, Your Honor.

THE COURT: The objection to the form will be sustained.

BY MR. ZULAUF:

Q You understood that to mean that he was investing in private companies, right?

A (No response.)

Q I'm sorry. I didn't hear that. Maybe you didn't answer.

A I'm still trying to work my way through that statement. Well, it says what it says, let's put it that way.

Q Well, when he talks about equity deals that aren't available for public participation, that signals to you he is not talking about investing in public markets, right?

MR. LANG: I object to what it signals, Your Honor.

THE COURT: The objection will be sustained.

BY MR. ZULAUF:

Q Do you take that language to mean that he wasn't investing in public companies?

A I guess that language is out there for anybody to try and understand. I don't know that I can clarify that language.

Q Okay. All right. Could we go back to Slide 13 for a moment?

When Mark Spangler indicated to you that 70.65 percent of

private equity -- that Growth was investing 70.65 percent in private equity, did you talk with him about which companies he was investing in?
A We knew some of the companies. We never, at that point in time, had a total picture of what all was in there.
Q Could we go to page 17, please? Or I'm sorry. Could we go to page 35, please? Could we go to Slide 34 -- or page 34, please?
Do you see that he talked about the private equity -- I'm sorry -- "The Spangler Group Private Equity Review of Long-Term Goals"?
A Uh-huh.
Q And do you see that one of the goals, the top bullet point, is to generate returns that are non-correlated to public equity? Do you see that?
A I do.
Q Okay. And what did you understand that to mean?
A Well, really not any more than it means to me right now.
Q And what is that?
A It doesn't mean anything to me.
Q Okay. All right. Could we have Slide No. 35, please? When Mark Spangler talked with you about the percentage that was invested in -- when Mark Spangler talked with you about Growth and the percentage that was invested in private equity, more than 70 percent, did he talk with you then about

the private companies that he was interested in?
A He did this projection that's on the screen, yes.
Q Including TeraHop and Tamarac, right?
A Five States, yeah, all of them.
Q Okay. So he had a number of companies that he was interested in, but he indicated that at least two of them were TeraHop and Tamarac, right?
A Yes.
Q Can we have Exhibit A121.11, please? Could you go to the first page?
And do you recognize that as another presentation that was made by Mark Spangler to you?
A Yes.
Q Okay. And page 2, please. Again, this was an asset allocation review, right?
A Yes.
Q And could we go to page 12, please? On page 12, do you see where it talks about the percentage that Mark has of Growth that is invested in private equity stock?
A Yes.
Q And do you see it being 76.5 percent?
A Yes.
Q And do you see the amount that he has invested in private equity convertible securities?
A Yes.

Q And do you see that as being 23.3 percent?
A Yes.
Q Okay. And you understood this was as of September 2010, right?
A The date on the document is September 2010. But our meeting was not then.
Q Okay. And then could we have page 13, please? On page 13, do you see where it indicates the SG Growth investments as of September 2010?
A Yes.
Q Okay. And do you see where it indicates TeraHop stock as being 64 percent?
A Yes.
Q And Tamarac stock as being 10.6 percent?
A Yes. I didn't see it at that date, though, just so you're aware of that.
Q All right. Did you see that in 2011?
A Yes.
Q You remember that's the date that you did see it?
A Yes.
Q Okay. What Mark Spangler did throughout the years is he showed you his increasing interest in private equity, right?
A Yes.
Q He consistently showed you all through the years his interest in TeraHop and Tamarac stock, right?

A As part of this package, yes.

MR. ZULAUF: Nothing further. Thank you.

THE COURT: Any redirect of Mr. Rupp?

MR. LANG: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. LANG:

Q Mr. Rupp, when Mr. Spangler was talking to you about TeraHop, did he reveal to you before December of 2010 how much of the Growth Fund was invested in TeraHop?

A He did not.

Q So when he was speaking to you about TeraHop, how were you relating that to your own portfolio over the years until December of 2010?

A It was just one of a category of investments.

Q I want to ask you some questions about these PowerPoints. Could we please bring up Exhibit 120.8, page 14? These have all been admitted.

Mr. Rupp, in the 2004 PowerPoint that Mr. Spangler showed to you, we have on the left side your funds, municipal bond, and then the second column is Equity Investors. Do you see that above the column marked "marketable equities"?

A Yes.

Q And then a couple of columns over we see private equities? Do you see that?

A Yes.

Q And did you understand this to be that the top reflects your asset allocation?
A The combined of all those?
Q Yes.
A Yes.
Q On the private equity section, you were asked some questions about the private equity investments. Action Engine, did that return a profit for you?
A It did not.
Q The next one, Bot, did that?
A No.
Q EYTE Partners, did that one?
A No.
Q Energy Investors, is that Five States Energy?
A Yes.
Q And did that turn a profit for you?
A Yes.
Q SeekerNet, also known as TeraHop, did that turn a profit for you?
A Did not.
Q Tamarac?
A Did not.
Q Who's Calling?
A There was a return on that of some sort.
Q And ZMP, did that return a profit for you?

A No.

Q Do you think Mr. Spangler was particularly gifted at picking private startup companies to invest in?

A No.

Q Could we please turn to Exhibit 120.14, page 31? Mr. Rupp, you see here initial investments of your assets. And do you see a summary of your investments listed at the bottom, Income+, Equity Investors, Long/Short, real assets, and private equities?

A Yes.

Q Do you see that at the top it says Long/Short Investors Group? Do you know if this reflected your own portfolio or something else? Do you remember this conversation, this part of the PowerPoint with Mr. Spangler?

A I would say it's my own portfolio.

Q Okay. It says summary of investment, appreciation, distribution, Rupp, September 30, 2006?

A Right.

Q Could we turn to Exhibit 120.17.32? And this is the PowerPoint for the year 2007. Do you see the various columns showing your portfolio as it's invested in the pooled funds at the bottom? Income+, do you see that?

A Yes.

Q Equity Investors?

A Yes.

Q Long/Short?
A Yes.
Q Real assets and private equities as a separate column. Do you see that?
A Yes.
Q Did Mr. Spangler explain to you in this presentation that he was moving your money into TeraHop at this time?
A And this was Equity Investors?
Q This is in the year 2007 PowerPoint presentation.
A Yeah, but what --
Q My question is: Did Mr. Spangler inform you verbally that he was moving your money into TeraHop through the Equity Investors fund at this time?
A No.
Q Can we turn to page 11 of this document, please? Did Mr. Spangler explain to you that your private equity -- your private equity portfolio was consistent with what's reflected on this page, or did you believe it to be what was shown in your asset allocations?
A It wasn't the same?
Q Did you know?
A No.
Q All right. Well, let's go back. This says Equity Investors, private equity, 31 percent. Now let's go back to your page, page 32. Did you believe these two to be

reflective of your portfolio? Do you know which one was reflective of your portfolio?
A Not at this time.
Q Okay. Can we please turn to Exhibit 120.23, page 32? In 2009, during your PowerPoint presentation, did Mr. Spangler provide this as well, where he broke down your various columns into separate asset classes? Do you see that?
A Yes, I do.
Q And does it reflect a separate column between private equity, SG Growth and SG Income?
A Yes, it does.
Q During all these years that you were investing with Mr. Spangler, were you desiring a diversified portfolio?
A Always.
MR. ZULAUF: Objection. Leading.
THE COURT: It is. The answer will stand. Ask another question.
BY MR. LANG:
Q Please turn to Exhibit 120.22, page 25. At the bottom of this page, Mr. Rupp, there is a second question from the bottom that reads, "Are Diane and Rick balanced?" Do you see that?
A Yes.
Q In 2010, did you have a discussion with Mr. Spangler about desiring to have a balanced portfolio?

A He always knew we wanted that.

Q Did you want to be in the same target as Mr. Spangler's other clients, or did you talk to him about your own desires and your own balance needs?

A It was always our own.

Q When Mr. Spangler showed you the PowerPoint slides that show the words, "core investment strategy, alternative is core, major alternative is private," did you have any idea what that meant for your portfolio?

A I did not.

Q Did you believe he was putting virtually all of your portfolio into Tamarac and TeraHop?

A No.

Q Did Mr. Spangler -- I just want to ask you, when did you learn that most of your portfolio in the Growth Fund was in Tamarac and TeraHop? Was that December of 2010?

A Yes. That and 2011, yes.

Q When did you learn most of your money in the Income fund was in Tamarac and TeraHop?

A Not until the receivership meeting.

Q And what was your reaction when you learned that, after all these PowerPoint presentations?

A I was -- one, I was very shocked about it. It was an income fund, and none of these companies were capable of producing income. And I was feeling very -- at that point in

time, we were in receivership. And I see this, and I was feeling very betrayed that we had all of our money invested in basically two startup companies that were illiquid and had no generation of income or marketability.

Q You were asked some questions about the PowerPoint presentations being put on Mr. Spangler's website. Did you ever look at those PowerPoints on the website?

A We had gone over them, so, no, I had not.

Q Did the defendant ever ask you to do so?

A No.

Q You were asked some questions about Mr. Spangler's reputation and your opinion as to his integrity and honesty. Has that opinion changed since 2010?

A Absolutely.

Q What is your opinion of his integrity and honesty today?

A Let me go back with this trail of thought. I mean, it's not explainable. The man is taking what he -- he had taken us away from the -- from how we wanted our money balanced. And we had no reasons to be in high risk, no reasons to be illiquid and unmarketable with all of our funds. I mean, he just threatened our whole livelihood.

MR. LANG: I don't have any other questions. Thank you.

THE COURT: Anything further, Mr. Zulauf?

RECROSS-EXAMINATION

BY MR. ZULAUF:

Q I think you've indicated that you felt betrayed because Mark had moved your money into private equity and you didn't feel comfortable with that, right?

A I felt like he was using me and taking our money for his benefit.

Q Well, every dime that he took was provided for in the contracts that you signed, right?

A Was he working in my best interest?

Q He was.

MR. LANG: Excuse me, Your Honor. I will object to counsel testifying.

THE COURT: The objection will be sustained. Ask him a question.

BY MR. ZULAUF:

Q When Mark explained to you that he was moving from 2004 to 2005 to 2006 to 2007, when he was increasing private equity every year, and he showed you what he was doing and what percentages, you can't believe that he has deceived you, can you?

MR. LANG: Objection. Argumentative.

THE COURT: The objection will be sustained to the form.

BY MR. ZULAUF:

Q When Mark Spangler explained to you in 2009, when he

showed you on paper that 70 percent of Equity or Growth was in a private company, he was straightforward with you about where your money was, wasn't he?
A He was not. Private equity doesn't necessarily mean or have to mean being in illiquid, unprofitable, unmarketable, high-risk companies.
Q Did you choose to pull your money out then?
A I didn't know it was there.
Q Did you ask Mark which private companies he was putting money in?
A Yes, we did.
Q Okay. And did he tell you TeraHop and Tamarac?
A He did not tell us where it was until it was too late.
Q You knew that he was moving away from public equity into private equity, right?
A Yes.
Q And the only companies he talked about were Tamarac and TeraHop and a couple of other companies, right?
A Five States. But we had done other private equity in timber. We had done private equity into oil and gas, other than that. And we'd done private equity into real estate.
Q It's not deception when he tells you every year what he's doing, is it?
A It's deception when he goes in a direction that he knows we don't want to go and has taken us totally away from our

balanced portfolio. We have an income-producing vehicle that has no ability to produce income. That is deception.

Q You could have, in 2006, pulled out of these investments if you didn't want to increase the level in private equity, but you chose to stay in there, right?

A Mark's PPAs, his Portfolio Performance Analyses, were all projecting these companies as healthy, making money, providing -- were solid investments, all the way through 2010. In our meeting in 2010, he said TeraHop was a fine company, and he projected forward with it. He said the same of Tamarac. And three months later, a company that he is controlling, he's president, he's chairman of the board, closes.

Q And he explained to you that there had been a run on the bank, that several investors all of a sudden decided to pull the money out, right?

A I think that is totally false.

Q Didn't he tell you that an investor had demanded her money out?

A One client had asked for money. And as the indictment shows, she asked that money be --

MR. ZULAUF: Objection, Your Honor. Nonresponsive.

THE COURT: Ask him another question.

BY MR. ZULAUF:

Q You were aware that Mark believed in TeraHop, right?

MR. LANG: Well, I'll object to the form of that question, Your Honor.

THE COURT: The objection will be sustained. It already has been asked and answered as well, Mr. Zulauf.

MR. ZULAUF: Nothing further. Thank you.

THE COURT: Mr. Rupp, thank you. You may step down.

THE WITNESS: Thank you.

THE COURT: Counsel, we will head into recess. Let's take our morning break at this point in time.

Ladies and gentlemen, we will have you step back into our jury room, standard practice. Please remember our cautionary instructions. We will try to bring you out here in 15 to 20 minutes.

(Jury leaves courtroom.)

THE COURT: We will be at recess.

(Brief recess.)

THE COURT: Are we ready for our jury?

MR. LANG: Yes, Your Honor.

THE COURT: Bring them out, please.

(Jury enters courtroom.)

THE COURT: And you may be seated. Thank you very much.

The government may call their next witness.

MR. LANG: Thank you, Your Honor. The government calls Keith Foxlee.

THE COURT: Good afternoon, sir. If you could work your way through the well of the courtroom there, come up in front of our clerk, and raise your right hand to be sworn.

(Witness sworn.)

THE CLERK: Will you please state your full name and spell your last name for the record?

THE WITNESS: Richard Heath Foxlee, R-I-C-H-A-R-D, H-E-A-T-H, F-O-X-L-E-E.

THE COURT: Mr. Foxlee, the microphone in front of you does not amplify very much. Don't get too close, because it will get a little fuzzy. But keep your voice up so that everyone in the courtroom can hear you, most importantly these people on your left.

THE WITNESS: Very good.

THE COURT: You may inquire, counsel.

MR. LANG: Thank you, Your Honor.

RICHARD FOXLEE,

being first duly sworn, the witness was called and testified as follows:

DIRECT EXAMINATION

BY MR. LANG:

Q Good morning, sir. What city and state do you live in?

A Sequim, Washington.

Q How are you employed?

A I'm a radiation oncologist.

Q A medical doctor?
A A medical doctor, specializing in the care of cancer patients using radiation therapy.
Q Do you know the defendant in this case, Mark Spangler?
A Yes.
Q How long ago did you meet him?
A I think 1990.
Q How did you meet him?
A A colleague of mine, Dr. John Rieke, who seemed sophisticated about financial things. I figured as I was starting out that I needed to work with somebody to handle my financial affairs, since I figured, as a physician and father, that was going to be difficult to do as well.
Q And so did you hire Mr. Spangler?
A Yes.
Q Approximately what year was that?
A It was probably, I think, late 1990. It was really quite early after moving to the area.
Q Now, at the time that you hired Mr. Spangler, what advice were you looking to him for?
A Putting together a financial plan, since I had just finished residency. And so at that point, you know, I owned nothing but a lot of degrees. And I was actually finally going to earn something. And it seemed like it would be good to come up with an efficient way to, you know, make sure that

I ended up with a good retirement.
Q Could you please give the jury a little sense of your education and background? You mentioned your residency. Why don't you just quickly walk us through your education and background, please.
A Well, colorful probably describes it better than most. I initially was a systems engineer, and did engineering grad school, worked as an engineer, went back and did med school. Did my internship in internal medicine, then did a two-year post-doctorate fellowship in medical computing, medical informatics, worked as a consultant in that, and then did a residency in radiation oncology. So I finished my training at 37.
Q And after you finished your training, did you move to the Seattle area?
A Yes, so that was the immediate move.
Q Okay. So you were relatively new to the area when you met Mr. Spangler?
A Yes.
Q Okay. So you sound like a smart person. Why did you need an investment advisor?
A Well, I realized that, you know, I had a lot of time commitments professionally, and figured that a professional who was looking at this full time could do a whole lot better than me looking at it part time, probably very part time.

Q How long did Mr. Spangler remain your investment advisor?
A From 1990 through 2011.
Q Did he charge you fees?
A Yes.
Q Approximately how much did he charge you?
A Well, for most of the years, it was 10,000 a year. I forget exactly what the startup was, but maybe 5,000, maybe a little less, since I owned nothing. But it still felt like money well spent, as he organized a whole system for me and made sure that I had done all of the responsible adult things that I hadn't done yet, you know, wills, directive medical stuff, so forth.
Q Through the decade of the 1990s -- I want to take you chronologically -- how much contact did you have with Mr. Spangler?
A Well, living in Sequim, you know, I probably saw him face-to-face about once a year. And we would talk on the phone from time to time when something came up.
Q How did he communicate with you, via email or phone calls?
A Well, early on, not through email. Few people were doing it then. Although I had my first email address in 1981. I just didn't have anybody I could email. And so initially it was mostly through mail and just the telephone. Early on there was at least one occasion where Mark Spangler came to Sequim to meet with me.

Q In the late 1990s, did Mr. Spangler recommend you invest in certain pooled funds that he was putting together?
A Yes. I don't remember if it was mid- or late, but I remember it seemed to have some significant benefits.
Q Okay. Let's go through the pooled funds. There was something called Equity Investors; something called Muni, or Municipal, Bond; Long/Short; Large Cap; Income. Which of those did you invest in?
A Well, specifically in the Growth, and then the -- could you go through those again, please?
Q Yes. And I'll actually refresh your memory in a minute here. But before doing that --
MR. LANG: Your Honor, I would offer Exhibits 105.5 to 105.19 and 105.58.
MR. ZULAUF: No objection.
THE COURT: Those will be admitted. Thank you.
(Exhibit(s) 105.5 to 105.19 and 105.58 admitted.)
BY MR. LANG:
Q Agent, could we please bring up Exhibit 105.6, just the first page?
Dr. Foxlee, on your screen there, you should see a document come up. Do you see that?
A Yes.
Q And do you see the date up above is 2004?
A Uh-huh.

Q And Municipal Bond is a fund in the middle of the page, and below it is something called Equity Investors. Do you see that?
A Right. I do.
Q Okay. Did you invest in those two funds?
A Yes.
Q And why did you invest in those funds? What was the decision factor?
A Well, I thought the Municipal Bond was to be one of those balancing out of the investments, something that was very solid and, you know, would balance changes in the market. The Equity, as I recall, we were going to be investing in relatively smaller companies with an eye towards growth.
Q Did you know whether those smaller companies would be public or private companies?
A I thought they would be public companies.
Q And did you sign some originating documents to allow you to invest in these pooled funds?
A Yes.
Q Okay. Did you read those documents very carefully?
A You know, I always read at least part of them. And usually I would hit some paragraphs that started to become more challenging to read, and then other things would happen. So I would read, you know, some. But clearly I wasn't reading them as if I were an MBA kind of person.

Q So why did you decide to invest in these funds?
A That was at the recommendation of Mark Spangler.
Q Okay. And at the time that you signed these documents and invested, was he acting as your investment advisor?
A Yes.
Q Did you also invest in certain private companies that Mr. Spangler recommended to you?
A Yes.
Q Agent, could we please turn to page 2 of this document?
Dr. Foxlee, in the middle of this page are a number of private companies. Do you see those?
A Yes.
Q Private equities. And it indicates a percentage for your portfolio of 19.2 percent. Is that consistent with where you wanted to be in terms of percentage of your portfolio, in private companies?
A It's higher than I had initially intended. You know, this is -- each one, as it came along, you know, seemed like a good idea at the time.
Q Okay. Did you receive any sort of profit on the first one, Action Engine, to your knowledge?
A No.
Q How about Bot, Incorporated?
A No.
Q ePartners?

A You know, that's still -- it went through various transformations, but I think that eventually turned into part of a real company. And at some point, we still had some value in that. I think maybe we got something as part of the dissolution of assets, but I'm not sure.
Q Okay. SeekerNet. Do you know that company, SeekerNet?
A Yes.
Q It became TeraHop?
A Yes.
Q Okay. I'll ask you about that later. Tamarac?
A Yes.
Q You invested in that. And the funds that you put into these companies --
A And then my favorite, which was ZPower.
Q Okay. Why was that your favorite?
A Everybody's got batteries, and it just made great sense to me. It just seemed like a potentially wonderful investment.
Q And have you received any sort of return on that investment to date?
A Well, no.
Q Okay. Do you still have an investment in it?
A I think I may.
Q Okay. Now, in each of these private equities, how would Mr. Spangler present them to you? Would he talk to you about them or just send you documents?

A Well, usually both.
Q Okay.
A There would be a description, and then we would also talk about, you know, the company and why it was a good idea.
Q And then did you make the investment recommendation, or put in the money that's listed under the cost basis column of this page here?
A You know, with the recommendations, I signed forms that said to go ahead and do that.
Q Approximately what year was the last year you put any money, knowingly, into these private companies?
A I would say certainly not after 2009, because at that time I went half-time, which turned into a little less than half-pay. So there were really no further active investments by me.
Q Agent, could we please bring up Exhibit 105.5?
Dr. Foxlee, on some occasions, would Mr. Spangler sit down with you or present you with PowerPoints about your portfolio?
A Yes, I can remember on multiple occasions.
Q On multiple occasions him sitting down with you?
A Yes. So when I had -- on those vaguely annual visits, going to Seattle.
Q How many PowerPoints did you get from him?
A I know at least two, and there may have been more.

Q Okay. And we have two here I'll show you. Exhibit 105.5 indicates the year 2004. Do you see that?
A Yes.
Q Agent, could we please turn to page 6?
Dr. Foxlee, does this reference your asset allocation as of the end of 2003?
A Yes, I believe so.
Q And do you see a separate section for marketable equities and one for private equities? Do you see that?
A Yes.
Q Is that consistent with where you believed your money was at that time?
A Yes.
Q Agent, could we please turn to page 8?
Dr. Foxlee, on this page it lists marketable equities. Do you see this in a bar graph instead of a pie chart?
A Yes.
Q And above the marketable equities, it indicates Equity Investors. Do you see that?
A Yes.
Q Was that consistent with your understanding of where that Equity Investors fund was invested?
A Yes.
Q And then a column or two over we see the column "private equities" and those companies that you and I talked about a

minute ago about. Do you see that?
A Yes.
Q Okay. So when Mr. Spangler sat down with you, did he go through each of these pages with you?
A Yes.
Q Did he ask you to invest more money in any of these private companies or recommend that you do so?
A I don't think at that time.
Q Okay. Could we please turn to Exhibit 105.9? And the next page, please, just to date it. Dr. Foxlee, we have this one from 2005.
Agent, if we could please turn to page 15.
We see here, Dr. Foxlee, marketable equities, 51.4 percent; private, 24.5 percent. Is that consistent with approximately where you wanted to be at that time?
A I think so.
Q Okay. And, Agent Kirkwood, if we could turn to the next page, briefly.
And, again, sir, Dr. Foxlee, we see separate columns in a bar graph. Do you see that?
A Yes.
Q Okay. Now, Agent Kirkwood, please turn to page 25 of this document.
Dr. Foxlee, back in 2005, do you see the summary of your investment basis, appreciation, distribution?

A Yes.
Q Do you see a separate column here for private equity?
A No.
Q Did you notice it at the time? Did you talk to Mr. Spangler about it at the time?
A I didn't notice the difference.
Q In 2008, did Mr. Spangler present some documents or the notion to you of changing the Equity fund into something called the Growth fund?
A Yes.
Q And what kind of change did Mr. Spangler explain that to be?
A What I recall is that it was mostly a name change, and maybe bookkeeping. It didn't seem like it was a significant change in direction.
Q How was this information communicated to you, verbally, via email?
A I would say probably a mix of email and verbally.
Q And so did he present any documents to you to review and sign?
A Yes.
Q And did you sign those documents?
A Yes.
Q Why did you sign them?
A Because he recommended that I do so, and it seemed like

just kind of a fairly routine thing. Actually, just because he suggested that was what needed to be done.

Q Did you read the documents that he provided to you?

A I looked them over.

Q Okay. Did Mr. Spangler verbally recommend to you that you get a lawyer to review them?

A No.

Q Did you get a lawyer to review them?

A No.

Q Why not?

A I felt that Mark Spangler was representing my financial interests, and I didn't see a need. I felt like we had developed a strong trust over many years.

Q At the time that you signed these documents in 2008, did Mr. Spangler verbally say anything to you about using the Growth fund to invest in a company called TeraHop or Tamarac?

A No.

Q Did you know he had been investing the Equity Investors fund into TeraHop and Tamarac?

A No.

Q Would that have been significant to you?

A Yes.

Q Why?

A I had become pretty disenchanted with TeraHop at that time and felt like I was actually quite overexposed with them in

particular.

Q And had you talked to Mr. Spangler about your disenchantment?

A I believe I had mentioned it. I do tend to understate a bit. But I believe that I had said that I was pretty unimpressed.

Q Agent, please bring up 105.15, page 1.

Dr. Foxlee, your portfolio as of the end of 2008 shows, at the bottom, an investment by you of 135,000 or so into TeraHop. Do you see that?

A Yes.

Q And so is that the investment that you were thinking of when you just spoke to us about that you had invested money into TeraHop already?

A Yes.

Q Did you believe that the Growth fund, up above it, had any money in TeraHop?

A No.

Q As of 2008, when you signed the documents to change Equity to Growth, were you interested in putting more of your money into TeraHop?

A No.

Q Were you interested in putting more of your money into Tamarac?

A I might have been open to that.

Q Why is that?

A Well, Tamarac actually seemed to have products and was actually achieving some of their goals.

Q Did Mr. Spangler present that to you as an investment opportunity as of 2008 or later?

A I don't think so. I think that at that point, my impression was that I had put more than enough into private equities and really didn't need any more of that.

Q In 2008 and into 2009, did you begin to have questions about the value of your portfolio?

A Yes. I had noted, particularly in the wake of the Bernie Madoff thing --

MR. ZULAUF: Objection.

A -- that there was a fairly significant chunk --

THE COURT: Hang on. Was there an objection?

MR. ZULAUF: I would object to reference to Bernie Madoff.

THE WITNESS: And that's fine.

THE COURT: Hang on. The objection --

THE WITNESS: Oh, that's right. You get to choose. Okay.

THE COURT: The objection will be overruled.

BY MR. LANG:

Q Dr. Foxlee, I will --

A Well, events in the news made me look over some of this

data a bit more. And I thought, you know, there's a fair chunk that the value is somewhat arbitrarily determined, as opposed to market determined.

Q Agent, could we please bring up the document we just had? I'm not sure if I have the number. It's 105.15.

So, Dr. Foxlee, did you contact Mr. Spangler and talk to him about your portfolio and the valuations on it? Did you express these concerns to him?

A I did raise it again, in my rather subtle way, that I was kind of concerned about how the valuations were done. And he gave me an explanation that set me at ease, the content of which I don't really recall, because, you know, this is kind of, you know, a foreign vocabulary thing.

Q The valuations that you were concerned about, which ones are they on the page here? Were they the private equity or the public funds? Which ones?

A Oh, I was concerned more about the private ones, since the value there seemed to be more difficult to tell. And I figured that the other ones, you know, there's an actual market value.

Q Incidentally, the middle of this page lists Longleaf Partners Fund. Is that something Mr. Spangler managed for you, or did you do that separately?

A I think that was part of my Virginia Mason funds.

Q Now, if we could please bring up Exhibit 105.19.

Dr. Foxlee, the end of 2010 valuation of your portfolio, I want to ask you some questions about that. In 2011 -- as of 2011, were you aware that the Growth fund was putting any money into TeraHop or Tamarac?

A No.

Q How did you find out? When did you find out?

A I think it was in the first receivership meeting.

Q Approximately what month was that?

A I think in the fall of 2011.

Q Before that time, had Mr. Spangler informed you of his investments through the Growth fund into either of those companies?

A No.

Q Did that surprise you?

A Yes.

Q At the bottom of this page, on the exhibit here, did that reflect where you believed your investments were in Tamarac and TeraHop?

A Yes.

Q Under "consumer durables," you have an investment in Ford Motor Company? Do you see that?

A Yes.

Q Is that something you had a conversation with Mr. Spangler about?

A Yes.

Q When was that?
A I think it was around 2009. It was when Ford was at 2. And that was when GM had gone into bankruptcy.
Q Who made that recommendation for your investment? Did you make that to Mr. Spangler, or did he make it to you?
A I made that one.
Q And why did you want to make that recommendation to him?
A It was something that I felt very strongly about. I felt like, you know, I had discussed this with a number of people and felt that Mulally was going to turn the issues around at Ford and that it was an excellent opportunity.
Q Okay. Was this when the markets were down?
A Yes, yes. This is when Chrysler and GM had gone into bankruptcy.
Q And do you still have that Ford investment?
A Yes, indeed. And I checked it this morning.
Q And what's the price today?
A I think it was right around 18, because they just reported a nice third quarter.
Q $18 a share?
A Yes.
Q And you bought it at 2?
A Yes.
Q Exhibit 105.19 reflects a Growth current value. Do you see that, in roughly the middle of the page, of $306,000?

A Yes.
Q How much of that did you get back from the receiver in this case?
A About 75-, $76,000.
Q At some point in time, did Mr. Spangler contact you, or did you contact him about shutting down The Spangler Group?
A I returned from a vacation and had an email that it had shut down.
Q And then did you reach out to Mr. Spangler?
A I did. I telephoned him.
Q Did you talk to him?
A Yes.
Q And describe that conversation. Summarize it for us, please.
A He said that he had been sued, and rather than pay the people who were asking for money at that time, he felt the equitable approach would be to go into receivership so that resources would be distributed among everyone.
Q And approximately when was that?
A I would guess July of 2011.
Q Before July of 2011, did you receive any information from Mr. Spangler about the state of his group?
A Well, every year we had an annual report. And sometime before that he had made a -- the last time we had met, maybe in the spring of that year, he had said there was a

possibility that he was going to be sued. But it didn't seem -- you know, his demeanor at that time suggested to me this was kind of like not a big deal.

Q And when you talked to him that summer of '11, did he explain to you the impact of that lawsuit on your Growth portfolio? Did he explain to you why that had an impact on your Growth portfolio?

A No.

MR. LANG: Okay. Thanks. I don't have any other questions.

THE COURT: Cross-examination for Dr. Foxlee.

MR. ZULAUF: Thank you.

CROSS-EXAMINATION

BY MR. ZULAUF:

Q Dr. Foxlee, good morning.

A Good morning.

Q You are a radiation oncologist. Do you use gamma knife technology, that sort of thing?

A I do radiosurgery. And a gamma knife is one of the forms. I don't use that particular one.

Q Okay. Quite complicated surgery, isn't it, where you are sending rays through people's body?

A It's a fascinating technology. It's fun to describe. Though I tend to put people to sleep.

Q Okay. We won't go through it then.

A I mean, I can wax enthusiastic on it, yes.
Q And some technology company put together that technology that allows you to save lives, right?
A Yes.
Q I'm going to just cover a couple of things today and then get you off the stand fairly quickly and let you go back to your work.
The first thing that I want to talk with you about is 2011. I think you testified that when Mark Spangler explained what had happened, he said that he had been sued, correct?
A Yes. Right.
Q And that as a result of the suit, he had to put his entire company into receivership, correct?
A Yes.
Q Okay. And he put it into receivership because he wanted to be fair to all of his investors, right?
MR. LANG: I'll object to the form of the question.
THE COURT: The objection is sustained. Ask another question.
BY MR. ZULAUF:
Q He told you that he wanted to be fair to all of the investors, correct?
A Yes.
Q All right. I'm going to shift gears again. You signed

these agreements for Equity Investors Group and others, correct?
A Yes.
Q Okay. And what they provided for was that Mark Spangler would make investment decisions for you, correct?
A Yes.
Q Okay. And you gave him the power and authority to do that, right?
A Yes.
Q And part of the power and authority was to change investments over time if he thought that was appropriate, right?
A Yes.
Q Okay. The initial investment was going to be in Southeast Asset Management, as you understood it, I think?
A Yes.
Q Okay. And Southeast Asset -- well, did you know that Southeast Asset Management was heavily invested in General Motors stock?
A No.
Q Okay. I think you indicated that -- well, let me back up.
There was a financial crisis that started with the housing crisis in 2007, right?
A Yes.
Q And then in 2008 and 2009 there was a financial crisis

here in the United States, correct?
A Yes.
Q Many public companies suffered during that period of time, didn't they?
A Yes.
Q One of them was General Motors, correct?
A Yes.
Q In fact, General Motors went bankrupt, didn't it?
A Yes.
Q And so if Mark had initially invested in Southeast Asset Management, you would hope that he would move that investment out of Southeast, if they were heavily invested in General Motors, correct?
A Well, at that time, I wasn't, you know, really thinking so much about the General Motors issue.
Q Okay. Fair enough. Let me ask you this: You expected Mark Spangler to look at the economy and make decisions about where to put your money, correct?
A Yes.
Q And you knew that Mark Spangler became involved in the operations of some of the private companies that he was interested in, correct?
A Yes.
Q I think you had a friend named Jim Peterson, correct? Did I get it wrong? No? I'm wrong?

A Are you thinking of John Rieke?
Q Pardon me?
A John Rieke?
Q Let me withdraw that question. You are aware that Mark Spangler was on the board of some of the private companies he was interested in, didn't you?
A Yes.
Q Okay. I think you already testified he gave you several PowerPoint presentations, correct?
A Yes.
MR. ZULAUF: Nothing further. Thank you.
MR. LANG: Just one question, Your Honor.

REDIRECT EXAMINATION

BY MR. LANG:
Q Over the course of your time with Mr. Spangler, did you also expect him to be telling you where he was putting your money?
A Yes.
MR. LANG: Thank you. No other questions.
THE COURT: Dr. Foxlee, thank you. You may step down. And I'm glad I met you in my profession and hope not to meet you in yours.
THE WITNESS: I know it's difficult. I understand.
THE COURT: You may call your next witness.
MR. BLACKSTONE: The government calls Diane Ryesky,

Your Honor.

THE COURT: Good morning. If I could have you make your way through the well of the courtroom, come up and stand in front of our clerk here, and raise your right hand to be sworn prior to taking the stand to testify.

(Witness sworn.)

THE CLERK: Will you please state your full name and spell your last name for the record?

THE WITNESS: My name is Diane Ryesky. The last name is spelled R-Y-E-S-K-Y.

THE COURT: Ms. Ryesky, there is water on your right there, should you need it.

THE WITNESS: Thank you.

THE COURT: Your voice sounds fine. Keep it up to that level so that all of these people over here, especially on your left, can hear you.

THE WITNESS: Okay.

THE COURT: You may inquire, counsel.

DIANE RYESKY,

being first duly sworn, the witness was called and testified as follows:

DIRECT EXAMINATION

BY MR. BLACKSTONE:

Q Good morning, Ms. Ryesky. I'm going to start off with a question I should never ask someone in public, but can you

tell us how old you are?
A I'm 70 years old.
Q Are you married?
A Yes.
Q And what's your husband's name?
A His name is Gerald Delay. Would you like me to spell it?
Q Yes.
A D-E-L-A-Y.
Q And how old is Mr. Delay?
A He is 72 years old.
Q Can you give us -- where do you currently live?
A We live in Seattle.
Q Give us a little background on your education and your employment history, if you could.
A I have a bachelor's in secondary education. I have a master's and a Ph.D. in anthropology. I lived and worked in Mexico for five years doing anthropological research. After that, I got a job at the University of Washington, teaching in the nutritional sciences and textiles department.
Q When was that, that you worked at the University of Washington?
A 1978 to 1984.
Q So you were on the faculty at UW?
A I was.
Q And what did you do after the University of Washington?

A Well, the program I was in was terminated. So I was unemployed for about six months. I collected unemployment. I taught one course at Seattle Central, which didn't pay much. And after that, I went to work at Microsoft.
Q What year was that?
A 1985.
Q 1985. Was the company public at that point?
A No. It went public, I think, about a year later.
Q So what did you do for Microsoft? Tell us about your career there.
A I started out as a proofreader, which is probably the lowest editorial position in a user ed group, which is the groups that do the documentation and help systems.
Q When I read those operating manuals, you're the person who wrote that? I finally met somebody who did that. Okay. Can you understand them?
A Some of them.
Q So tell us how your career progressed at Microsoft and when you left there.
A Well, after that, I moved up through the editorial ranks, and I became a low-level manager in user ed -- various user ed groups. And I also worked for a couple of years in an international group, managing a group that dealt with language standards for translations and localizations.
Q And at some point, did you leave Microsoft?

A I left Microsoft in 1998.
Q You were there about 13 years, if my math is right?
A That's right.
Q And when you left, had you accumulated a fair amount of Microsoft stock?
A I had.
Q Approximately how much stock did you have when you left Microsoft?
A I don't know. I can't give you the exact number today. But I know that all of the stock options that I received -- and I received stock options on performance reviews, although not when I started -- we transferred all of that into stock. We never cashed any -- we cashed one set in. That was about it.
Q Okay. So just give us a ballpark figure of the total amount you had in stock at Microsoft over your career there.
A I don't know. $3 million. And, of course, the amounts changed because of the stock splits and so forth.
Q Now, you know Mark Spangler, the defendant in this case?
A I do.
Q And when did you first become acquainted with the defendant?
A I believe it was 1997.
Q And how did you make his acquaintance?
A Well, we were interested in finding a new financial

planner. We had a financial planner who was commission-based. And we were tired of getting sales pitches all the time, and we wanted to go to a planner who was fee-based, which Mr. Spangler was.
Q Explain that to us, what you mean by fee-based.
A It means that you pay a fee either for the work they do for you, or a fee, a percentage of the money under management. Supposedly this is a way in which the planner doesn't have their own interests at heart. They are more of your -- you know, they are more involved with your interest; whereas, a commission-based planner has something to sell, and they are going to make money off of what they sell you.
Q And did you meet with Mr. Spangler sometime in 1997?
A Yes.
Q And I know you can't remember the precise conversation. But in general, can you tell us what you discussed with him?
A Well, I recall that he did a financial plan for us. And we also told him that we were interested in maintaining our nest egg, perhaps with a tiny bit of growth. We were interested in having income to live on, because we hoped to retire soon thereafter. And we wanted to diversify, because we had a lot of Microsoft stock. We were very heavy in Microsoft stock compared to whatever else we had at the time.
Q And what would you describe as you and Mr. Delay's risk tolerance as of this point in time, in 1997?

A Fairly low.
Q Did your investment objectives ever change over time?
A They did not.
Q Nest egg, income, low risk?
A Correct.
Q And did Mr. Spangler share your investment objectives?
A He seemed to. But then again, a person you pay to be your fiduciary and your financial advisor needs to work with what your objectives are.
Q And after your meetings with Mr. Spangler, did you hire him to be your investment advisor?
A We did.
Q And what year was that, approximately?
A 1997.
Q And what did you understand his duties and obligations were to you as your investment advisor?
A We understood that he would follow our wishes, in terms of what we wanted to do with our money. We understood that he would suggest investments to us in order to achieve our goals.
Q Did you expect him to tell you where he was placing your money?
A We certainly did.
Q Did you expect him to share with you any negative information about your investment?

A We did.
Q And did you pay him a fee for these services?
A We certainly did.
Q And did the fee change over time?
A Yes.
Q Tell us what the final fee was towards the last couple of years. What were you paying him?
A From 2004 on, we paid $70,000 a year.
Q $70,000 a year?
A Yes.
Q So in total, do you know how much you paid Mr. Spangler since 1997 to whenever you terminated him?
A It was about 700,000.
Q $700,000?
A Uh-huh.
Q When did your relationship with Mr. Spangler end, Ms. Ryesky?
A It ended when Mr. Spangler's business went into the receivership in 2011.
Q So how many years did you have him as your investment advisor?
A Fourteen.
Q Okay. Let me turn your attention to 1998. Was that the year you retired from Microsoft?
A Yes.

Q Was Mr. Delay still working at this point?
A No.
Q You both were retired. In '98, did Mr. Spangler start to talk to you about various private funds he had established for his investors?
A I'm not sure it was in 1998. But at some point early in our relationship, he began to talk to us about the private funds he was establishing for his investors.
Q And what did he tell you about these private funds?
A He told us that they were like funds that families invest in, and they provided the opportunity to -- as opposed to a mutual fund, they provided the opportunity to direct your money more the way you wanted it to be directed.
For example, a lot of his clients came from high tech, a lot from Microsoft, and had a heavy investment in technology or Microsoft stocks, and this would allow you to get the diversification that was desired. It also would allow expenses to be kept in check.
Q What do you mean by that, expenses to be kept in check?
A Well, he was choosing managers for these investments who had low expense ratios.
Q On these various funds, did you understand that Mr. Spangler was going to be the one who was actually making the investments, buying the stocks and the bonds and stuff like that?

A No.

Q What did you understand his role was going to be in connection with these private funds?

A I understood that he was hiring investment companies, for example, Southeast Asset Management, to manage the funds for Growth, and that the people at Southeast would be deciding which stocks, bonds, or whatever to purchase, with Spangler's guidance and suggestions.

Q Was it your understanding, based on your conversation with Mr. Spangler, that each of these private funds would have a different investment objective?

A Yes.

Q And did you decide, you and Mr. Delay decide, to invest in some of these funds?

A Yes, we did.

Q Let's take a look at --

MR. BLACKSTONE: I've got a couple of exhibits that I would like to offer at this point, Your Honor. My list is longer than Mr. Lang's. I apologize. Exhibits 14.1 through 14.13; Exhibits 103.5 through 103.23; 103.40 through 103.44; 103.46 through 103.48; and then Exhibit 380.8, pages 1 through 5.

THE COURT: Any objection to those?

MR. ZULAUF: No objection.

THE COURT: Thank you.

Madam Clerk, do you have all those?

THE CLERK: I do.

THE COURT: They will be admitted.

(Exhibit(s) 14.1 to 14.13; 103.5 to 103.23; 103.40 to 103.44; 103.46 to 103.48; 380.8, pages 1 through 5, admitted.)

BY MR. BLACKSTONE:

Q If we could look at Exhibit 103.9, please, Agent Kirkwood. Can you see that okay, Ms. Ryesky?

A Yes, I can.

Q And what's a Portfolio Position Analysis?

A It's a list that came out every three months, and it listed all of your investments. It told you the cost basis for them. It told you the current value. It told you any cumulative income you had. It gave actual annual net return percentages.

Q And was the thing always broken down in categories: cash, fixed income, marketable equities?

A It always was.

Q Okay. Let's focus on a couple of these funds here. The Municipal Bond fund, is that one of the private funds Mr. Spangler set up?

A Yes, it was.

Q And what was your understanding as to what that fund was going to be invested in?

A Municipal bonds.
Q And who told you that?
A Mr. Spangler.
Q And then there's an Income+ fund. What was your understanding that that fund was going to be invested in?
A Mostly income-producing securities, bonds.
Q Bonds. And who told you that?
A Mr. Spangler.
Q Did he tell you those were going to be public bonds?
MR. ZULAUF: Objection. Leading.
THE COURT: Let me have you rephrase.
BY MR. BLACKSTONE:
Q Did he tell you what type of bonds the Income+ fund was going to invest in, Ms. Ryesky?
A We knew he was investing it. He had another manager. I think it was Hutchinson or something, some name of the sort. And it was going to be public securities.
Q At any point in time, did Mr. Spangler ever tell you that the Income+ fund was going to invest into private equity?
A He did not.
Q Did he ever tell you the Income+ fund was going to invest in startup companies such as TeraHop and Tamarac?
A He did not.
Q Is that information you would have liked to have known?
A Yes.

Q Would you have approved such a decision?
A No.
Q Why not?
A We had made a decision -- he also began offering investments in startup companies and venture capital. And we had decided that we would put about 5 percent of our nest egg into those. We didn't want more than that. So we had invested in several of those companies. He had told us, you know, the pluses and minuses of investing in venture capital and so forth.
Q Did you tell Mr. Spangler that you only wanted to invest about 5 percent or so of your money in private equity?
A Yes, we did.
Q And what was his reaction to that?
A That that seemed appropriate.
Q At any point in time, did he ever encourage you to increase your stake in private equity beyond what you felt comfortable with?
A No, I don't believe we were ever encouraged to increase our stake. But there were -- you know, every now and then a new opportunity came along.
Q At any point in time, did he ever tell you that your portfolio, which is reflected on the PPA here, had more than 5 percent or so of your money in startup companies?
A No.

Q There's a fund listed on this exhibit called Equity Investors. What was your understanding as to what that fund was going to be invested in?
A Our understanding was that it was going to be invested in growth stocks, in companies that had, you know, earning potential.
Q And by growth stocks, what do you mean by that?
A Stocks, publicly-traded stocks.
Q Did Mr. Spangler at any point in time ever tell you that Equity Investors was going to invest in private equity?
A He did not.
Q Did he ever tell you it was going to invest in startup companies such as TeraHop or Tamarac?
A He did not.
Q Is that information you would have liked to have known?
A Yes.
Q Were you given various documents that you had to sign before you put money into these funds, the Muni fund, the Income fund, the Equity fund?
A Yes.
Q Okay. Were they lengthy documents?
A Each fund had a PPM. It was a long document written by legal experts and explained the purposes of the fund and the tax implications and what have you. And those were lengthy.
Q What did Mr. Spangler tell you about those legal documents

he gave you?
A Well, he basically said they explained what the fund did. If we had questions, we should come back to him with questions. And we often did.
Q Did he review those documents with you, sit you down and review them?
A No, he didn't sit us down and review them. But usually we read them at home alone and then marked them up and came back to him with whatever questions we had.
Q And you read those documents?
A Yes.
Q And based on your reading of the Equity Investors PPM, did you believe it was consistent with what Mr. Spangler was telling you about that fund, that it was going to invest in publicly-traded stocks?
A Yes. This is in 2000, or when it began.
Q Right. And based on your reading of the Income+ PPM, did you believe that its objective was consistent with what Mr. Spangler told you, namely that it was going to invest in publicly-traded bonds?
A Yes.
Q Did you get a lawyer to review those documents, Ms. Ryesky?
A No, we did not.
Q Why not?

A We discussed it at one time, and we decided that we were paying Mr. Spangler a lot of money to be our investment advisor, and he was -- we expected that he would bring us investments that were not -- that were beneficial to us.
Q If those PPMs provided for something other than you expected, did you think Mr. Spangler would have brought that to your attention?
A Yes.
Q Did you expect him to bring that to your attention?
A Yes.
Q Did he ever tell you anything that led you to change your view as to what the Equity fund was going to invest in?
A No.
Q How about the Income fund?
A Same answer as above.
Q Let's go back to this 103.9, which is on the screen. And if we could go to page 2, please, Agent.
At the bottom there, do you see that category that says private equities, preferred and common stock?
A Yes, I do.
Q And what is listed there, Ms. Ryesky?
A Action Engine, Bot, ePartners, SeekerNet. And these were all some of the venture capital investments.
Q And was each one of these companies recommended to you by Mr. Spangler to invest in?

A He recommended them all.
Q Let's focus on SeekerNet. What was SeekerNet?
A SeekerNet was -- SV7 was set up for a company called InTransit. And they were involved with asset-tracking devices. InTransit failed, and SeekerNet was placed in SV7. And, again, it involved tracking devices.
Q And did Mr. Spangler recommend you invest in SeekerNet?
A Yes.
Q And at this point in time, December 31, '04, did you believe that the full extent of your exposure to SeekerNet was 1.3 percent of your overall portfolio?
A Yes, we did.
Q And how much money had you placed into SeekerNet as of this time?
A 135,000.
Q And what was SV7? What does that refer to, Ms. Ryesky?
A SV7, he had a series of limited liability companies, and SV7 was a limited liability company that held SeekerNet.
Q Let's go to page 3 in this. There's more private equity listed on page 3, Ms. Ryesky. Do you see that there?
A Yes, I do.
Q What was your total exposure to private equity as of December 31, 2004?
A Well, it looks like it was 5.3 percent of our portfolio. No. I'm sorry. Add a little more for the bonds.

5.7 percent. And it looks like a total of $836,000 is the cost basis, with $870,000 being the current value, as he put it here.

Q And I see you invested in a company called Tamarac?

A Yes.

Q Who recommended that to you?

A Mr. Spangler.

Q Did you know or did Mr. Spangler tell you that he was -- he had a role in both Tamarac and TeraHop?

A At some point in time, we found out that he did. I don't know if we knew from the very beginning or not. But when we found that out, we assumed it was a good thing, that he would be therefore able to work with the companies to benefit the interests of the investors. We knew --

Q At any point in time --

A -- he had --

Q At any point in time, did he tell you that his company, Spangler Ventures, had a financial stake in Tamarac and TeraHop?

A No.

Q At any point in time, did he ever tell you that Tamarac and TeraHop were paying fees to him and his company?

A No.

Q Is that information you would have liked to have heard from him?

A Yes.
Q Why is that?
A It might have made us think a little bit more about conflict of interest.
Q Did he ever give you a document that specifically told you what the conflict of interest was between his role at TeraHop and Tamarac and his role as your investment advisor?
A Some of the PPMs stated that there could be conflicts of interest.
Q But did the PPMs spell out exactly what the conflicts of interest were, Ms. Ryesky?
A I don't recall that they did.
Q Did you expect your investment advisor to provide that information to you?
A Yes.
Q And he never did?
A Correct.
Q Was this -- as of 12/31/04, was this what you thought your total exposure was to startup companies, 5.7 percent?
A Yes.
Q And did that percentage stay roughly the same over time, between '04 and when you terminated your relationship with Mr. Spangler?
A Roughly.
Q What did Mr. Spangler tell you about the risk associated

with these startup companies?
A He told us that maybe one in seven would succeed. He told us that there were some tax benefits if they didn't succeed. He told us that, you know, the one in seven that would succeed would make a good payoff, and, effectively, most of them did not succeed.
Q Did you make any money on any of these startup companies?
A We made money on Who's Calling.
Q How much did you make? You put in 150,000. Do you know what you got back?
A About 76,000 was what we got back.
Q About a 50 percent return?
A Yes. We also made money on Tamarac. Well, the receivership made money on Tamarac. It was sold during the receivership.
Q Do you know what your return was on Tamarac?
A I thought it was like 120 percent.
Q 120 percent. Okay. And the rest of the companies, you lost all your money in the other companies?
A Zinc Matrix is still in existence.
Q But have you gotten any money back from that?
A No.
Q Now let me direct your attention to -- let's look at the 12/31/08 PPA, which is Exhibit -- if we could pull up Exhibit 103.18, Agent Kirkwood. I appreciate that.

Do you recognize this as your Portfolio Position Analysis as of 12/31/08?
A Yes, I do.
Q And there's a couple things I want to talk about. You notice under equities, the name of the fund is no longer Equity Investors, it's now called SG Growth+?
A Yes.
Q Do you know why the name changed?
A Yes. In May or June of 2008, he sent out a revised PPM with a cover letter for both Growth and Income. He changed the names.
Q And who was the cover letter from?
A Well, I believe it was from Mr. Spangler.
Q And when did you receive this?
A We effectively received it around June 16, 2008.
Q And how did you receive it?
A I believe it was UPS'd. We had been on vacation and found it inside our front door on the porch when we got back.
Q Had Mr. Spangler given you any prior notice that he was thinking about changing the name of the company?
A No.
Q If you could look for me at Exhibit 103.47. Let's just blow up the lower portion of this email. This is June 17th.
Is this an email you sent to Mr. Spangler?
A Yes, it is.

Q And you said, "We just returned last evening from a fabulous trip. While we were away, a UPS package containing changes to Income+ and Equity arrived, with our response due yesterday." Is this what you -- you got home and you found this on your front porch?

A Yes.

Q And you were already past the due date, it looks like?

A We were.

Q And you asked for a couple more days to review it and return it to Mr. Spangler, is that right?

A Yes, we did.

Q And what is his response to you, up above on this exhibit?

A Well, they responded that -- they asked if Friday was okay. And I believe Friday was the 20th of June.

Q And maybe I already asked you this, but you said the UPS packet had a cover letter. Was there anything else in that package?

A There was a disc -- or two discs. One each. And they contained the PPMs.

Q Let's take a look at Exhibit 406.5. Could we blow that up, Agent? I'd like the top, too. Get the whole -- could you blow the whole letter up? There we go.

And is this the cover letter that you were talking about for the Equity Investors Group?

A Yes, it is.

Q And it's dated May 21st?
A Yes.
Q You were still on vacation at that time, I take it?
A Yes. We left around May 15th or so.
Q And this is a letter from Mr. Spangler?
A It is.
Q And is this a cover letter summarizing what the key changes are in the documents?
A It says the amendments fall into the following general categories. And as we read the cover letter, a lot of it looked like the name was changed.
Q In No. 2, he says, "The purpose of the company has been refined to reflect our overall goal of long-term capital appreciation from investments." What did that mean to you?
A Well, it meant long-term growth from investments. It was similar to what I thought we were already in.
Q Is there anything in this letter that told you Mr. Spangler was changing the investment objective of the Equity fund?
A No.
Q Is there anything in this letter that tells you he's going to put money into private equity in the Equity fund?
A No.
Q Is there any mention that he's going to put money into TeraHop and Tamarac in this letter?

A No.
Q Did you discuss this change with Mr. Spangler, why he was changing the name and what was going on here?
A No, we did not.
Q And was there a PPM attached in part of that CD that you got?
A The CD had -- yes, the CD had the PPMs in it.
Q And was it a lengthy document?
A Yes.
Q A lot of legal language in there?
A Oh, yes.
Q Did you read it?
A I don't recall what I did at the time.
Q Did you feel you needed to read it?
A Well, we felt that, as our investment advisor in whom we trusted and to whom we were paying quite a bit of money, that this letter should have been sufficient. I don't know -- as I said, I do not recall exactly what we did at the time. I have since --
Q Did Mr. Spangler --
A -- read the --
Q Go ahead. I'm sorry. I cut you off. I apologize.
A I have since read it.
Q Okay. When did you read it?
A When I discovered -- I didn't even remember this document

until I was starting to look for information from the -- to set up the claim to the receivership. And at that point, I found this document, and I found the PPM. And at that point, I skimmed the PPM. And about a week ago I read the PPM.
Q Based on your reading of the PPM, did it indicate to you that there were any major changes to the Equity fund?
A Yes.
Q What were the changes?
A The changes were some paragraphs that said that they may invest in small firms, they may not have much diversity.
Q Any other changes that you found significant?
A Those are the major ones coming to my mind right now.
Q And you would have read this document when?
A I read it thoroughly about a week or two ago.
Q So that's --
A And I skimmed it when I discovered it, when we were trying to pull our information together for the receiver.
Q And was there anything in this cover letter that told you that Mr. Spangler's new PPM may be investing in small companies?
A Not in this cover letter.
Q Anything in the cover letter that told you he may be investing in less diversified companies?
A No, not in the cover letter.
Q Okay. Between 2008 -- May of 2008 and whenever you

terminated in 2011, did he ever sit you down and say, Diane, there's been a big change here?
A He did not.
Q Did he ever tell you that the new PPM gave him the authority, in his mind, to invest in private equities?
A He did not.
Q Did he ever tell you that he thought the PPM gave him the ability to put all your money in TeraHop and Tamarac?
A He did not.
Q Do you think that's something your trusted advisor should have told you, Ms. Ryesky?
MR. BLACKSTONE: Your Honor, maybe this is a good time to break for lunch. Maybe I'm jumping the gun here.
THE COURT: I think it's fine, Mr. Blackstone.
MR. BLACKSTONE: I apologize, Your Honor.
THE COURT: How much more do you have with her?
MR. BLACKSTONE: 15 or 20 minutes.
THE COURT: Okay. So we will go ahead and take our lunch break at this point in time. And then we will come back and pick up with the direct examination of Ms. Ryesky. Please remember our cautionary instructions, as always. If we can have you back in the jury room, say, no later than 1:15, we will try to start up as quickly as possible as soon as you are all back.
(Jury leaves courtroom.)

THE COURT: Counsel, we will be at recess. Let's shoot to start up at about 1:20.

MR. BLACKSTONE: Thank you, Your Honor.

(Lunch recess.)

THE COURT: You may be seated. Counsel, we have a matter to take up outside the presence of the jury?

MR. CARPENTER: Yes, Your Honor. I have one request. If it could be accommodated, great. If it's not, I'll understand. I've been assistant coaching my daughter's soccer team this year. She's seven. The rest of the team is seven, eight.

I'd like to get -- today is the last practice. I missed two of them last week. I made Tuesday. But I'd like to get to this one, if at all possible. If we could end the court day today at 4:00, 4:15, that would help me out so I can get home, because I'm biking to work.

But if I can't get there, the game of soccer is not going to be set back. So I just bring it up. If that works out, great.

THE COURT: You know that happens to be my soft spot, right, girls and soccer?

MR. CARPENTER: That's why I brought it up.

THE COURT: That's why you brought it up. All right. We will do that.

And I like the pace that the government has picked up.

And if we could do the same with the defense, I think that will help a lot as well.

So we will go until 4:00, Mr. Carpenter.

MR. CARPENTER: Okay.

(Jury enters courtroom.)

THE COURT: Good afternoon. Welcome back, ladies and gentlemen. We are ready to start our afternoon session. If you remember, we were still on direct examination with Ms. Ryesky.

MR. BLACKSTONE: Thank you, Your Honor.

Q Ms. Ryesky, during the years that Mr. Spangler was your investment advisor, how often would you meet with him to review your portfolio?

A I remember two portfolio reviews.

Q And those are PowerPoints?

A Yes, they are.

Q Were both of those meetings where you actually sat down and reviewed your portfolio?

A Yes.

Q In addition to those two meetings, did you have any other meetings with him over the years where you discussed your portfolio?

A We had several -- well, quite a number of meetings with him over the years, sometimes involving new investments that he wanted us to get into and things of the sort. And almost

every time there was some discussion of the rest of our portfolio.

Q And did you also talk to him over the phone during the course of those years?

A Oh, yes.

Q And did you have an email relationship with him as well?

A Yes.

Q So you communicated in a variety of ways with him?

A That's correct.

Q Let's talk about these portfolio reviews. You said you only got two of them during the years you worked with Mr. Spangler?

A Two formalized portfolio reviews, that I recall.

Q If we could look at 103.7. Do you recognize this as a portfolio review you got in or about November of 2003?

A Yes, I do.

Q And how were these given to you or displayed to you?

A I don't totally recall. I think that we probably had some paper copies of them. I don't remember if they were also on a computer screen.

Q If you could look for me at page 6, please. Was this pie chart contained in the PowerPoint?

A Yes.

Q And does this pie chart accurately reflect where you believed your funds were invested as of the third quarter of

2003?
A Yes.
Q Okay. So you had about 6.6 percent in private equities; at least that's what you thought you had, is that right?
A Yes.
Q Okay. And let's take a look at 103.11. If you could go to page 2 of that exhibit, please. And is this the second portfolio review you received from Mr. Spangler in December of '05?
A Yes.
Q If you would look for me at page 4. Do you see that third bullet point, "Core 'alpha' portfolio of alternatives with swing 'beta' portfolio of public stocks and bonds"? Did Mr. Spangler explain to you what that meant?
A I don't remember.
Q During this 2005 meeting, did he at any time tell you he was shifting directions and putting more of you -- putting any of your money into private equities?
A I have no recollection of him saying that.
Q And if you could look for me at page 16. Again, here is a pie chart showing where all your money was invested. Does this appear to be where you believed all your money was invested?
A Yes.
Q Private equities, 7 percent, approximately?

A Yes.
Q Okay. And then if you could look for me at page 29 of this exhibit. Were you also given this bar chart by Mr. Spangler?
A Yes, we were.
Q And it shows a section that shows marketable equities. How much does it show you have invested in marketable equities?
A Just under $7 million.
Q And it shows Equity Investors over there. Do you see that?
A Yes.
Q And was that your understanding as of this point, that Equity was only involved in marketable equities?
A Yes, it was.
Q And then over here it says "private equities," and there's a number of colored bars there. Do you know what is reflected there?
A Well, I understood that to be that the colored bars indicated which private equity fund we were in. Like the hot pink is Action Engine, for example.
Q And then ePartners, SeekerNet, Tamarac is the blue, and VStar is the pink?
A Uh-huh.
Q Okay. And this shows about $1 million in private

equities, is that right?
A Yes.
Q Is this the approximate amount you thought you had in private equity as of December of '05?
A Yes.
Q Did Mr. Spangler at any point ever provide you with a pie chart showing that Equity or Growth was invested in private equities?
A No, he did not.
Q Did he ever show you a pie chart that showed that Income+ was invested in private equities?
A No, he did not.
Q Now let me shift gears to August of 2010, and ask you if you invested another $500,000 into the SG Income fund?
A Yes, we did.
Q If we could look at Exhibit 14.1, please. Can you see that email okay? Let's blow it up a little bit. And what's the date on this email?
A August 13th, Friday, the 13th.
Q It's from Mr. Spangler to you and Mr. Delay, correct?
A Yes, it is.
Q And he says, "Diana and Jerry, attached is my latest investment recommendation. Please sign and return at your earliest convenience. Thanks."
Had Mr. Spangler called you before he sent you this email

and investment recommendation?
A I don't recall receiving a phone call.
Q And did you typically follow his recommendations?
A For the most part, we did. There were a couple of times that we didn't.
Q What were the times where you didn't follow his recommendation?
A One that I recall was a real estate deal that we read through the PPM on, and we found some things that we felt were not to our benefit, and we declined to go with it.
Q Let's go back in this email, 14.1. And if we could look at page 2 of that -- page 3 of that, please. And what is this document, Ms. Ryesky?
A This is the kind of investment recommendation documents he would send when it involved cash or Microsoft stock, things of that sort.
Q And what is the recommendation that Mr. Spangler is making to you here?
A He wanted us to sell shares of Microsoft.
Q This is the stock you still owned in Microsoft?
A Today?
Q No. As of 2010, you still had 10,464 shares of Microsoft?
A Yes, we did.
Q He recommended you sell that and buy what?
A $265,000 of money market. That would be the proceeds that

would be deposited in the money market account.
Q And then what is he asking you to do here on the bottom portion of this?
A Sell $500,000 of our money market account and buy $500,000 of Income+.
Q So you would have already had some cash in your money market fund?
A We did, yes.
Q And so when you added the 265-, that came to 500-?
A Yes.
Q Okay. And did Mr. Spangler tell you why he wanted you to -- I'm having technical difficulty here. Oh, thank you. You have to have someone under 40 in your trial.
Okay. Did Mr. Spangler tell you why he wanted you to do all this?
A I don't recall that he did.
Q And did you approve this recommendation?
A Yes, we did.
Q If you could look for me at Exhibit 14.3, page 2. Let's blow that up there. Is that your signature and your husband's signature approving the transfer?
A Yes, those are our signatures.
Q And do you know how the money was transferred?
A Well, I believe it was a wire transfer.
Q If you could look for me at Exhibit 14.10. And did you

and Mr. Delay have your money market account at Charles Schwab?

A Yes.

Q And do you see your signature and his signature on the bottom of this document?

A Yes, I see them.

Q And does this reflect that $500,000 was wired from your money market account at Schwab to a Comerica account in Dallas, Texas?

A Yes, it does.

Q And what was the name on the account you were sending this money to?

A SG Income+ Investors Group, LLC.

Q Okay. And where did you believe this money was going to be invested once you sent it to SG Income+?

A We thought it would be invested in the Income+ fund.

Q Did Mr. Spangler ever tell you that a portion of this money was going to be invested in TeraHop?

A He did not.

Q Had he told you that, would you have put $500,000 into the Income fund?

A We definitely would not have put that money into the Income fund.

Q Did he tell you that some of this money was also going to be invested in Tamarac?

A He did not.
Q Had he told you that, would you have put $500,000 in the Income fund?
A No.
Q Did he tell you that a portion of this money was going to be used to pay off other investors?
A No.
MR. ZULAUF: Objection. Assumes facts that are not in evidence, Your Honor.
THE COURT: The objection will be sustained.
BY MR. BLACKSTONE:
Q Now, Ms. Ryesky, if you would look for me at Exhibit 14.12. Do you recognize -- can you see that okay? Let's blow that up so everybody can see it, the whole document, please.
Do you recognize this as your bank account statement for the Schwab account that you and Mr. Delay had?
A Yes, I do.
Q And it's for the period August 1 through August 31, 2010?
A Yes, it is.
Q And if you could look for me at page 2. And if you can just highlight the 8/24 entry there, the 500,000, please.
And do you see this 500,000 going out of your account?
A Yes, I do.
Q Does that reflect the 500,000 that you placed into the SG

Income+ fund?

A Yes.

Q Now let me have you take a look at Exhibit 380.8, page 1. And let's blow that up. This is an email to you, January 27, 2011, to someone named Donald Gracia. I want you to take a quick look at that and let me know if you recognize that email.

A I do recognize that email.

Q Okay. Had Mr. Spangler called you and told you you were going to get some communication from a guy named Donald Gracia?

A No, he had not.

Q Had you ever heard of Donald Gracia?

A No.

Q Did you learn who he was?

A I ended up -- we thought this was a rather strange thing to receive, that wanted personal information from us, from some other person. So we called Spangler's office to find out if this was kosher or not. And we were told that it was.

Q Had you ever received -- this is a request for you to confirm the money you had in your account?

A Yes, it is.

Q Had you ever received any prior request like this, prior to January of 2011?

A No.

Q And they are asking that you provide the information back by January 31, 2011. Look for me at page 2 of this document. And is this a letter that was attached to the email from Mr. Spangler?
A Yes, I believe this came from Mr. Gracia.
Q Okay. And they are talking about the auditors are conducting a procedural examination of The Spangler Group pursuant to some rule of the Investment Advisors Act of 1940. Did anyone explain to you what this procedural examination was all about?
A No.
Q Did Mr. Spangler tell you?
A No. They just told us that it was okay and had their approval.
Q And the letter goes on to say, "Please confirm both the investment balances you hold in SG Income+ as of September 30, 2010, and the balances held by SG Income+ as of September 30, 2010." And there's a dollar amount of 1,713,113.
And what were you supposed to do? What was your understanding of what you were supposed to do here?
A Our understanding as to what we were supposed to do was to look up on our PPAs, or whatever proof we had, to find out if this figure was correct.
Q And did you go look at your PPA to see if you had that

amount of money in SG Income+?
A Yes, we did.
Q And was that correct?
A No, it was not. There was a small discrepancy, which is outlined in the email that I used to answer him.
Q Did you eventually sign this letter, verifying that the amount you had in SG Income+ was correct, with that correction you made?
A I don't know whether we signed this or not. But we sent an email to explain.
Q Okay. If you could look -- and Mr. Spangler in this letter says, "When confirming your investment, please refer to the attached financial statement for the entity you invested in as well as the following information."
Did you refer to the attached financial statement or just your PPA when you did this?
A I needed to refer to both.
Q Okay. Let's look at page 4. If you could blow that up.
Do you recall receiving this as the last page of that email from Mr. Gracia?
A Yes, I do.
Q Did you rely on this in confirming the amount of money you had in your SG Income+ fund?
A No, because this tells what the total was in SG Income+, not just ours.

Q So this had nothing to do with your balance?
A It didn't have anything to do with our balance. But one of Gracia's questions was how much was in the Income+ fund.
Q And what did you -- did you look at this, and what conclusion did you draw from looking at this document?
A Well, in my email, I noted that they asked for the September date. I put the 9,362,000 figure in my email, and I mentioned that we had no other proof that this was correct.
Q Okay. And let's pull up and have side-by-side the December 31, 2010, PPA, which is Exhibit 103.22. Go to page 2 of that document, Agent. And blow up the private section down below.
Do you recognize this as your quarterly statement as of the end of the year for 2010?
A Yes, I do.
Q And how much -- what percent of your money did you think you had in TeraHop?
A 3.1 percent.
Q And how much did you have in Tamarac?
A It looks like 2.5 or so.
Q And then the dollar amounts that you invested are over here in this column?
A Yes.
Q Okay. Now, go back to the last page of Exhibit 380.8. By the way, when you looked at your PPA, did you believe that

was the total amount of money you had in TeraHop and Tamarac?
A Yes.
Q Okay. Go over here to this financial position document. Do you see there's an SV9 column there?
A Yes.
Q And do you see the dollar amount there, $581,000, as of December 31, 2010?
A Yes.
Q Did you focus on that? Did it mean anything?
A At the time, I must have focused on it. I do remember commenting to my husband that this is the first time we had any knowledge as to what was inside any of the big funds. I don't remember it hitting me over the head.
Q And how about the SV7? Did you see that on there, that there's $520,000 in SV7?
A Yes.
Q And what was your reaction when you saw this?
A Like I said, it was the first time that we had ever found out what was inside any of the big funds.
Q Had you been asking Mr. Spangler what the Income fund was invested in and what the Growth fund was invested in?
A Prior to -- I don't know quite the date. I did ask for some information as to what the big funds were invested in. And he told me that that would be really difficult to provide because things were changing very quickly. And I didn't push

any further than that. And then it wasn't until March of 2011.

Q That you first learned?

A That I concretely learned, yes.

Q Let's go back to page 1 of Exhibit 103.22. And this financial position is just from Income+, is that correct?

If we could go to the top of that one, 380.8, and if we could blow up the top of that, Agent.

A Yes.

Q For Income+?

A (Indicating.)

Q And how much money did you have in the Growth fund as of 12/31/10?

If we could go down a little bit on the right side there, and move it over a bit?

A It looks like the basis was $9,125,000 and some. And what we thought the current value was is $12,741,656.41.

Q Did Mr. Spangler ever provide you a similar financial position for the Growth fund?

A He did not.

Q And when you looked at this document on the left-hand side of the screen for the first time in late January of 2011, did you realize Income+ was in Tamarac and TeraHop?

A I am not sure I realized that at the time. If I did, I would have thought, well, there's a minor amount in it, and

there must be a lot of investors in Income+, and we're not going to be seriously hurt by this if something goes wrong. Also, I noticed that the document has "preliminary confidential" all over it in big letters.

Q Did you ask Mr. Spangler what that meant?

A No.

Q You mentioned you learned sometime in March 2011 about where these fund were invested in. Tell us how you learned that, when you learned it, and who told it to you.

A Around March 24th, Mark asked -- well, Mark asked to have a meeting with us, and he wanted to come to our house. Usually we met with him at his office, at his home office. So we thought that was a little odd, but we were delighted to have him come over.

And on March 24th, he came over. And basically he wanted to give us a presentation about Tamarac, to tell us what a great company it was and how it was moving forward and what the plans were for the next few years. And he brought a computer, a laptop, and gave us a presentation right there at our dining room table.

Q And at this point in time, you thought you had a little over 2 percent of your money in Tamarac?

A That's right.

Q Okay. Did he tell you why he was coming -- is this the first time he had come to your house to talk to you?

A He had been to our house before, but not on business.
Q Did he tell you why he was making this presentation to you on Tamarac?
A Because he wanted to tell us how great a company it was. He wasn't asking for an additional investment.
Q What did he tell you about Tamarac during that conversation?
A I don't remember the details.
Q Did you have any questions for him after he finished the presentation?
A After he finished the presentation, we had some other questions lined up about other aspects of our finances. And one of them was what was in the big funds. And I asked him that. And he said, well, Tamarac and Five States. And my jaw dropped.
Q Why did your jaw drop?
A Because I didn't think that we were invested in Tamarac and Five States, other than the investments that were published in the PPA. You know, if Growth or Income had investments in Five States, then a lot more of our money was in it than we ever knew.
So I asked him if he could send us an accounting of what the big funds were invested in, because, you know, we wanted to know. We didn't want to just fly off the handle or anything. We're methodical people. And we never received

that accounting.
Q Did you ask him what percent of the Income and Growth fund was in Tamarac?
A No.
Q Was anything else discussed during that meeting at your house on March 24, 2011?
A Those are the main things I recall.
Q During that meeting of March 24, 2011, did Mr. Spangler ever tell you that the Growth or Income fund was also heavily invested in TeraHop?
A No.
Q At this point in time then, what did you think your exposure was to TeraHop?
A Well, we still thought our exposure was what the PPA said.
Q About 3.1 percent?
A Yes.
Q Had Mr. Spangler at any point in time ever given you any negative information about TeraHop?
A Well, I remember its predecessors failed. I don't remember any information -- current information at that time about -- negative information about TeraHop.
Q Did he ever tell you that as of 12/31/09, TeraHop had lost over $50 million?
A Oh, no.
Q Take a look at your PPA on 12/31/2010. That's

Exhibit 103.22, page 2. So under TeraHop, it looks like you've invested $380,000, is that correct, as of that date?
A Yes.
Q If we can go all the way out, Agent. If you could blow the whole thing up there under "private preferred."
Now, the 380,000, that's the money you put into TeraHop, right?
A Yes.
Q And what did Mr. Spangler tell you the current value of TeraHop was as of December 31, 2010?
A $575,638.24.
Q And that's showing you the stock has gone up 46.8 percent in value?
A It appears to show that.
Q Did you ever ask him how it was this private company went up so much in value?
A We did not ask that.
Q He never told you how he valued it?
A No, he did not.
Q Did you learn shortly after that March 24th meeting that TeraHop had closed?
A Yes, we did.
Q And how did you learn that?
A We received a letter in early April telling us some great things about Tamarac and some other things. And then there

was a paragraph in there that said we had bad news, essentially that TeraHop has closed.

Q If you could look for me at Exhibit 100, please. And do you recognize this as a letter you received from Mr. Spangler?

A Yes, I do.

Q When did you receive this letter in relation to your March 24, 2011, meeting?

A It would have been sometime in early April.

Q Did you get it by mail?

A That, I don't recall, if it came by mail or if it was emailed.

Q And you said the first part had very good news about Tamarac, is that right?

A Yes.

Q And then the second-to-the-last paragraph indicates, "This week we received some sad news, TeraHop has been closed." What was your reaction when you learned that, that TeraHop had been closed?

A We thought, oh, brother, another one goes down. And then we looked at our financial statement and said, well, you know, basically we've lost, supposedly, 500,000 here, and I guess we can deal with that.

Q And Mr. Spangler says, "The effect of these actions will reflect in your future statements." Did he ever provide you

with any accounting as to what effect the closing of TeraHop would have on your portfolio?
A He did not. The 2010 PPA was the last PPA we received from him.
Q Did you ever talk with Mr. Spangler again after that March 24th meeting at your home?
A Not personally. We talked to him about -- him or the office staff about K-1s.
Q Did you learn subsequently how much of your money in the Growth and Income fund was actually in TeraHop?
A Once the receivership opened.
Q What did you learn?
A Well, we learned that Growth was invested in SV11, which also was invested in TeraHop. And we had been advised not to invest personally in SV11 because it was for new people. So we were surprised to learn that Growth was invested in TeraHop that way. And I don't know. I think something like 76 percent of Growth was invested in TeraHop. It was a huge amount.
Q Did you ever authorize Mr. Spangler to put 76 percent of your money into TeraHop?
A We certainly did not.
Q Did he ever ask you if you wanted to do that?
A He never asked us.
Q Take a final look at your PPA, December 31, 2010,

Exhibit 103.22. And if we could look at the last page, page 3. As of 12/31/2010, what did you believe the current value was of all the assets that are reflected on this PPA?
A We thought that we had $18,861,630.13, as the current value of our assets.
Q And some of these assets weren't under Mr. Spangler's control, is that correct?
A That is correct.
Q If you could go back to the first page, Agent.
How much did you believe the value was of your Income+ fund as of 12/31/2010?
A The current value, $2,299,023.93.
Q And what did you believe the current value was of your SG Growth fund?
A $12,741,656.41.
Q And did you believe, if you gave Mr. Spangler appropriate notice, you could get $14 million back?
A Yes. But we knew that there were some limits. Like you had to give him 45 days' notice, and there were holdbacks and so forth.
Q But if you gave him proper notice, you thought you could get most of this money back in the form of cash?
A Yes.
Q Did he ever tell you that he was going to pay this money to you in stock in TeraHop and Tamarac?

A He never told us that.
Q Were you and Mr. Delay able to recover money from the receivership?
A Yes, we were.
Q How much did you get back of this $14 million?
A So far we've gotten back $4,200,000 in one payment, another $200,000 in a second payment. And from what the receivership says, we expect to get back, all told, $4,900,000.
Q So you lost almost $10 million?
A Yes.

MR. BLACKSTONE: Thank you. I have nothing further, Your Honor.

THE COURT: Cross-examination for this witness.

MR. ZULAUF: Thank you.

CROSS-EXAMINATION

BY MR. ZULAUF:
Q Hi. I'm Jon Zulauf, and I represent Mark Spangler here. I want to talk with you about a subject area that the government brought up in direct examination.

As I understand it, you read through the Equity PPM, and then you received another PPM in 2008, I believe, is that right?
A Yes. We received one when the Equity fund was founded in 2000 or so, and then another one in 2008.

Q Okay. And the government asked you about the differences between the two PPMs. I understand you were a proofreader at Microsoft, is that right?
A I was.
Q Okay. So as I understand it, you were able to put these two documents next to each other and try to determine some differences between the two, right?
A You could if you wished. You could also read -- there was a redlined version of the PPM on the disc in 2008. And that is the one I read about a week ago, the redlined version, which also shows you the differences.
Q So when you got the PPM in 2008, it not only came with the new Growth PPM, but also a redlined version of that?
A That's correct. Correct, there was a clean version and a redlined version.
Q Okay. In fact, the changes were relatively minor between the two documents, weren't they?
A No, they were not.
Q Okay. All right. Well, could we then take a look first at the Equity PPM? And what I would like to do is focus first on Document 401.6, if we could. Do you see that is the Equity Investors Group PPM?
A Yes.
Q Okay. And if it's hard to see some portion and you need it to be highlighted, please let me know, okay?

A Thank you.
Q I want to just focus on the degree of risk that was identified for that Equity PPM. It indicates that it was a high degree of risk for that investment, correct?
A Yes, that's what it says.
Q Okay. And then let me compare that with the Growth PPM. Could we have 406.6.1, please?
Okay. And do you recognize that as being the SG Growth private placement memorandum?
A Yes.
Q And that's what you got in 2008?
A Yes.
Q At the very bottom, it indicates that this investment involves a high degree of risk, right?
A Yes.
Q Okay. No change between those documents, right?
A In the text title, no.
Q Okay. In the portion that talks about the degree of risk, no change, right?
A No, they are the same.
Q Ms. Valencia, could we go to 401.6.2 again? That's the Equity PPM.
At the very top there, do you see that first paragraph, "Purchase of the securities offered hereby entails a high degree of risk. No investment in these securities should be

made by any person who is not in a position to lose the entire amount of the investment"? Do you see that section?
A Yes.
Q Okay. And then, Ms. Valencia, could we pull up the Growth PPM at 406.6, page 2?
And could you take a look at that first paragraph? Does it appear to be exactly the same as the Equity PPM?
A Yes.
Q Okay. So both documents said this is a high degree of risk, and you shouldn't invest unless you are prepared to lose all of your investment, right?
A That's what the documents say.
Q Okay. And then could we go, Ms. Valencia, to 406.1, page 6, please?
And, again, this is the Equity PPM. We are focused here on the Equity PPM again. And could you look at that section entitled "Proposed Initial Investment"? And do you see, in the middle of the page, starting with, "The manager may, in its sole direction, from time to time, invest the company's assets in one or more other investment vehicles having similar investment objectives"? Do you see that?
A I do see that.
Q And, Ms. Valencia, could you pull up then 406.6, page 7? This is the Growth PPM. And can you focus on that initial investment section?

MR. BLACKSTONE: Your Honor, I object to this whole line of questioning. If he's just having her compare the documents, the jury can do that themselves. She didn't even read the document until a week ago. So I don't see the point of this exercise.

MR. ZULAUF: Might I respond?

THE COURT: Yes.

MR. ZULAUF: The government suggested to the witness that there were big changes between these documents.

MR. BLACKSTONE: We didn't suggest anything.

THE COURT: All right. Here is the problem, Mr. Zulauf: These documents are lengthy. They may be very similar in certain areas. She indicated they were not minor changes. Maybe you should ask her what the changes were and focus on those areas rather than going through 30 pages of this other material.

MR. ZULAUF: I'm going to go through very quickly. But it seems important to focus on certain portions of the document that clearly did not change, Your Honor. I'm trying to do this as quickly as possible.

THE COURT: I'll give you some leeway. Go ahead.

BY MR. ZULAUF:

Q And do you see on this document where it says, "The manager may, in its sole discretion, from time to time, invest the company's assets in one or more other investment

vehicles"? That didn't change, did it?
A Well, I would have to look back at the first one.
Q I'm sorry. Okay. That's fine. Could we go back to 401.6.006?
And can you see where it says, "The manager may, in its sole discretion, from time to time, invest the company's assets in one or more other investment vehicles"?
A Yes.
Q Okay. That's the same language, right?
A Yes, it's the same language.
Q Okay. And let me try and move a little quicker on this. In both documents, the Equity PPM and the Growth PPM, it indicated that the initial manager would be Mark Spangler, correct?
A I believe that the Equity PPM talked about Southeast Asset Management.
Q Okay. Then would you go to 406.17, please? I'm sorry. 406.17.
And do you see where it says, "manager"?
A Yes, I see that.
Q Do you see that first sentence there?
A Yes.
Q "Mark Spangler will serve as the sole initial manager"?
A Yes.
Q Okay. And could we pull up the Growth PPM, 406.6.8?

And do you see where it says, "manager"? And it says, "Mark Spangler will serve as the sole initial manager of the company"?

A Yes.

Q That didn't change, did it?

A No.

Q Okay. And then can we go to investment objectives, 406.1.10, please, page 10? I said it wrong, didn't I? We're looking at 401.6.

Do you see where it says, "Investment Objectives and Policies"? And this language changed a little bit. So I want to just focus on the language, which is going to be that second sentence there in "Investment Objectives and Policies."

Do you see where it says, "The company's investment objective is to realize capital appreciation through investment in equity securities at a discount to their corporate worth"?

A Yes.

Q And can we pull up, by contrast, 406.6.11? This is the Growth PPM. And can you focus on that first paragraph, please?

And can you see the "Investment Objectives and Policies" for the Growth PPM?

A Yes.

Q "The company's investment objective is to pursue long-term capital appreciation through investments"?
A Yes.
Q The investment objective didn't really change, did it?
A It was perhaps more specific in the first version.
Q Okay. And so in the first version it said, "Capital appreciation for investments in equity securities at a discount to their corporate worth." And in the second one, it said, "The company's investment objective is to pursue long-term capital appreciation through investments"?
A Yes.
Q Roughly the same thing, isn't it?
A Well, as I mentioned before, the first one was more specific. It said how it was going to do it.
Q Okay. And so the second one, arguably, allowed it to be a little bit broader. But it's the same investment objective, isn't it, from the first to the second, that is, to -- could we go to the second one and --

MR. BLACKSTONE: Objection, Your Honor. It's not relevant to the issues with this witness, to show the similarities between these documents. We'll stipulate that they are very similar in many respects, Your Honor, if that will speed things up.

MR. ZULAUF: Your Honor --

THE COURT: Excuse me. She has answered the

question, counsel. She has given you the best answer you are going to get. So ask another question.

BY MR. ZULAUF:

Q In each of these, the Equity and Growth PPM, the manager, Mark Spangler, had the power to determine what the investments for the company would be, didn't he?

A He had the power to hire other investment advisors and overall -- I understood he had the overall -- the overview of what the investments would be, yes.

Q That he could choose the investments under the Equity PPM, and he could choose the investments under the Growth PPM, right?

A He could choose investments or investment advisors.

Q Right. He could choose the investments. He had the power to choose the investments, and he had the power to choose investment advisors under both, correct?

A I believe so.

Q And could we go to Exhibit 401.6.19? Do you see the section, "Reliance on the Manager"?

A (Indicating.)

Q And do you see that members should be aware that they will have no right to participate in the management of the company?

A Yes.

Q Okay. And then do you see where it says, "They will have

no opportunity to select or evaluate any of the company's investments or strategies, including the selection of investment advisors"?

A I see that as well.

Q Could we go to 406.6.21, page 21? And do you see that section called "Reliance on the Manager"?

MR. BLACKSTONE: Objection. The document speaks for itself, Your Honor.

THE COURT: The objection will be sustained.

BY MR. ZULAUF:

Q Do you see any difference between --

MR. BLACKSTONE: Same objection.

THE COURT: Counsel, the objection was sustained.

MR. ZULAUF: Your Honor, this witness was allowed to testify that there were changes in the PPMs. It seems to me that we should be allowed to show that they stayed the same.

THE COURT: The documents speak for themselves. The jury can see the documents side by side. You have made that point. If you want to focus on the differences, that might be different.

BY MR. ZULAUF:

Q In the Equity Investors PPM and the Growth PPM, both indicated that there would be a lack of diversification, didn't they?

MR. BLACKSTONE: Objection, Your Honor.

THE COURT: The objection will be sustained. It's the same problem, Mr. Zulauf.

MR. ZULAUF: Your Honor, could we have a sidebar?

THE COURT: No.

BY MR. ZULAUF:

Q There was no change in the language regarding liquidity between the two documents, was there?

MR. BLACKSTONE: Objection, Your Honor.

THE COURT: The objection will be sustained. Ask about the differences that she spoke about.

MR. ZULAUF: I think I am. When we talk about liquidity, Your Honor, she testified that there was a change from one to the next. It seems to me I ought to be able to show there was no change.

THE COURT: You are choosing the subject matter. She never indicated what the subject was in terms of the changes. Why don't you ask her, if you want, about the changes that she perceived.

BY MR. ZULAUF:

Q Was there a perceived change between Equity and Growth regarding liquidity?

A I don't recall the exact language on liquidity.

Q In fact, there was no change, was there?

MR. BLACKSTONE: Objection, Your Honor.

THE COURT: The objection will be sustained.

BY MR. ZULAUF:

Q Was there any change in the provisions between the two documents that provided for in kind payment?

MR. BLACKSTONE: Objection, Your Honor.

THE COURT: The objection will be overruled.

Do you understand the question?

THE WITNESS: Yes. Whether you -- if you wanted to withdraw your money.

BY MR. ZULAUF:

Q Could the manager pay in kind under both the Equity PPM and the Growth PPM?

A Without looking at the documents close up, right now, I believe I saw that.

Q In each?

A What?

Q You saw that they were the same in each?

A Yes, I believe that's what I saw. But, again, I would have to review the documents, because there's a lot of verbiage in these things.

Q And do you remember there being a conflict of interest section in each document?

A Yes.

Q And it indicated that the manager would have conflicts of interest, didn't it, in each document?

A It indicated that they could have conflicts of interest.

Q Okay. And you accepted the terms of these contracts, right?
A Mr. Spangler was our investment advisor, and we were paying him good money to advise us and take good care of our fiduciary interests. And, yes, we accepted these contracts.
Q Ms. Ryesky, I think the government asked you about payments for consulting work that were made by Tamarac. Do you recall that line of questioning?
A Payments for consulting work by who?
Q Payments made by Tamarac to Mark Spangler -- well, let me ask it a different way.
Were you aware that Mark Spangler was being paid $6,000 a month by Tamarac to him for consulting work?
A No, we were not.
Q Okay. Do you remember receiving the 2009 Tamarac private placement memorandum?
A Not specifically, I don't remember that.
Q Could I pull up A36.02, please? I'm sorry. Could I pull up A36.03, please?
MR. ZULAUF: I'm not sure if this is published. It is. Okay.
Q Could I have you take a look at the Tamarac private placement memorandum for October 2009? Do you recognize that document?
A Looking at it here today, no, I don't remember that

document. We received quite a number of private placement memorandums from Mr. Spangler.

MR. ZULAUF: Could I have a moment, Your Honor?

(Pause in proceedings.)

BY MR. ZULAUF:

Q Do you remember that you owned shares in Tamarac?

A Yes.

Q Okay. And that when there were new stock offerings for Tamarac, you would receive these private placement memorandums?

A Yes, I remember that.

Q And, Ms. Valencia, could you take me to what I have here as page 31 of the document?

Do you remember seeing that Mark Spangler was the chairman of the board of Tamarac?

A No, I do not remember seeing that.

Q Could you look at what I think is .031 here. Does this refresh your recollection as to whether he was the chairman of the board of Tamarac?

A That's what this says.

Q Okay. But it doesn't refresh your recollection?

A No. I knew that Mr. Spangler worked for some of the startup companies that he had us invest in. I didn't know always what his role was.

Q Could I go to page 32, and to that second paragraph?

This indicates that, pursuant to this agreement, The Spangler Group provides Tamarac with certain management and advisory services in exchange for compensation in the amount of $6,000 a month. Do you know whether or not you read this provision?

A At this point, I do not recall.

Q And, finally, Ms. Ryesky, do you remember that there was an economic crisis, well, first a housing crisis, in 2007?

A Well, I recall that there was a huge financial crisis in 2008, 2007, 2008.

Q Okay.

A In the whole country.

Q And it kept going into 2009, right?

A Well, we're still coming out of it, if I understand correctly.

Q And the public stock market plummeted during that period, right?

A Yes.

Q Okay. And were you aware that Mark had invested some of the money with Southeast Asset Management?

A Yes, I was. That's where it was invested under the Equity provisions, when Equity first started. And I don't know when his relationship with Equity -- with Southeast, excuse me, stopped.

Q Okay. And do you know whether Southeast Asset Management

was heavily invested in General Motors stock?
A I do not know.
Q Do you know how Southeast Asset Management's portfolio did during that time period, from 2007 to 2008 to 2009?
A I do not know. We were not provided with that information.
MR. ZULAUF: Nothing further. Thank you.
THE COURT: Any redirect for this witness?
MR. BLACKSTONE: A couple questions, Your Honor.

REDIRECT EXAMINATION

BY MR. BLACKSTONE:
Q Now, Ms. Ryesky, you weren't actually invested in -- you didn't actually have shares of stock in Tamarac, did you?
A Shares of stock?
Q Right. Was your investment through SV9?
A It was through SV9.
Q It wasn't directly in Tamarac. Okay.
Did Mr. Spangler at any point ever tell you that he was getting $6,000 a month from Tamarac?
A I don't believe he verbally told us, no.
Q And Mr. Zulauf showed you page 32 of some lengthy legal document where in fine print it said he got $6,000 a month?
A Yes.
Q Did you expect him to sit you down and say, hey, Diana, I'm getting $6,000 a month from this company?

A Yes, I expected some disclosure.

MR. BLACKSTONE: Thank you.

THE COURT: Ms. Ryesky, thank you. You may step down. You are free to go.

THE WITNESS: Thank you.

THE COURT: Counsel, the government may call their next witness.

MR. FRANZE-NAKAMURA: Thank you, Your Honor. The government calls Dr. Robert Olson.

THE COURT: Good afternoon, Dr. Olson. If you would make your way through the well of the courtroom, come up in front of our clerk, and raise your right hand to be sworn, sir, before taking the witness stand.

(Witness sworn.)

THE CLERK: Will you please state your full name and spell your last name for the record?

THE WITNESS: Dr. Robert Olson, O-L-S-O-N.

THE COURT: Doctor, there is water here on your right. And I need you to keep your voice up loud enough so everybody can hear you, most importantly these people on your left.

You may inquire.

MR. FRANZE-NAKAMURA: Thank you, Your Honor. Before inquiring, I would like to move for the admission of Exhibits 161.05 through 161.57.

THE COURT: Any objection?

MR. CARPENTER: No objection, Your Honor. I believe there's a break at some point in that series. But from the exhibits Mr. Franze provided me earlier, I have no objection.

DR. ROBERT OLSON,

being first duly sworn, the witness was called and testified as follows:

DIRECT EXAMINATION

BY MR. FRANZE-NAKAMURA:

Q Good afternoon, Doctor.

A Hello.

Q Where do you live?

A I'm in Bellingham, Washington.

Q Can you sum up in two to three minutes what you do for a living and what you have done throughout your professional career?

A Sure. I'm an OB hospitalist. So that means I'm a board-certified OB-GYN, which means I'm a physician who takes care of women's health and delivers babies. So I did my college at Indiana University, and went to medical school at Rutgers, back east. And then did my specialty training, my internship and residency, at USC in Los Angeles.

I worked for a year down there as a junior doctor underneath another doctor. And then in 1979, I followed my wife up to Bellingham. And I've been a doctor in Bellingham

ever since. I had a solo practice for 27 years, which means I was the only doctor in the office. But, of course, I had employees.

And then in 2007, I sold that practice in order to become what's called an OB hospitalist, which means that I only deliver babies in the hospital now. I don't have an office. I don't do any gynecologic surgery. I just take care of emergencies and women in the hospital, in the labor and delivery area.

Q Do you have any idea how many babies you have delivered during your career?

A No. I stopped keeping track at 1,000. And I really wish I had kept track. To the best of my knowledge, it's somewhere between 3,500 and 4,000.

Q Were you Mark Spangler's client from the mid 1990's until approximately December of 2008?

A Yes.

Q Did you invest your personal savings with him?

A No. I invested my retirement savings, so the savings that I got from my private practice, from my office. I had a profit-sharing plan, which is a way that a small businessman can have a tax-deferred retirement for himself and his employees. And that was the main thing that I invested with Mr. Spangler.

Q So it wasn't just your retirement money; it was your

employees' retirement money as well?
A Sure.
Q And why did you set up this retirement plan?
A Well, for two reasons. One, being self-employed, I had to save my own money for my retirement. Nobody else was going to give me a pension or any retirement other than what I could save for myself and, of course, Social Security, once I'm 65. But I also wanted to give that as a benefit to my employees, because I wanted to attract long-term employees. And so I wanted to give them benefits, health benefits, as well as retirement.
Q Was it necessary for you to set up this plan for your employees' benefit?
A No. That was something I chose to do. I didn't have to do it.
Q So this was money taken out of your pocket that was going to your employees?
A Sure. I had the choice. I could take that money as salary and then have that as my own money, or I could take a portion, and instead of taking it as my salary, put it into this retirement plan for both myself and my employees.
Q When you set up this retirement plan, did you think you had any obligations to the employees who would benefit from this plan?
A Well, sure. You know, as the controller of the plan, I

had a fiduciary responsibility to them. It's their money that I put in for them. But once I put it in, it's their money, not my money any longer. So of course I felt like I needed to care for it.

Q And by caring for it, did you think you needed to protect your employees' retirement?

A Sure, yeah. Just like the phrase, you know, widows and orphans. You know, the retirement money is very important. It needs to be protected, of course.

Q Before becoming Mark Spangler's client, what was your general investment strategy?

A Well, you know, I was pretty naive, really. I mean, I'm a physician, not a financial wizard or anything like that. So, you know, I tried to invest on my own, and I did some speculation, and got interested in high tech stuff, and put some money into small companies and things like that.

Q Were there startup companies?

A Some of them were startup companies, yeah.

Q And how did that work out?

A Well, you know, in the end, not so well. But when the money started to accumulate, enough that it was sort of significant, is when I sought out some professional advice to have somebody else manage it for me.

Q You met Mr. Spangler in the mid-1990's. Why did you hire him?

A Well, for a couple of reasons. When I started looking for a financial advisor, I tried to read books about how to do it. I interviewed several different people and companies. And I felt like Merrill Lynch, a stock brokerage that would do financial planning for you, they had a sort of -- they would make money every time they made a stock decision. If they bought stock for you, they'd make money. If they sold stock for you, they'd make money.

And I wanted what they call a fee-only financial advisor. So somebody that I could pay a fee to and have them give me advice, and then not make money off the advice they were giving me. I was paying them a fee, and I expected that to be, you know, an hourly rate or a fee, a percentage of what they managed, but then they would give me objective advice. They wouldn't get any more money for selling a stock or buying a stock or making this investment or not.

So that was very important to me. And so when I investigated Mr. Spangler, I even found out he was the past president of a financial advisor group, a fee-only financial advisor group. So, you know, I investigated him. I got recommendations. I checked on him as much as I could, feeling that he would do that for me. But he didn't.

Q How did you instruct Mr. Spangler to invest your money, your retirement money and your employees' retirement money?

A The majority of it I told him: This is going to be my

retirement. I want you to be conservative with this, to have low risk. And we want it to grow, but, you know, protect it.

And then there's going to be a portion that I was going to continue to do myself, a very small percentage, so that I could continue to look at these little companies and decide if I wanted to try to do a small portion to hit a big home run. But the majority I gave it to him and said for him to do it in a conservative retirement investment kind of way.

Q Did Mr. Spangler give you any indication that he wouldn't follow your instructions to protect your money?

A No.

Q Now, did Mr. Spangler tell you that he had some general funds that he used to pool his investors' money?

A Yes. And he talked about two different ones, a Growth one and a Growth and Income one, yes.

Q And the Growth one, when you invested, was that called Equity Investors Group?

A You know, once again, you are going back 10 or 12 years to what the original words were. And I don't recall that.

Q And what did he tell you the purpose of the Growth fund was?

A The Growth fund was to be conservative, to invest in companies that were solid companies that had good long-term growth potential, that would do exactly what they say. You know, the money would grow over time.

Q And what did he tell you about the Income fund?
A The Income fund was a little bit more conservative. There were growth companies in there, but a lot of it was dividend worthy, companies that had a dividend payout as part of their stock, as well as other bonds and stuff that would make income. So the Income fund would also grow, but it was less risky than the Growth fund.
Q Did you choose to invest your retirement money and your employees' retirement money into the Income and Growth fund?
A Yes.
Q Did Mr. Spangler present you with the legal paperwork for joining those funds?
A I'm sure he probably did. I don't recall if he did.
Q And did he advise you to sign that paperwork?
A I'm sure he did. I don't recall that.
Q And did you sign the paperwork for the Income fund and the Equity Investors fund?
A I may have. I don't recall actually signing papers. But I'm sure I did it early on.
Q Now, did Mr. Spangler tell you that in 2003 he was investing the Equity Investors Group into TeraHop and Tamarac?
A No.
Q Did he tell you that he had figured out a way, in 2003, to avoid an upcoming stock market crash?

A I don't recall that.
Q Did he tell you that TeraHop and Tamarac were a way to protect you from fluctuations or crashes in the stock market?
A No.
Q Let's look at Exhibit 161.44. If we could look at the top of this. I'm sorry. This is the wrong exhibit here. We'll come back to it.
Did you make investments into the -- could you give us a rough sense of what percentage of your money you put into the Equity Investors Group?
A You know, I think it was about two-thirds into the Equity and one-third into the Income.
Q And did he give you any sense that the Income fund was invested in TeraHop and Tamarac?
A No.
Q How about the Equity fund?
A No.
Q In 2008, did Mr. Spangler tell you that he was going to update the paperwork for the Equity fund and the Income fund?
A You know, in 2008, he did send me paperwork and wanted me to sign that. And my wife and I looked at that paperwork. We had already, you know, kind of gotten worried about him. My wife was actually more perceptive than I had been. She, for a couple years, had been saying, look, you know, let's --
MR. CARPENTER: Objection. Hearsay, Your Honor.

THE COURT: Ask another question.

BY MR. FRANZE-NAKAMURA:

Q Did you ever sign those documents?

A No.

Q And did Mr. Spangler move your money from the Equity fund to the Growth fund, even though you didn't sign his documents?

A I found out later he did that. I didn't know at the time. He didn't tell me he was going to do that.

Q Earlier you indicated that at some point you sold your practice?

A Yes.

Q Do you remember when that was?

A I believe that was in May of 2007.

Q And as part of that process, did you close out the retirement plan for your employees?

A Yes.

Q In 2007, did Mr. Spangler tell you that almost half of the Equity fund was invested in TeraHop and Tamarac?

A No.

Q Did he tell you that there would be any difficulty in paying out your employees --

MR. CARPENTER: Objection. Leading, Your Honor.

THE COURT: It is. Rephrase.

BY MR. FRANZE-NAKAMURA:

Q When you asked him to close out the employee plan, what did he tell you about liquidation?
A Yeah, he said that that's something we could do, that some of this was illiquid, that I would have to wait as much as a quarter, you know, a three-month period of time in order to get that money.
Q Did he mention anything about a liquidation fee?
A No.
Q Did he indicate that he would need to pay you in kind instead of in cash?
A No.
Q From time to time, did Mr. Spangler give you portfolio reviews?
A Yes.
Q And in 2008, do you remember having a review with Mr. Spangler?
A I don't recall the exact date. And we had kind of two reviews somewhere in that period of time.
Q Do you remember where those reviews were held?
A Yeah. This was another thing. So, you know, before, I had gone to his office and met him at his office. That's where I had first interviewed him. And then after that, in his office and in his home. So I would go to his home, and he had an office, and it was fairly business-like.
But the last two reviews we had was on his yacht. And,

once again, you know, my wife said -- and I should have realized -- why are we meeting here, and what's he doing with this great big yacht?

MR. CARPENTER: Objection. Nonresponsive and hearsay, Your Honor.

BY MR. FRANZE-NAKAMURA:

Q Did something bother you about the location?

THE COURT: Hang on. The objection will be sustained. Let me have you ask another question.

BY MR. FRANZE-NAKAMURA:

Q Did something bother you about where he was having reviews?

A Yes. Having it on his yacht bothered me.

Q Did you end up firing Mark Spangler?

A Yes.

Q And do you remember when that happened?

A We had discussed it. I had done a phone call with him in late 2008. And the formal end of our relationship was in December of 2008.

Q Why did you fire him?

A Well, for all the reasons that I have just said. You know, we were worried. It was -- you know, we were concerned about this business of the yacht and his being vague about what was going on. It was very difficult to read his reports. And then he gave us this whole new paperwork that

sounded like they were given even more authority to take our money. And we just didn't want to do that. We wanted to have a financial planner who made sense to us. And he just wasn't making sense.

Q Could we have Exhibit 161.47, page 2, please?

Do you recognize this letter?

A Yes.

Q It's dated December 17, 2008. Is this the termination letter?

A This is the formal one, yes.

Q Can we enlarge the first two paragraphs?

This refers to a phone call on December 15, 2008?

A That is correct.

Q Is that the phone call you were referring to when you spoke to Mr. Spangler?

A Yes.

Q And in the second paragraph, you write, "I understand that it will take until the end of the first quarter, March 31, 2009, to liquidate our investments." Where is that understanding coming from?

A Well, from our phone call, from him. You know, he said, yes, of course we can terminate, and he can, you know, put our money into our Schwab account, but some of it would take as much as a quarter for that to happen. And that kind of made sense to me. I trusted him right up to the end, and let

him say that.
Q So did you expect to get your money on March 31, 2009?
A I did, yes.
Q Did he liquidate your holdings by that date?
A No.
Q Could we zoom out on this a little bit? And if we can look at the bottom portion of this letter. You write, "We intend to keep our positions in the private equity investments." So what are you referring to there?
A Well, he had this -- you know, first of all, I independently had done some private equity. So I knew what that was. On his advice, we invested some small amounts of money into a couple of private equities that he was recommending and part of running. One of them was the batteries, the ZPower, and the other one was -- I'm blanking on the name right now, but it went belly-up.
Q In the next paragraph you say, "I will pay you the $3,000 owed to you for services rendered in 2008, but will not get additional bills for 2009." Why did you write that?
A Well, once again, he was saying that we still owed him money. And, you know, I was willing to pay him his fee. That's how I set it up with him. I paid him a fee, and I expected him then to work on my behalf for that fee. And since he wasn't going to be working for me anymore, I didn't feel like I had to pay any further fee in 2009. And then, of

course, surprises came.

Q We'll get to those in a moment. Let's look at Exhibit 161.53. This is an email dated May 23, 2009. This is from you to Mr. Spangler. Do you remember this email?

A Yes.

Q And what are you asking in this email?

A Well, once again, you know, we had an accounting of what the money is -- you know, my money that was going to be put into the account. And, you know, he had told me initially, back when I terminated our relationship, that we would have it by the end of the quarter in 2009. And we still hadn't had it.

And as it turns out, he put in large portions of it, but then some of it he didn't -- you know, he didn't pull out. He said we had to wait for that and stuff. So I just didn't understand that.

Q Can we look at the last paragraph here? You write, "How much do I have left in each account? Is this money at risk?" Did Mr. Spangler tell you that the Growth fund was over 82 percent invested in TeraHop and Tamarac?

A Absolutely not.

Q Did he ever give you a breakdown of where the Growth and Income funds were invested?

A Never.

Q Can we see Exhibit 161.54 on the right panel and then see

Exhibit 161.47 on the left?
On the left we see your termination letter of December 17, 2008, where you request liquidation, and on the right we see an email dated June 26, 2009. It's from Mr. Spangler to yourself. Do you remember receiving this email?
A Yes.
Q And Mr. Spangler is referring to making final payments to you today?
A Yes.
Q So was this the date on which he finally cashed you out?
A Yes.
Q What obligations did you believe that Mr. Spangler owed you as your investment investor?
A Well, to be my fiduciary advisor, to advise me in a way that is conservative, to help me reach my goals of being able to retire, and of course to have my employees have those things, to retire. To be trustworthy, to be honest, to be transparent, those are the things he owed me.
Q You mentioned transparency. When he liquidated your accounts, did he ever give you an invoice or a report showing how he liquidated your money?
A No.
Q Can we have Exhibit 161.56? This is a document showing The Spangler Group liquidating your account. And do you see here, up at the top, it says, "OB-GYN redemption

computation"?

A Yes.

Q And do you see this line here where it says, "Less: Spangler Ventures 7 accrued dividends"?

A Yes.

Q And they take out $44,000. Have you ever heard of accrued dividends before?

A No. Well, I mean, I've heard of accrued dividends as some financial term. But I've never heard it -- Mr. Spangler never gave me those words when he talked to me. He never used those words when he talked with me. When I met with him, he never said those words to me. He never said that and explained that to me.

Q When he discussed liquidation to you, did he say, I'm going to take out accrued dividends?

A No, he did not. And that's the exact thing that I did not want him to do. I paid him a fee.

MR. CARPENTER: Objection, Your Honor.

A And he was supposed to be a fee-only --

MR. CARPENTER: Objection.

THE COURT: Dr. Olson, it will be a lot easier if you just listen to the question and give your best answer.

THE WITNESS: Yes, sir. I'm sorry.

THE COURT: Counsel, maybe we can take our break at this point in time, all right?

MR. FRANZE-NAKAMURA: Okay.

THE COURT: Ladies and gentlemen, we will go ahead and take our afternoon recess at this point in time. Please remember our cautionary instructions. We are going to bring you back out here in about 15 minutes.

(Jury leaves courtroom.)

THE COURT: Counsel, we will be at recess, 15 minutes.

MR. FRANZE-NAKAMURA: Thank you.

(Brief recess.)

THE COURT: Counsel, please be seated. There is a matter we need to take up before we bring our jurors out. Juror No. 3, I believe, Ms. Denise O'Donnell, is from Whatcom County. And after Dr. Olson took the stand, she realized she actually knows him.

She indicated to our clerk -- and, Madam Clerk, please correct me if I'm wrong -- that she met him briefly, she thinks about 16 years ago, in the hospital, and that's the extent of her contact or knowledge with him.

So I guess I'm asking two things. One, does either side feel the necessity to bring her out and ask for more information, or do you feel the necessity to give any further instruction of any type?

Government.

MR. BLACKSTONE: Was she his patient, or just

happened to run into him in the hospital 16 years ago?

THE COURT: Let me ask this: Dr. Olson --

THE WITNESS: I don't recall her.

THE COURT: Well, you only delivered 3,500 babies or something. No, she didn't say that you delivered any of her children or anything like that. But the clerk indicated that what she said was that he had been involved in like a ten-minute examination of her. So I guess he was the doctor and she was the patient at that point in time.

MR. BLACKSTONE: We don't feel a need for any further inquiry, Your Honor. We're fine.

THE COURT: Defense.

MR. ZULAUF: I don't want to waste the time. But on the other hand, it seems like we probably ought to inquire about this and whether she feels that she would credit this doctor's testimony more than some other witness.

THE COURT: All right. Let's bring her out then.

MR. ZULAUF: And could we excuse the doctor during this?

THE COURT: You mean you want him down, in the back?

MR. ZULAUF: I guess I think he shouldn't be in the courtroom while we are examining the juror regarding the doctor.

THE COURT: All right. Just to be on the safe side, Doctor, let me ask you to step down for a moment.

THE WITNESS: Sure.
THE COURT: All right. Madam Clerk, bring her out.
(Juror enters courtroom.)
THE COURT: Ms. O'Donnell, please be seated. You indicated to our clerk during the break that after seeing Dr. Olson on the witness stand, that you actually remember having some contact with him back in the past, is that correct?
JUROR NO. 3: That's correct.
THE COURT: Can you tell us as much as you can remember, when it happened, how it happened, those kind of things?
JUROR NO. 3: In approximately 1996, he was the emergency fill-in OB doctor for my OB doctor. I had probably a six-minute visit to meet and greet, and that's it.
THE COURT: Was that the very first time you had ever met him?
JUROR NO. 3: First and only.
THE COURT: And only time. You haven't seen him since then?
JUROR NO. 3: No. I only recognized that -- I recalled him because he was an OB-GYN in Bellingham, Washington.
THE COURT: Does that contact in any way, shape, or form, you believe, affect your ability to judge his

credibility just like anybody else's?

JUROR NO. 3: No.

THE COURT: Any questions from the government?

MR. BLACKSTONE: No, Your Honor.

THE COURT: Any questions from the defense?

MR. CARPENTER: I just have a couple.

Mrs. O'Donnell, when I see a doctor, I sometimes develop a fondness for that doctor because the doctor has helped me in some sort of way. Did you develop a fondness for Dr. Olson because of your interaction with him?

JUROR NO. 3: No. I strictly met him as if he was to fill in for my OB doctor if she was out of town or what have you and I went into labor. I was about eight, nine months pregnant. So what? It was just basically so I knew, if he had to fill in, that, yes, this is the right person that's supposed to be here.

MR. CARPENTER: All right. And if you were in Mr. Spangler's shoes, would you still be comfortable having yourself decide his case despite the fact that you met Dr. Olson?

JUROR NO. 3: Yes. I didn't even recognize him. Like I said, it was strictly from a description of his employment.

MR. CARPENTER: Thank you.

THE COURT: Thank you very much.

(Juror leaves courtroom.)

THE COURT: All right. No problems? No objection?

MR. ZULAUF: No objection.

THE COURT: All right. Let's bring our doctor back in, and let's bring our jurors back out.

(Jury enters courtroom.)

THE COURT: Thank you. Please be seated. All right. We are back for our last session of the day. And, again, because of another small conflict, I am going to have to shut down at about 4:05. So you've got about another hour. I know you are all torn up about that. And, remember, tomorrow is a day off for you, but we will see you back on Monday.

All right. Counsel, you may inquire.

MR. FRANZE-NAKAMURA: Thank you, Your Honor.

Q Before the break, we were talking about the redemption of your holdings with Mr. Spangler?

A Yes.

Q And we were talking about the SG Income+ Investors Group. At the bottom of this form, it talks about a 2 percent redemption fee. Did Mr. Spangler explain to you why he was charging you a 2 percent fee?

A No, he did not. He did not say that to me. And since I was paying him a fee of thousands of dollars already, I didn't expect him to try to steal money from me this way.

MR. CARPENTER: Objection, Your Honor, as to the

categorization of stealing.

THE COURT: The objection will be sustained.

MR. CARPENTER: I ask that that last answer be stricken.

THE COURT: It will be stricken.

BY MR. FRANZE-NAKAMURA:

Q Can we have the last page, and one more page?

Now, this spreadsheet deals with the Growth fund. You were invested in the Growth fund, correct?

A That is correct.

Q And, here, we see that they are backing out the SV11 accrued dividends. Any mention to you about backing out those dividends?

A Not at all.

Q And, here, there is backing out of accrued interest. Any discussion with you about that?

A No.

Q Again, at the bottom, here, we have a notation for taking a 2 percent redemption fee. Any discussion about that?

A None at all.

Q Doctor, did you feel that Mr. Spangler owed you a duty to be transparent about your redemption?

A Of course.

Q Did he give any explanation about why he was charging a fee?

A He didn't mention he was charging me a fee at all. I didn't know that until this happened, and I'm starting to look at these papers. I had never seen a paper like this before.
Q Did he give you any explanation of why it took so long to redeem your holdings?
A No.
MR. FRANZE-NAKAMURA: Thank you, Your Honor. No further questions.
THE COURT: Cross-examination, Mr. Carpenter.

CROSS-EXAMINATION

BY MR. CARPENTER:
Q Dr. Olson, a moment ago you talked about you didn't have any knowledge about this 2 percent withdrawal fee, is that right?
A That is correct.
Q Okay. You signed the Equity PPM, is that right?
A I don't know.
Q In your direct testimony, didn't you say you had no doubt that you signed it?
A You know, first of all, I don't know what paper you're talking about. And tell me the date, and show me my signature. I don't know what you're talking about.
Q Please bring up, Ms. Valencia, 401.2, page 9.
Do you see your signature here, 12/28/98?

A I do, yeah.
Q Does that look like your signature?
A Yes, it does.
Q Could you also bring up 401.21, page 8?
A How many pages was in this document?
Q Could we have 401.2 point -- 401.21, page 8?
Do you see your signature there as well?
A I do.
Q Do you see, at the top, it says, "Equity Investors Group, consent of members"?
A Sure.
Q Do you think you signed documents agreeing to be a member of the Equity group?
A Apparently I did, yes.
Q I'd ask you to take a look at Document 401.6.008. Let's start with the first page, Ms. Valencia.
This is what's been admitted as the Equity Investors Group PPM, Dr. Olson.
A All right.
Q I'd like now to turn to page 8, Ms. Valencia.
Do you see the section called "withdrawal rights" there?
A I do.
Q Before you signed this document, did you read it at all?
A You know, I probably glanced through it, you know. But at that point, I trusted Mr. Spangler. And he knew that I

wanted a fee-only financial planner. And I would be surprised that he would have given me a document like this, showing these kind of fees, when he knew I did not want that. I would have expected him to say: Hey, I'm going to change the terms of our agreement. Look at this. Be sure you know this before you sign it.

MR. CARPENTER: Your Honor, I would ask to strike that last answer as not responsive.

THE COURT: The answer will stand.

BY MR. CARPENTER:

Q Mr. Spangler didn't tell you not to read the contract, did he, Dr. Olson?

A No, of course not.

Q And the last sentence of the paragraph here says, "The amount of any withdrawal may be reduced by a fee not to exceed 2 percent of the amount withdrawn"?

A That's apparently what it says, sure.

Q If you could take a look at page 14. If we could highlight the middle paragraph there under "admissions and withdrawals."

Do you recall reading this paragraph, Dr. Olson?

A I do not.

Q As you read it now, do you see it talks about providing 40 days' prior notice before the end of the quarter?

A Sure, yeah, I see it right there. It's right there in the

middle of this, what, 14-page document, 28-page document. Yeah, I see that.

Q And you see that it says, generally payment will be paid in full within 30 days of a withdrawal date?

A I see that, sure.

Q And complete withdrawals generally will be paid 70 percent within 30 days and the remainder within 120 days of this date?

A Sure, I see that.

Q And then it also talks about the 2 percent?

A You're absolutely right.

Q Do you recall ever seeing any PowerPoint slides with Mr. Spangler when you met him on his yacht or anywhere else?

A You know, I think that there were some on the yacht. Yeah, I think there were.

Q Do you recall speaking with an FBI agent by the name of Spencer Walker and a couple of IRS agents by the names of Benjamin George and Aaron Hopper on or about June 25, 2012?

A You know, once again, I talked to several different people at least on two phone calls prior to this immediate phone call on this testimony. So, yeah, there's probably people, and I don't recall their names, but, yeah, FBI and attorneys, and, sure.

Q Do you recall telling those agents that you did not recall ever seeing a slide-show-type presentation with Mr. Spangler?

A Okay. That's probably what I said.
Q But now you think you might have?
A I don't know.
Q Take a look at those presentations, and we'll see if they refresh your recollection. If we could take a look at Exhibit No. 16.002. Let's see. Let me just have one moment here. If you could display the first page of 16.02.2.
MR. CARPENTER: Actually, I'm not sure this has been admitted yet. And if it hasn't, let's not publish it yet.
Did Mr. Franze move for admission of this?
MR. FRANZE-NAKAMURA: I believe it's already admitted, Your Honor.
MR. CARPENTER: Thank you.
THE COURT: Is it already in evidence? All right.
BY MR. CARPENTER:
Q Dr. Olson, this is admitted as a PowerPoint that was attached with your account. It was on Mr. Spangler's server when he turned that server over to the receivership. You recognize your name and your wife's name there, I imagine?
A Yes.
Q And you are aware, too, that Mr. Spangler maintained a website for The Spangler Group, right?
A Yes.
Q And on that website, he maintained PowerPoint presentations he gave to his clients, such as yourself?

A I don't know that.
Q You never went on to look at them?
A You know, I went onto his website. But I don't believe I ever looked at PowerPoint presentations on his website.
Q Okay. But it was password protected. You could get on and look at the data that he maintained on your behalf; is that fair to say?
A Yes.
Q Let's take a look at -- actually, we'll come back to this.
You indicated that you thought that these were conservative investments. Let's take another look at the Equity PPM just for a moment.
Ms. Valencia, if we could take a look at Equity PPM, at 401.6.002, focusing on the first two sentences at the top of the page there.
Dr. Olson, you see that this portion of the PPM indicates that the securities offered entail a high degree of risk and that no investment in these securities should be made by any person who is not in a position to lose the entire amount of such investment? Do you recall reading this when you glanced at the Equity PPM some years ago?
A No.
Q If we could take a look back at the PowerPoint presentation. And if we can take a look at .005. Dr. Olson, when you look at this, and look at the first, say, three

bulleted PowerPoints there, where it talks about alternative strategies being the core and the major alternative strategy as private equity, do you recall ever seeing this before?

A You know, already in 2008 I had decided to leave Mr. Spangler. So I was investigating other financial planners. When he brought new stuff and new papers to sign, I chose not to sign it. If he showed me this -- and I don't recall actually seeing this. And I'm getting a little bit mixed up on my memory, because I saw this in preparation for coming in to this testimony. I don't independently recall seeing this, you know, five, six years ago, that he presented this to me, if he did. He might have. But I probably wasn't paying close attention to him, because I had no intention of sticking with him.

Q Okay. That answers my question. Thank you.

If we could look at page 9, Ms. Valencia. And I apparently have requested the wrong page. How about page 10? Yes, that's it.

This indicates a breakdown of income showing roughly 62 percent in debt securities and roughly 9.7 percent in private equity. Do you see that?

A I do.

Q Do you recall whether you saw this back in 2008?

A As I testified, I don't recall seeing this entire PowerPoint. So I'm saying, I don't recall seeing this

particular pie chart either.
Q Right. And what I'm trying to do, Dr. Olson -- I'm not trying to belabor the point. What I mean to do is to go through various things to see if that refreshes your recollection about whether you might have seen it. So I'm almost done, okay?
If we could take a look at the next slide, please. Okay. This shows a breakdown for Growth, showing 36 percent in public equities and 58 percent in private equities. When you look at this now, does it refresh your recollection about whether you might have seen it back in 2008?
A No.
Q Okay. And then, finally, if you take a look at page 16, Dr. Olson, this is a page where, if you look at the first few bullets at the top, it indicate that the idea behind this major alternative strategy is having greater control and less risk. Same question as before: When you look at this today, does that refresh your recollection about whether you might have seen this back in 2008?
A No.
Q Okay. Thank you.
MR. CARPENTER: Your Honor, I ask that Exhibit No. -- Defense Exhibit A185.04 be admitted -- excuse me -- be brought up, Ms. Valencia. And I don't believe it has been admitted yet.

Q Dr. Olson, this slide is hard to read. But I'm going to try to highlight the part at the bottom here that Ms. Valencia is highlighting about --

MR. FRANZE-NAKAMURA: We have no objection to its admission.

MR. CARPENTER: Thank you, counsel.

THE COURT: Are you asking for it to be admitted, counsel?

MR. CARPENTER: Yes, Your Honor. Ask that it be admitted.

THE COURT: It will be admitted, Madam Clerk.

And you may publish, counsel.

MR. CARPENTER: Thank you.

(Exhibit(s) A185.04 admitted.)

BY MR. CARPENTER:

Q Dr. Olson, it looks to me that you might be asking Mr. Spangler, why not increase our investment in ZPower. Is my understanding of that correct?

A Yes.

Q Okay. And it looks like Mr. Spangler is responding to you by saying, the reason not to is you already have a position in ZPower in Equity?

A Yes.

Q Okay. All right. And did you invest in Who's Calling as well?

A I'm sorry?
Q Did you ever invest in Who's Calling?
A No.
MR. CARPENTER: Thank you, sir.
THE COURT: Any redirect for this witness?
MR. FRANZE-NAKAMURA: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. FRANZE-NAKAMURA:
Q Doctor, you were shown some signature pages from 1998, right?
A Correct.
Q Were you shown any signature pages from 2008?
A No.
Q Do you remember testifying that you did not sign the papers in 2008?
A That is correct.
Q Did you ever agree to have your money put into the Growth fund?
A No.
Q You were shown some PowerPoint slides?
A Yes.
Q I would like to pull up 161.22, page 16. Mr. Carpenter was showing you this slide here under the bullet point of private equity, major alternative strategy. There is another bullet point down here that says, "Use member human capital."

Did Mr. Spangler ever use your member human capital?
A No.
Q Do you even know what that means?
A You know, maybe the investors are supposed to work at the company or something. I don't know what that means, really.
Q On the left-hand side -- can we have page 11 of this document?
I believe this was the slide that was shown to you by Mr. Carpenter about the Growth fund?
A Yes.
Q On the right-hand side -- if we could have page 30? Now, the slide on the left is for the Growth fund in general. The slide on the right is telling you where your money is, correct?
A Yes.
Q And it shows you your different asset allocations?
A Correct.
Q Mr. Carpenter didn't show you this slide, did he?
A No, he did not.
Q Can we enlarge page 30 in the full panel here? On the right-hand side, we see the section for private equities, correct?
A Correct, yes.
Q Do you think that shows you your full exposure to private equity?

A Sure, because I knew that I had a small portion of my entire retirement that was in these startup, little, tiny, hoping for a home run on this. The majority was supposed to be in safe retirement investments. I was shocked when I saw that it wasn't.

Q Now, in this other column here, there is a column for the Income fund and the Growth fund?

A Yes.

Q Do you think that any of the money from those funds were put into private equities?

A I did not think so at all.

Q Did Mr. Spangler ever tell you at this point he had moved tens of millions of dollars in those funds into private equities?

A No, no, he did not. And he didn't tell me he moved my money in there.

Q Earlier you talked about duties as a financial advisor?

A Yes.

Q Does that include a duty to tell you where your money is?

A Sure.

Q You mentioned transparency. It looks pretty clear here that it's transparent that you have only that amount of money in private equities?

MR. CARPENTER: Objection. Argumentative. It's also beyond the scope and asked and answered.

THE COURT: The objection will be sustained.

BY MR. FRANZE-NAKAMURA:

Q Sir, at any point, did Mr. Spangler tell you that your money in the Growth fund and Income fund was in jeopardy?

A No.

MR. FRANZE-NAKAMURA: Thank you, Your Honor. No further questions.

THE COURT: Doctor, thank you. You may step down.

And the government may call their next witness.

MR. BLACKSTONE: Call Essex Porter, Your Honor.

(Witness sworn.)

THE COURT: Mr. Porter, good afternoon. If you could work your way through the well of the courtroom there, come up in front of our clerk, and raise your right hand to be sworn, sir, before taking the witness stand.

THE CLERK: Please take the stand.

Will you please state your full name and spell your last name for the record?

THE WITNESS: My name is Essex J. Porter. And my last name is spelled P-O-R-T-E-R.

THE COURT: Mr. Porter, there is water on your left there, in case you should want some. And please keep your voice up so everybody can hear you, most importantly these people on your left.

You may inquire.

MR. BLACKSTONE: Thank you, Your Honor.

ESSEX PORTER,

being first duly sworn, the witness was called and testified as follows:

DIRECT EXAMINATION

BY MR. BLACKSTONE:

Q Mr. Porter, where do you currently live?
A I live in Seattle.
Q Are you married?
A I'm married.
Q And do you have any children?
A I have one daughter.
Q And how old are you, if I can be so bold as to ask that question?
A I am 57.
Q You look 45.
A That old?
Q Actually, 35. Give us a little sense of your educational background and your employment history over time.
A I am a high school graduate of Bradford High School in Hawaii. I'm a graduate of the University of Nebraska School of Journalism, in Lincoln, Nebraska. And I moved to Omaha to begin my reporting career, and moved to Portland back in '79 and to Seattle in '82.
Q And what have you done since you've been in Seattle? What

has your employment been?
A I'm a news reporter at KIRO TV, Channel 7. I have worked there since I moved to Seattle in '82.
Q So you're on TV?
A I'm on television.
Q Do you cover a particular area, or anything that walks in the door?
A I tend to focus on government and politics. But the television station has a pretty small staff of reporters, so we all cover everything. I've covered trials. I cover fires and accidents, tragedies, you know, murders and other things. But tend to focus on government and politics.
Q You just did a story on the mayor race?
A Yes. We just did a half-hour special on the mayor's race. We finished it up. And it ran on Monday. And it will air again this coming Sunday, right in advance of 60 Minutes.
Q So who is going to win?
A I'm going to keep my analysis to myself on that. That would be the prudent thing for a reporter to do.
Q Now, tell me about what your wife has done. Does she have a job outside the home?
A Yes. My wife is a journalist as well by trade. She is a newspaper reporter. When we met, she was working as a reporter in Bend, Oregon. When we married, she became a technical editor at Microsoft.

Q And is she still at Microsoft today?
A No. She left Microsoft a number of years ago. She did copy editing for the Seattle PI, and ultimately got a master's in library and information science at the University of Washington.
Q What is her name, and what was her job at Microsoft?
A Her name is Cindy. And her job at Microsoft was as a technical editor. In the mid-'90s, she is the person who edited the help files for Microsoft Office.
Q Okay. Do you know the defendant Mark Spangler?
A I do.
Q And when did you first became acquainted with him, and how?
A Became acquainted with him roughly in 1991. One of my wife's colleagues had been acquainted with him. She had earned some Microsoft stock, and we were looking for a way to invest those proceeds.
Q And were you looking to Mark Spangler to be your investment advisor?
A Yes, we were.
Q Had you had an investment advisor prior to 1991?
A We had not.
Q And did you meet with Mr. Spangler?
A Yes, we did.
Q And was your wife there as well?

A She was.
Q What was your -- did you tell him what your goals were with the money you had accumulated, the two of you?
A Yeah, our goals were for the money to grow, for us to be able to use the money to supplement our incomes, to build for retirement. We did not have children at the time, but we were looking forward to children, and to be able to build a nest egg to help them with college.
Q Did you talk to Mr. Spangler about your risk tolerance?
A Yes, he asked about it. We discussed what would be the proper risk for what at the time was a much younger couple with work lives ahead. We talked about what we would to see money invested in, what we would not. You know, he offered that he could advise for funds that didn't invest a lot, say, in tobacco. We were looking to certainly grow the amount of money, but also, you know, not to take exceptional risk.
Q Did your tolerance for risk change over time?
A No. Our tolerance for risk and our, pretty much, discussions with Mr. Spangler were, it was pretty much the same. As we got older, you know, of course, you try to adjust your portfolio to the fact that you won't be working as much. So if there are losses, you won't have a chance necessarily to replace them as much. But, in general, we were looking for prudent risk and good, but not, you know, skyrocketing returns, because of course that would indicate a

great risk of loss as well.
Q After meeting with Mr. Spangler, did you and your wife decide to hire him as an investment advisor?
A We did.
Q And would that have been in 1991 as well?
A I believe it was.
Q And so for how long did you continue to use his services?
A We used his services until we got an email in 2011 saying that the firm was in receivership.
Q So you were with him for almost 20 years?
A Yeah.
Q And were you paying him a fee for these services that he was giving to you?
A We were.
Q What was the fee you paid? And if it changed over time, then tell us what the fee was at the end.
A It changed over time. The fee at the end was $3,000 a quarter, or $12,000 a year.
Q Okay. And Mr. Spangler was your investment advisor, is that correct?
A That is correct.
Q What did you believe his duties and obligations were to you, as his client?
A To give us appropriate advice on what to invest in, to explain what he was investing in on our behalf, to ask our

permission for what he was investing in on our behalf, and to select investments that would help our money grow without putting it at great risk.

Q And would Mr. Spangler provide you with account statements showing you how your money was doing?

A Yes, he would.

Q Let me show you --

MR. BLACKSTONE: We have some exhibits to offer here, Your Honor. At this time, we would like to offer Exhibits 115.5 through 115.23; 115.40 to 115.43; 115.47; 115.51; Exhibit 401.2, page 13; Exhibit 401.23, pages 62 to 66; and, finally, Exhibit 406.21, page 44.

MR. CARPENTER: No objection.

THE COURT: Thank you, Mr. Carpenter.

Those will be admitted, Madam Clerk.

(Exhibit(s) 115.5 to 115.23; 115.40 to 115.43; 115.47; 115.51; 401.2, page 13; 401.23, pages 62 to 66; 406.21, page 44, admitted.)

BY MR. BLACKSTONE:

Q And let's pull up Exhibit 115.9. Do you see that on the screen in front of you, Mr. Porter?

A I do see it.

Q Do you recognize this as one of the account statements you got from Mr. Spangler?

A Yes, I do.

Q What time frame is this?
A This is for the year ending 2004.
Q Now I want to focus your attention down -- how much money in total do you think you gave Mr. Spangler to manage for you?
A Over the years, you know, it would have been roughly $300,000, for some of the larger accounts. And then there would have been more for some of the smaller investments, say, if there were some real estate investments, real estate partnerships, some venture capital things. So there would have been additional money on top of it.
Q I want to focus on the marketable equities. Equity Investors, what was that investment?
A That investment was what I always called sort of a private mutual fund that Mr. Spangler had assembled on behalf of his clients.
Q And did he explain to you what that private mutual fund was investing in?
A Yes. That fund was investing in a basket of stock market choices. It was actually managed by a group that manages more of a public mutual fund, but was, as I understood it, managing -- helping to manage this mutual fund on behalf of the Spangler clients.
Q And did Mr. Spangler tell you what the underlying investments were going to be for Equity Investors? Were they

going to invest in public stock, private stock, all of the above?
A My understanding was that it was mostly, if not all, public stocks. But there was -- you know, on the fringes, there may have been some things that were more private.
Q Did Mr. Spangler ever tell you that the Equity Investors fund was going to invest in a company called TeraHop or Tamarac?
A He never did.
Q If we could look at page 2 of this Exhibit 115.9. There's a section here that says "private equities, preferred and common stock." What is this all about, Mr. Porter?
A So the private equities are venture capital investments. These were startup companies that he had chosen and specifically recommended investing in and asked permission if we wanted to invest in them.
It was very clear about these companies that the risk was higher, but the rewards could be good. And the thing that we always considered was, you know, keeping that to a fraction of our investment, but exposing us to perhaps a very good upside.
Q Who told you these were more risky investments than the Equity fund?
A Mark did, Mark Spangler did. And it was -- it's clear in the literature he sent with them describing the companies and

asking permission whether we wanted to invest, sometimes recommending -- in fact, I think always recommending a particular amount to invest, it was very clear that these startup companies would be riskier than the common stocks you see on the New York Stock Exchange.
Q Did you and your wife determine what percent of your net worth you wanted to expose to these type of risky investments?
A I don't think we ever put a specific number on it. But we always thought that it needed to be a small fraction of the overall pool of investment.
Q And in looking at this PPA, the amount you have here is about 6.4 percent. Do you see that?
A Let's see. Yes, I see it there, yes.
Q Is that about in the ballpark of what you wanted to risk in this area?
A Right. We didn't feel that was out of the ballpark in terms of the percentage of risk.
Q Did Mr. Spangler ever encourage you to put more of your money into the risky startups?
A There were some that he encouraged us to put money into that we declined. There were sometimes, for some of these, additional investments that he suggested. And we usually agreed to do that.
Q Did Mr. Spangler ever recommend that you invest in a

company called TeraHop?
A No, I do not remember ever a recommendation for TeraHop.
Q And you've looked at your PPAs, and do they show any investment in TeraHop?
A No, I never saw TeraHop on any of these documents that we would get, certainly on a yearly basis, if not a quarterly basis.
Q What about Tamarac, did you ever invest in a company called Tamarac?
A Not to my knowledge.
Q And you didn't see Tamarac on any of your account statements either, did you?
A No.
Q Now, how often would you meet with Mr. Spangler to go over your finances?
A We would meet roughly once a year. Although, in the latter years, we would not meet in person, necessarily. We would have short conversations by phone if a question came up or a recommendation came up. But, you know, I monitored the documents that he sent and would call with a question if I had one.
Q And do you recall on occasion he would share with you a PowerPoint presentation about your investments?
A Yes, there were years where he did share a PowerPoint presentation.

Q Let me show you 115.7. Do you recognize that as a PowerPoint you would have received from him in December of 2003?
A Yes.
Q And would this be a sitting down with Mr. Spangler and going over this document?
A There were times when we did sit down and go over the document. There were other times when I might receive a link to it or may have received it in the mail and looked at it.
Q If you could look for me at page 6 of this document. Do you recall if there was a pie chart like this in the PowerPoint that showed where your money was invested?
A Yes, that's correct.
Q And looking at this, does this seem about right, that you had about 7.2 in private equities as of October 31, 2003?
A That seems about right.
Q And the rest was in marketable equities, fixed income, and the other categories, is that right?
A Right.
Q Look for me at page 10, please. And was this chart also provided to you as part of a PowerPoint?
A Yes.
Q And this reflects that the bulk of your money is in marketable equities, is that right, and fixed income?
A That's correct.

Q And over here, this shows what you have in private equities?
A That's correct.
Q Okay. And are those all the companies you believed you were invested in?
A That's correct.
Q Did he ever give you a chart that showed that this column over here was invested in TeraHop, Tamarac, or other private equities?
A No.
Q Would you have expected Mr. Spangler to have told you that, as your investment advisor?
A I would have expected not only that he would have told me that, but if we had those specific investments, that he would have asked approval.
Q Let me show you another PowerPoint marked as Exhibit 115.11. Let's go to page 2 of that document, please. Do you recognize this as a portfolio review you got in September of 2005?
A Yes.
Q And look for me at page 4. Do you see this third point, "Core 'alpha' portfolio of alternatives with swing 'beta' portfolio of public stocks and bonds"? Did Mr. Spangler explain what that meant to you?
A I don't recall asking a question about that, because, you

know, once you look at the sentence, it just, to me, says there will be a portfolio that includes public stocks and bonds. In terms of alternatives, that to me simply meant the venture capital alternatives that he had discussed and asked approval to invest in.
Q Look for me at page 16 of this exhibit. Do you recall getting this as part of the portfolio review in September of '05?
A Yes.
Q And does this accurately reflect where you thought your money was invested?
A Yes, that's correct.
Q And then, finally, look for me at page 26 of this exhibit, Mr. Porter. And do you recall getting this graph from Mr. Spangler in September of '05?
A Yes.
Q And, again, does it show the bulk of your money is in marketable equities?
A That's correct.
Q And only a small amount in private equities?
A That's correct.
Q And Mr. Spangler identifies which companies are in the private equity chunk there, is that right?
A Yes, those companies are identified.
Q And when you met with him in December of '05, did he tell

you that any of the money in this box over here was actually in TeraHop, Tamarac, and other private equities?
A He did not.
Q Did you receive any other PowerPoints besides these two?
A I believe so. Although I can't necessarily identify them off the top of my head. But I believe so.
Q If you got another PowerPoint, do you recall any of those PowerPoints giving you a pie chart that showed that a chunk of the Equity fund was in private equity?
A Those PowerPoints often included such a pie chart. And so I certainly wouldn't be surprised if that was the case. In fact, I would be surprised if it wasn't. I'm not visualizing the specific pie chart. But, you know, that's often how the information was presented.
Q Did you keep copies of these PowerPoints?
A I kept them for a time. I had to do a lot of record clearing in 2010. So a number of things that I once had I actually did destroy.
Q Let me show you your 2008 PPA, which is Exhibit 115.18. If we could have that up on the screen, please. And look for me down under equities. Do you see SG Growth+ there?
A I do.
Q The '04 PPA had that fund identified as Equity Investors. Can you tell us why the name is changed on here, what you know about that?

A Mr. Spangler changed the name and sent a description saying, I think, that he had changed the name and things were to reflect more of what the account was about. I believe in that description it sounded more like, hey, it's been a long time, we've had the same name for a long time, we're changing the name to reflect this.

Q And were you provided with some documents relating to that name change?

A Yes.

Q And did you talk with Mr. Spangler about this change from Equity Investors to SG Growth+?

A I read the document. I remember a summary of the document. I read that. I do remember having a phone call with Mr. Spangler just to sort of try to understand it a little better. It seemed more like a housekeeping change than anything else. And when we talked about it, it did not seem that any of the underlying philosophy of the way he was approaching our investments was to change.

Q Did he tell you that the investment objective was changing from the Equity fund to the SG Growth fund?

A I did not get the impression that the investment objective was changing. The objective was to certainly grow the returns with reasonable risk. That was always our objective with him. I did not get the impression at all that that was changing because the name was changing.

Q Did he tell you this new fund was going to invest a lot more heavily in TeraHop and Tamarac?
A Those names were never mentioned.
Q Did he tell you this new fund was going to invest more heavily in startup companies?
MR. CARPENTER: Objection. Leading, Your Honor.
THE COURT: They are. Rephrase.
BY MR. BLACKSTONE:
Q What did he tell you about what the SG Growth fund was going to be invested in, if anything?
A The impression I got from our conversation was that it would continue to be invested in the same type of equities that the former -- that the name of the former investment vehicle was. There was nothing in our conversation that indicated there would be much, much greater risk.
Q And look at page 2 of this exhibit, 115.18. And how much do you have in private equity as of 12/31/08?
You need to go on the next column below that, Agent.
Are you only invested in ZPower as of this point?
A Right.
Q And what percent of your total portfolio was in ZPower?
A Oops. It disappeared there. So as a percentage, you know, there's a couple of vehicles that were very small, fractional percentages in ZPower. There were some with just a little bit more. And I think 2.3 percent, 2.7 percent. So

that seems like roughly 5 percent.
Q Okay. And as of this time, do you believe that was your total exposure in private equity?
A Yes, yes.
Q And did Mr. Spangler ever tell you that the SG Growth fund, which appears on page 1 of this, was invested in private equity as well?
A No.
Q Now let me direct your attention to the 12/31/2010 PPA, which is Exhibit 115.22. How much did you believe your investment was worth in SG Growth as of this date?
A As of this date, I believed the value was 414,419. That's what I believed the value was.
Q And where did you believe that money was invested?
A I believed that money was invested largely in a basket of stocks and funds that, you know, might -- that should do perhaps a little better than the stock market at large, but, you know, more closely managed by him and the folks he designated. I certainly did not believe it was heavily invested in a private startup company.
Q Would you have expected Mr. Spangler to have told you that as your investment advisor?
A Yes, I expect he would have told me.
Q And as of 12/31/10, how much did you have in private equity?

A Well, it looks -- if I'm reading correctly, it's about 2.1 percent.
Q Okay. And did you believe that was your total exposure to private equity as of 12/31/2010?
A I did.
Q And this shows, again, you had no investment in either TeraHop or Tamarac?
A No.
Q Did you learn at some point in 2011 there was a problem with Tamarac -- TeraHop? I'm sorry.
A I only learned there was a problem with TeraHop in a letter that Spangler sent sort of recapping the year.
Q Let's look at Exhibit 100. Let's blow that up.
And do you recognize this as the letter you received from Mr. Spangler?
A Yes, I do.
Q Do you recall when you received that letter, approximately, Mr. Porter?
A It may have been late winter, early spring.
Q Okay. And the first paragraph talks about how great Tamarac is doing?
A That's correct.
Q And you weren't in Tamarac?
A I was not.
Q And the last paragraph says, some sad news, TeraHop

closed. You weren't in TeraHop either, right?
A I was not.
Q Were you wondering why you got this letter?
A Well, because the letter was sent to the clientele at large, I assumed that other clients were invested in these. I certainly was not invested in all of Mr. Spangler's vehicles. So I thought it was more of a form letter. So the fact that these two were mentioned didn't puzzle me. It didn't concern me much, since I wasn't invested in them.
Q So what was your reaction to this? Did you think you had any exposure, either upside or downside?
A No, I did not.
Q Did you wish you had invested in Tamarac when you saw the glowing news in the first paragraph there?
A I have to say, yeah, I wished a little that I might have been a part of that, and was grateful that I was not a part of TeraHop.
Q Okay. Did you later learn that you had more exposure to these two companies than you thought?
A Yes, I did.
Q How did you learn that?
A Well, the first inkling of that was a conversation with Mr. Spangler, I think it was in early April of 2011, where he was discussing trouble he was having with one of the investors, but also talked about sort of the portfolios he

was managing as a whole, and mentioned Tamarac. And, you know, I casually mentioned that, you know, well, we're not invested in Tamarac, and was told that, yes, we were.

Q Okay. I want to just show you the email so we can set the time frame, and then we'll come back to that conversation. Let's look at Exhibit 115.47. And let's go down to the bottom of this, Agent.

This is an email, April 1st, from Mr. Spangler to you. "Can we Skype tomorrow...morning good for you? Subject: Past year and this coming year. Do you have a Skype address?" Did this email come to you kind of out of the blue?

A Well, this is the second in the sequence. I think he asked -- he sent an email that asked for a meeting or a phone call, suggested Skype. And I said we could Skype at a particular time. And I asked what the subject was. So this is his answer to me.

Q Okay. Let's go to your response to his question. And you say, "Tomorrow morning's fine." That would be April 2nd. "Will 9:30 work? We have some sudden concerns about this year as well. Both I and our house have had to undergo 'surgery' in the past month. (We'll both be fine.) My new Skype address is," whatever.

What were the concerns you had, sudden concerns that were coming up?

A Well, it had turned out that my house, I discovered, had developed a very large leak, and I had to replace a lot of siding. The house was built improperly. And it cost a lot of money to replace the siding, which meant that my cash reserves were low. And what I was going to ask him at this meeting was about a redemption to replenish some of these cash reserves.
Q What did you want to redeem?
A I wanted to redeem a portion of SG Growth and have that as cash so I could pay for replacing some of the siding on my house.
Q So I take it that that conversation took place the next day, April 2nd?
A It did.
Q And that was when he told you that you were in Tamarac?
A Yes, that's when.
Q Did he tell you that the Growth fund was in Tamarac?
A No, he did not say that specifically. I recall him saying specifically that I did have some part in Tamarac. And as a practical matter, it could have only been through the Growth fund.
Q Did he tell you how much of your money was tied up in Tamarac?
A He did not.
Q What was your reaction when he told you you were in

Tamarac, when you didn't think you were?
A It was surprise, because that's not the sort of investment I expected the Growth fund to be in.
Q Did you ever authorize him to put your money in Tamarac?
A I did not.
Q Did he tell you during that Skype on April 2nd that your money also was in a company called TeraHop?
A No.
Q Has he ever told you that?
A No.
Q Did you tell him on that April 2nd Skype as to your cash needs? Did you mention that to him?
A I mentioned that I would be looking for a redemption. But he described trouble with one of the investors in the fund. And since I didn't need the money absolutely right away, I offered to put aside that request for a few months to see if this trouble could be settled down, thinking that maybe that would complicate things.
Q During that April 2nd Skype conversation, did Mr. Spangler tell you there would be any problem or difficulty getting your money back to you?
A He did not.
Q Did you have any further conversations with him after that date?
A I did not.

Q Did you learn how much of your money was actually in TeraHop and Tamarac?
A Not from Mr. Spangler.
Q Who did you learn it from?
A Ultimately, when the receiver broke down how the funds were invested, I learned some from that and from the analysis that was done there.
Q Do you know how much of your money was in those two companies?
A I do not remember absolutely off the top of my head. I remember that it was a great percentage.
Q Do you remember how much you paid Mr. Spangler in fees over the years?
A I don't remember the exact number. But over the years, I believe it was in excess of $100,000.
Q And how much money did you get back from the receivership, Mr. Porter?
A From the receiver, we've received two payments so far. I think one was 114,000, and one roughly 5- or 6,000.
Q So how much money have you lost?
A A lot. Certainly, you know, roughly three-quarters or so of the value that I was told I had in 2010.
MR. BLACKSTONE: Thank you. I have nothing further, Your Honor.
THE COURT: How much do you have?

MR. CARPENTER: Your Honor, I don't have all that much. I might be able to do it in ten minutes.

THE COURT: That's fine.

CROSS-EXAMINATION

BY MR. CARPENTER:

Q Hopefully, Mr. Porter, we won't have to have you come back on Monday.

A Thank you.

Q Let me ask you a few questions here. You reviewed -- just one moment.

You reviewed the Equity and Growth PPMs, right?

A I reviewed certainly the one, one-and-a-half-page summary he sent describing the changes. And I looked over the larger stack of paper.

Q Let me ask you a couple of broader questions. Your understanding was that these investment vehicles allowed for investments in private equity, is that correct?

A My understanding was that the vehicles allowed for perhaps investment on the fringes, but it would not be all private equity. It would be largely the more basket of stocks that we had seen before.

Q Okay. And I want to take just a quick look at the objectives. If we could bring up, Ms. Valencia, 401.6.0010, which should be the Equity fund objectives, and also 406.7.0012, which should be the Growth objectives. And let

me just -- and, actually, if you could highlight the first paragraph of the redlined version, that would accomplish both goals quickly.

As you look at this, Mr. Porter, this is the redlined version showing the changes between the Equity fund and the Growth fund. Do you recall seeing a version like this?

A Yes, I recall seeing this.

Q Okay. And the initial investment objective was to, from the Equity fund, was to realize capital appreciation through investment in equity securities. Does that sound, roughly, accurate to you?

A I'm sorry. Where are you?

Q Well, actually, let me -- if you look at -- you have to read the red strikeout. Look at the second paragraph there. I'm sorry. The second sentence of the paragraph, if you could highlight that for Mr. Porter.

I'll give you time. I'm not trying to -- let me let you read that and kind of get a sense. I don't mean to quibble about the wording here, but I think I've got it right.

A Yes, I see the wording. But I'm sorry. I don't recall your question.

Q My question basically was that the Equity fund initially, its objective was to realize capital appreciation through investment and equity securities?

A I see that there, yes.

Q Okay. And then was changing Growth to -- the objective was changed to pursue long-term capital appreciation through investments?
A I see the change. I do not necessarily see the difference.
Q Okay. And that's kind of what I'm getting at here, I suppose. I mean, there's some different wording. One talks about equity security. One talks about investments. We can argue about those two terms, how they might differ. But I don't propose we do that right now.
But you indicated that, reviewing these documents, you believed that -- you understood them to allow for private equity investment, and I think you had testified at the fringes?
A I did say at the fringes.
Q Okay. And are you aware that other portions of this document talk about that investments might not be liquid and might be concentrated as well, the portfolio might be concentrated? Do you recall seeing provisions like that?
A I recall seeing a provision about the investments may not be -- some of the investments may not be liquid. I don't recall the portion about concentrated.
Q Okay. I'll show you that briefly.
And if we could take a look at this same document, Ms. Valencia, at page 21? If we could highlight 12, 13, and

14.

Let me give you a moment to take a look at this, Mr. Porter. And take a look at this. You'll see that it talks about illiquidity of investments and concentration of investments in small companies?

A Yes, I see these paragraphs. Mr. Spangler never went over those paragraphs with me in detail that would suggest that that's exactly what he would do to the exclusion of other investments.

Q Okay. But he provided this document to you, is that accurate?

A He provided this document to me.

Q Okay. And the documents were made available on his website?

A I don't remember that they were available on the website, but he did provide them to me.

Q Okay. All right. And he never encouraged you not to read this document; he never said, don't worry about this, just sign?

A He never said that.

Q Okay. All right. I'll move on now and hopefully still get you home, and the jury home, too.

There's some holiday parties, I believe, around wintertime, at Mr. Spangler's residence, is that right?

A That is correct, we were invited to holiday parties

routinely.
Q Did you sometimes go to those?
A Yes.
Q And when you attended, did other investors attend as well?
A Yes.
Q Okay. Are you friends with any of the other people in the group?
A Really just friends with the Douthit family, who had introduced us to Mr. Spangler.
Q Okay. But when you signed these agreements, you never believed that you would be in control of the decisions about where the investments would be placed and in what particular companies?
A When I signed the agreements, I believed that I could trust Mr. Spangler to follow the risk profiles that we had discussed over the years. So I would not necessarily be picking an individual investment, but that I could trust that we would be taking appropriate risk.
Q Okay. So you gave Mr. Spangler discretion to invest consistent with your wishes; that was your understanding? You didn't believe that you would be making the decisions yourself?
A That's correct. When we invested in venture capital firms, there was also a specific memorandum and a specific request for permission.

Q Exactly the point. My question was not precise. But I meant within the Growth and Equity vehicles. Thank you.
You invested in Who's Calling, right?
A That's correct.
Q I'm going to ask to pull up an email that is at 115.45.001. And I don't believe this has been admitted yet. So for a moment, let's not publish it.
MR. BLACKSTONE: No objection to it, Your Honor.
MR. CARPENTER: Thank you.
Your Honor, I ask that this email be admitted.
I'll give you a chance to look at it once Ms. Valencia highlights it or enlarges it for you, Mr. Porter.
THE COURT: It will be admitted.
(Exhibit(s) 115.45.001 admitted.)
BY MR. CARPENTER:
Q Okay. You did invest in Who's Calling?
A That is correct.
Q Okay. What is Who's Calling? Is that private or public?
A That was private.
Q Okay. And how did that do for you?
A We did receive a return on that. The description in the email is 46 percent on the original investment.
Q And that sounds about right to you?
A That sounds about right.
Q Okay. And I think I read somewhere that you were shocked

to learn that Mark was the CEO of TeraHop. Is my memory on that correct? Maybe it's not.
A Yes, I was surprised to learn that.
Q Okay. Did you ever receive newsletters from Mr. Spangler throughout your course of working with him?
A Yes, there were times when we received newsletters.
Q I'm going to bring up one of them, which is 327.0013. I'm sorry. Can we pull up 115.22?
And this is the PPA that I believe you discussed with my friend, Mr. Blackstone. If we can focus in on the cost basis of this, the equities line for Growth. How much money have you gotten back from the receiver so far, Mr. Porter?
A I guess roughly 119,000, in two distributions.
Q Okay. And so relative to your cost basis, that's less than half, right? The cost basis is 296-, is that right?
A That's correct.
Q Okay. And now if we could take a look at 327.0013. And perhaps go to the first page first. This is a 2004 annual newsletter that has already been admitted. When you look at this, do you think you might have received this? Does this look familiar to you at all?
A You know, I have to say, it looks a little unfamiliar. I may very well have received it, especially -- I don't remember receiving something in this particular format, vertical, with the large headline that way. But I may have.

It just does seem unfamiliar.
Q Okay. Let me ask -- I think I just have two more questions, or maybe just one. Let's take a look at page 13 of this exhibit to see if this refreshes your recollection about whether you received it or reviewed it.
If you look at the -- are you familiar with what SeekerNet is, Mr. Porter?
A I was not familiar with SeekerNet. We did not invest in SeekerNet. We were not asked to invest in that, as far as I remember.
Q Okay. It sounds like you might be even unaware that it's a predecessor to TeraHop?
A No. This is the first time hearing that.
Q Okay. Well, that might explain a couple of things then. If you did read this and it said -- when you look at this now, do you recall whether you might have read, "Mark Spangler is currently the chairman of SeekerNet"?
A I don't recall reading that.
MR. CARPENTER: Okay. Thank you for your time, sir.
THE COURT: Any redirect?
MR. BLACKSTONE: No, Your Honor.
THE COURT: Mr. Porter, thank you. You may step down. You are free to go.
All right. Ladies and gentlemen, this is going to bring us to the end of our day and the end of your week, unless any

of you want to come back and watch tomorrow morning. I'll be right here for the whole day, basically. It's an open courtroom.

Please remember the cautionary instructions. Absolutely critical during the three-day break. Back here Monday morning, same time, same place. We will do our best to start up at 9 o'clock. Have a great weekend.

(Jury leaves courtroom.)

THE COURT: All right. Counsel, we will be at recess. Have a great three days. We'll see you on Monday.

(Proceedings adjourned.)

* * * * * * * * * *

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated this April 23, 2014.

/S/ KARI McGRATH

Kari McGrath, CCR, CRR, RMR

Official Court Reporter